# Transcript of the Testimony of

# **Hanson, Charles**

**Date:** March 18, 2019

**Case:** Ryan Wesley Wilder vs. Credit Control Company, Inc.

**Bushman Court Reporting**
Crystal Garrison, CCR
Phone:  (501) 372-5115
Fax: (501) 378-0077

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RYAN WESLEY WILDER          ) PLAINTIFF
                            )
V.                          ) Case No. 4:18-CV-344-KGB
                            )
CREDIT CONTROL COMPANY,     )
INC.                        ) DEFENDANT.

---------------------------------------

ORAL DEPOSITION OF

CHARLES D. HANSON

MARCH 18, 2019

---------------------------------------

ORAL DEPOSITION OF CHARLES D. HANSON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on March 18, 2019, from 11:34 a.m. to 1:55 p.m., before Crystal Garrison, Certified Court Reporter, in and for the State of Arkansas, reported by machine shorthand, at the law offices of Jack Nelson Jones, 1 Allied Drive, Building 1, Suite 1110, Little Rock, Arkansas 72202, pursuant to the Federal Rules of Civil Procedure.

Page 2

APPEARANCES

ATTORNEY FOR THE PLAINTIFF:
MR. COREY D. McGAHA
Crowder McGaha, LLP
5507 Ranch Drive, Suite 202
Little Rock, Arkansas 72223
cmcgaha@crodermcgaha.com

ATTORNEY FOR THE DEFENDANT:
MR. STEPHEN W. JONES
Jack Nelson Jones, P.A.
1 Allied Drive, Building 1, Suite 1110
Little Rock, Arkansas 72202
sjones@jacknelsonjones.com

Page 3

EXAMINATION INDEX
                                         PAGE
CHARLES D. HANSON
   Examination by Mr. McGaha........................4
   Examination by Mr. Jones.........................87

Changes and Signature................................95

Reporter's Certificate...............................97

EXHIBIT INDEX

NO.  DESCRIPTION                          PAGE

6   Notice of Deposition, 4 pages....................30

7   Notice of 30(b)(6) Deposition, 4 pages...........30

8   Policy Manual/Ironclad Rules, 16 pages...........31

9   Raw data received from MEMS, 11 pages............39

10  E-mails between Carol and Randy, 2 pages.........80

11  Complaint filed with AG's Office, 30 pages.......82

Page 4

CHARLES D. HANSON,

having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. McGAHA:

Q.  Mr. Hanson, I'm Cory McGaha; I represent Ryan Wilder in this case.

A.  Yes, sir.

Q.  And would you please state your name for the record.

A.  Charles D. Hanson, H-A-N-S-O-N.

Q.  And, Mr. Hanson, you were in the conference room when Mr. Wilder was deposed just a few minutes ago for about an hour; is that correct?

A.  Yes, sir.

Q.  And you heard everything he had to say about the case?

A.  Yes, sir.

Q.  Okay. Mr. Hanson, what is your work and home addresses?

A.  The work address is Credit Control Company Incorporated, 10201 West Markham, Suite 104, Little Rock, Arkansas 72205. My home address is 2124 Arkansas Valley Drive, Little Rock, Arkansas 72212.

Q.  And how long have you lived at your home address?

A.  About five years, I believe. That's actually the family home. I moved back in there to take care of my

1  (Pages 1 to 4)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 5

elderly mother.

Q. Okay. And are you married?

A. No, sir.

Q. Okay. Do you have brothers and sisters?

A. Yes, sir.

Q. Can you tell me your brothers and sisters names?

A. The surviving brothers and sisters, my brother is Randy Hanson; my sister is Patty Hanson.

Q. And your mother's name is what?

A. Gloria.

Q. And do all three of those people live in Pulaski County or central Arkansas?

A. Yes.

Q. And does Randy Hanson also work for Credit Control?

A. Yes, sir.

Q. Does your sister work for Credit Control?

A. No, sir.

Q. Did your mother at any time work for Credit Control or your father?

A. My father founded the company in 1972; he has since passed away.

Q. Were you born in Little Rock?

A. Yes, sir.

Q. Have you ever lived anywhere else, other than Little Rock?

Page 6

A. A very very brief time in the dorm rooms in Fayetteville, but that was many many years ago.

Q. Okay. And Fayetteville, I take it you went to the University of Arkansas; is that correct?

A. Yes.

Q. Can you tell me what your educational background is.

A. I spent a year at Fayetteville and then returned back to Little Rock.

Q. And did you go to high school in Little Rock?

A. Yes, sir.

Q. And which high school did you attend?

A. Little Rock Central.

Q. And when did you graduate?

A. 1984.

Q. And did you go to Fayetteville immediately after that?

A. About a year, there was a gap year.

Q. Okay. And what did you do in between the time you graduated from Little Rock Central and you went to the University of Arkansas for a year?

A. I worked for Credit Control Company.

Q. Okay. And why did you leave the University of Arkansas?

A. I was 18 years old and was not as dedicated to my studies as I should have been.

Page 7

Q. And what year was that?

A. 1985.

Q. And what did you do after you left the University of Arkansas for employment?

A. I came back to Little Rock and I went to work for my father.

Q. At Credit Control?

A. At Credit Control, yes, sir.

Q. And have you worked at Credit Control since 1985 when you left the university?

A. Not consecutively, no, sir.

Q. Okay. Let's just go from 1985 until -- what year did you work for Credit Control the first time?

A. The first time was, you know, as a very young teenager doing data entry and emptying trash cans.

Q. Okay. So let's go from the time you left the University of Arkansas and I think you said you left the University of Arkansas and you went to work for Credit Control?

A. Yes, sir.

Q. How many years did you work for Credit Control at that point?

A. I would say approximately four to five years, somewhere in that range.

Q. And what did you do for them, for Credit Control?

Page 8

A. Immediately when I came back, I still -- I did data entry. I did I.T. work. And I did some work as a collector.

Q. Okay. And what job did you take when you left Credit Control that first time?

A. I actually went to work for a car dealership, Jones Toyota Volvo doing collections for them.

Q. And where was Jones Toyota Volvo? Was that here in Little Rock?

A. Yes, sir. They were out on South University.

Q. Okay. And you said you were doing collections for them. Did they do their own in-house financing at that time?

A. They had several in-house financing lots. I did collections on those accounts. There was some recourse with the bank that I collected on. And I collected some commercial accounts for their parts department where they would sell parts to body shops and things like that.

Q. Is that dealership still in existence?

A. No, sir.

Q. And how long did you work for Jones Toyota?

A. Again, I've got to give you ballparks. I would say five to six years.

Q. And always doing collections or did you have other

2 (Pages 5 to 8)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 9

job duties?

A. I did a whole lot of other things. I was, again, hired to do collections. I also -- by default, I ended up doing a lot of I.T. work for them. Over the years, as things needed to be done because they had let somebody go, I did everything from business management to doing payroll to, at one point, after they fired their advertising agency, for about six months, I did basically everything an advertising agency does for them.

Q. Okay. How big was Jones Toyota's collection department?

A. There were two of us.

Q. And who was the other person?

A. Very nice older lady, Bonnie. I believe her last name was McAllister.

Q. Okay. And you said you worked for Jones Toyota for four or five years, I think, or five or six?

A. Yes, sir.

Q. And why did you leave Jones Toyota?

A. They were selling the dealership.

Q. Okay. And did you not want to stay with the new owners or the owners did not do collections or what was the reason that you moved on to do something else?

A. They sold the Volvo to -- I believe it was North

Page 10

Point at the time. They sold the Toyota part of the dealership to another group that was actually an automotive group out of New Jersey. They were -- it was be a big corporate deal. They were bringing in lot of their own people from out of state.

Q. Okay. So what did you do for employment when you left Jones Toyota?

A. I actually worked for about a year or two doing freelance consulting and I.T. work. I actually did some work for North Point Volvo in transitioning their systems, helping getting the Volvo systems installed and get everything set up for them; and I did some for the Toyota dealership, too.

Q. And you --

A. And other clients.

Q. Were you just a sole proprietorship --

A. Yeah.

Q. -- or did you have a corporation?

A. No. Just --

Q. 1099?

A. Yes.

Q. Okay. How long did you do that for your primary source of income?

A. About two years.

Q. Okay. And what did you do after you stopped doing

Page 11

the freelance or you went, I guess, to be employed somewhere else?

A. Yes.

Q. And where was that?

A. I worked for G.C. Services.

Q. And what is G.C. Services?

A. That is a national collection agency based out of Houston, Texas.

Q. Okay.

A. They were just opening their first office here in Little Rock that was going to be a pretty large deal. And I went to work for them just a couple weeks before they actually started business.

Q. And what year was that, about?

A. Mid '90s, '96.

Q. Do they have an actual office here?

A. Yes, sir.

Q. And where was the office?

A. Out on Executive Center Drive, kind of off near Kanis, that part of town.

Q. How many people did they employ in their Little Rock office?

A. At any given time, with a full complement of collectors, we had 535 collectors.

Q. In Little Rock?

Page 12

A. Yes, sir.

Q. Okay. And what were --

A. Plus add more people in admin and H.R. and things like that. But on the collection floor, there were 535.

Q. And what were your job duties for G.C. Services?

A. When I initially was employed there, I was hired to be a unit manager, meaning they had teams of collectors that were supposed to average around 12; but sometimes it got as high as 20. And a unit manager was the collector -- was the manager over that group of collectors.

So, when I started there as a unit manager, actually, I had one of the larger teams. I had sometimes in the low 20s of collectors that worked directly for me.

Q. So were there 535 collectors on the floor at one time?

A. No, sir. We could seat about 230 at any given time. But we ran three shifts a day, 7:00 a.m. to 11:00 p.m., seven days a week.

Q. Okay. How many units managers were there besides you?

A. It fluctuated, but in the neighborhood of 12 to 15.

Q. And would G.C. Services attempt to collect debts through phone calls?

3 (Pages 9 to 12)

Crystal Garrison, CCR

Bushman Court Reporting                                           501-372-5115

Page 13

A. Yes, sir.

Q. And collect debts through collection letters?

A. We did not do any letters whatsoever.

Q. Okay.

A. This was basically first-party collections as opposed to third-party. G.C. -- nationally, they did all kinds of things. We only did one thing in the Little Rock office, and our client was Sprint. We called for them as agents for Sprint to let people know they still had -- their phones were working; they were still customers; they were behind. And our job was to call them and try and solicit payment.

Q. Okay. Did Sprint own G.C. Services?

A. No, sir.

Q. Okay. And G.C. Services was just hired by Sprint to collect?

A. Correct.

Q. Okay.

A. We were one of three different agencies nationally that they used.

Q. And how long did you work for G.C. Services as a unit manager?

A. I was a unit manager for four or five months before I was promoted to assistant manager, which there were three -- generally, three assistant managers that were

Page 14

like the next tier up. And working underneath us was a group of unit managers.

Q. And how many unit managers did you manage as assistant manager?

A. You had four or five, six, depending on how many units we had at that particular time.

Q. Okay. Going back to the Jones Toyota, what was the method of collections for Jones Toyota? Was it phone calls, letters?

A. Again, it was pretty much -- we had a few letters that we would use. But that was few and far between. It was primarily telephone collections.

Q. Okay. And at Jones Toyota, you were collecting on promissory notes that were secured by vehicles; is that correct?

A. That is correct.

Q. Okay. Were you ever in charge of authorizing a repossession of a vehicle?

A. Yes, sir.

Q. Ever in charge of filing a writ of possession if the self-help remedy wasn't satisfactory?

A. I'm just trying to remember. That was something that we discussed. But you're talking like on a deficiency judgment?

Q. No, I'm saying if you -- I'm just asking: At Jones

Page 15

Toyota, you said that you would send obviously repossession agents out if somebody got so far behind they had to have a self-help repossession; correct?

A. Correct.

Q. I'm asking: Did you ever have to go to court to get a writ of possession for a vehicle?

A. No, sir.

Q. Okay.

A. We did not pursue things in -- even if they sold the car, if it did not cover the amount that they owed, we did not pursue that on deficiency judgments.

Q. Okay. So, you didn't have anything to do with filing lawsuits to collect deficiencies on the notes while you were at Jones Toyota?

A. No, sir.

Q. Okay. And you -- so let's go back to G.C. Services. How long did you work for G.C. Services?

A. Again, three to four years. From unit manager to assistant manager to, eventually, I was the collection manager.

Q. Okay. So you went from unit manager to assistant manager all the way to -- and collection manager is a step above the assistant manager; is that correct?

A. Yes, sir.

Q. Okay.

Page 16

A. At that point, I had assistant managers that answered to me. And my boss was the general manager of the entire facility.

Q. Okay. And how many other collection managers were there?

A. There were two of us.

Q. Okay. So you were in charge of basically everybody on the floor at that point if you're collection manager; is that correct?

A. Yes, sir. Our division of labor -- previously, you would have -- each collection manager would have so many assistant managers under them in just that tiered structure. We kind of split it up when I took it over. And I was basically responsible for the collection floor, traffic department, and I.T. The other collection manager was more involved with the H.R. end of it, the administrative parts of things.

Q. Okay. So, fair to say as assistant manager, you were more in charge of the actual collections on the account and the other assistant manager was more in charge of H.R. and managing?

A. These were when we were at collection manager, yes, sir.

Q. Okay.

A. But that would be correct.

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 17

Q. And how long were you the collection manager at G.C. Services?

A. That was probably my final year there.

Q. And what year was that, about?

A. Now, we're talking very end of the '90s, '98, '99, somewhere in that vicinity, I believe.

Q. Okay. And how did your employment at G.C. Services come to an end?

A. They shut down the Little Rock office.

Q. Okay.

A. They moved -- we were a Sprint outbound call center. They moved it from Little Rock, Arkansas to Saskatoon, Saskatchewan. I was not willing to move to Canada.

Q. Okay. They offered you the chance to move to --

A. They offered me the chance to move to Canada, which I declined. They offered to go to one of their other offices, either in St. Louis or in Houston. And I declined that offer, too. My family is here. My kids were here. That wasn't -- leaving town was not something I wanted to do.

Q. Okay. And what did you do for employment at that point?

A. After that, I went to work for a -- I'm almost embarrassed to say this. But I went to work for a company that was a fast cash payday loan kind of place.

Page 18

Q. And which company was that?

A. It was Fast Cash was the name of it, out of Fordyce.

Q. Okay. Did they have an office in Little Rock?

A. They did. They had 17 locations throughout Arkansas.

Q. But they were headquartered in Fordyce?

A. Yes, sir.

Q. And you were in Little Rock?

A. Yes, sir.

Q. And were you involved in collections on the payday loans or giving the loans?

A. Collections.

Q. Okay.

A. They hired me to be the collection manager for all 17 of the stores.

Q. And how long did you do that job?

A. I did that about six months before I had reached the point where I realized that this was not a type of business I wanted to be involved in.

Q. Okay. And when you moved on from Fast Cash, what did you do?

A. I went to work for First Collections of Little Rock.

Q. And what is First Collections? Is that a local collection agency?

A. Yes, sir. Out on Otter Creek out in Mabelvale.

Page 19

Q. And they're still around?

A. Yes, sir.

Q. Okay. And what did you do for First Collections?

A. I went to apply for the job there, and they told me that they did not have a collector management position available; if they did, that he would certainly have hired me. And I told the man that was the collection manager that was okay; I absolutely had to get out of this business that I didn't think was ethical, to be honest, on the payday loans.

Q. You mean the Fast Cash business?

A. Yes. I didn't want to have anything to do with it anymore. And if he doesn't have a collector management job, that's okay; give me a phone and a computer and I'll be a collector for you.

Q. Okay.

A. Which is what I did.

Q. And at Fast Cash, did you -- did Fast Cash try to collect through phone calls?

A. Yes.

Q. Did they try to collect through dunning letters?

A. Both.

Q. Both?

A. Primarily, again, it was by phone.

Q. And did they ever try to collect through litigation

Page 20

by --

A. No, sir.

Q. -- filing lawsuits against people?

A. (Shaking head.)

Q. Okay. First Collections in Otter Creek, you were just an on-the-floor collector; is that correct?

A. That is what I was hired to do.

Q. Okay. And how long were you just a collector on the floor for First Collections?

A. Right around or maybe a little less than 90 days.

Q. Okay. And you were trying to collect by phone?

A. Yes, sir.

Q. First Collections collects by letters; correct?

A. Yes.

Q. Okay. And what happened after 90 days?

A. At First Collections they had a predictive dialer that we were working on. And I noticed some things that seemed to really be inefficient on the way that it worked. So I went to the owner and said, "If we could restructure this so it would work in this fashion, I think we would be more successful." And he said, "Well, it's an old dialer and we don't know how to do that." And I said, "Well, I do."

Q. Uh-huh.

A. So, that was the last day I was on the floor. I

5 (Pages 17 to 20)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 21

took over managing, to begin with, the predictive dialer and more of an I.T. role at that point. But also involved, you know, setting up the strategies for that from a collection management standpoint.

Q. What's a predictive dialer?

A. It is sometimes referred to as the "robo" dialers. It is a dialing system where you've got all of the information in the computer. It attempts to dial a telephone number. When it makes a connection with someone, it passes it to an agent then.

Q. It's not an actual person dialing the initial phone number; correct?

A. Correct.

Q. Okay. And how long did you work as or work to be in charge of the predictive dialer at First Collections?

A. I did that. There's no definitive timeline. I did the predictive dialer for the rest of my employment with them. Also, at various times, I became a collection manager; I did a lot of that. And I also did a lot basically with just the overall collection strategy for the company.

Q. Okay. And how long did you work at First Collections?

A. Till about 2006, I believe.

Q. Okay. So how many years did you work for them?

Page 22

A. Again, six or seven years, thereabouts.

Q. And the last six -- other than the first 90 days, the latter part of that employment was all related to the predictive dialer, basically?

A. It was predictive dialer; it was overall collection management, either with one particular team or with the floor in general. It was -- we called it collection strategies in our computer system how we're setting it up. So we're saying what collector sees what account at what time to be most effective in use of time.

Q. Okay. How were you compensated as a collector on the floor at First Collections? Are you just on a commission?

A. Collectors on the floor were compensated with a base rate. If you collected over a set amount of whatever your target goal was -- prior to that, you were just on -- you were an hourly employee. If you reached your collection goal, then you got a percentage of the fees that you collected after that point.

Q. Okay. And how were you compensated once you moved on to the --

A. Salary.

Q. Just straight salary?

A. Yes, sir.

Q. Okay. When did you leave First Collections?

Page 23

A. That would have been about 2006.

Q. And why did you leave First Collections?

A. It was a situation where being on straight salary, I was working 10 to 12 hours a day and then had an owner that liked to call me in the evening hours. And he's a wonderful man; I'm still friends with him today, but I was putting a whole lot of time into that. And I was at a point where I had just recently gotten divorced and I needed to scale back and spend a little bit more time -- well, not working 12 to 15 hours a day.

Q. Okay. It's not like that in law firms; you don't ever get calls after you go home. Okay. And so, where did you go to -- what did you do for employment after you left First Collections?

A. After that, a friend of mine and myself started doing -- we started our own deal we call NCG or Network Consultants Group. And so, he's actually -- his daytime job, he's a system administrator for UAMS, long-time computer geek. So the two of us got together to do that, setting up computer systems and software, doing some support for that for various clients.

Q. And you said there were three of you?

A. Two of us.

Q. Two of you?

A. Uh-huh.

Page 24

Q. Who was the other person that you went into business with?

A. Larry Foshee, F-O-S-H-E-E.

Q. Does he live here in Little Rock?

A. Yes.

Q. Do you have any employees at NCG?

A. No, just the two of us.

Q. Sounds like you're just doing IT work for companies; is that basically it?

A. Yes.

Q. Was that successful?

A. To a degree. Not as successful as we really wanted it to be because every client that we had were basically either someone we knew from other contacts or were referred to us by an existing client. We basically came to the conclusion that while both of us were fairly good at IT, neither one of us was a salesman. And it was very difficult -- we tried, but it was very difficult to get new clients other than just the word-of-mouth deal. Cold calling people for sales was neither of our strength.

Q. Okay. And I take it that NCG is no longer in existence?

A. Correct.

Q. Did y'all shut the company down voluntarily?

6 (Pages 21 to 24)

Page 25

A. Yes.

Q. And about what year was that?

A. That would have been -- well, end of 2013 was basically the end of my involvement. Larry, I think, kept it up for a little while longer, maybe another six months, before he closed that down. And then I think there's a -- he still has one existing client that predated NCG and postdated, it's a dental office that he's done work for 25 years. And he still does that on the side, but I don't have any involvement with that.

Q. What year did you stop having any involvement with NCG?

A. That would have been the end of 2013.

Q. 2013, okay. And so, what did you do for employment after that?

A. Well, and part of the reason why I left that was that I'm fairly certain it was Thanksgiving of 2013 at our family Thanksgiving dinner, my brother asked me if I would come back to Credit Control.

Q. Okay. And your brother is Randy Hanson; correct?

A. Yes, sir.

Q. And at that point, was Randy the sole shareholder of Credit Control or how did the ownership of the corporation work?

A. Randy is CEO, primary shareholder. The other stock

Page 26

shares in Credit Control Company -- I believe there's maybe 10 percent that Dad had given to a former employee in the early '70s. But the other 90 percent either resides with my brother or in my father's living trust.

Q. Gotcha. Okay.

A. Or possibly my mother. That breakdown of who has what, I honestly couldn't tell you exactly. But 90 percent of the company is held by the family.

Q. And what is your job title at Credit Control?

A. I am in charge of daily operations in Credit Control Company.

Q. Do you work on a salary?

A. Yes, sir.

Q. Do you get any commission?

A. No, sir.

Q. You're on a straight salary?

A. Yes, sir.

Q. And how many people do you supervise?

A. There are eight employees, not including myself and my brother.

Q. And those eight employees are all debt collectors?

A. No, sir.

Q. No?

A. Four people are collectors.

Q. And the other four people are administrative?

Page 27

A. We have administrative and legal.

Q. And legal?

A. Uh-huh.

Q. Okay. Who is the -- who are the names of the people in the administrative positions?

A. We have Miles Harris and Don Anderson. So, actually, I miscounted; there are seven employees besides my brother and myself.

Q. Okay. And you said there's a legal department; is that correct?

A. Yes.

Q. Okay. And who is in the legal department?

A. That would be Ms. Cindy Craft.

Q. And is Cindy Craft an attorney?

A. No.

Q. Okay. And why is she considered to be in the legal department?

A. Because her job is -- she does a lot of typing and preparation of things. But her job is mainly to work with Mr. Jones.

Q. Okay. At any point today, I'm not going to ask you what you've talked to Mr. Jones about or your policies in general. And I'm sure Mr. Jones will object if he thinks that you may answer about something that you've communicated to him. But that's not my intention today.

Page 28

A. Sure.

Q. So what are the names of the four collectors that actually collect debt for Credit Control?

A. Are you asking --

MR. JONES: Let me interject at this point. We've had the discussion before about desk names versus actual names.

MR. McGAHA: Sure. And I'm asking for actual names.

MR. JONES: I'd like to put that under the confidentiality agreement.

MR. McGAHA: Sure.

Q. (BY MR. McGAHA) You can answer with their actual names.

A. Okay. That would be Marianne ████, Carol ████, Karen ████, and Jeff ████.

Q. Okay. And do each of those four people use aliases?

A. Yes, sir.

Q. Okay. And what are the aliases for each of those four people?

A. In the same order, it would be Mary Scott, Carol Lewis, Karen Day, and Lee Ellis.

Q. Okay. And have you basically had the same position at Credit Control since Randy Hanson asked you to come and work there?

A. Since I returned at the very very end of 2013, yes,

Page 29

sir.

Q. Okay. And I don't want to put words in your mouth. But I take it that you're not -- you don't get any type of commission on the amount of money that Credit Control collects; you're just straight salary?

A. That's correct.

Q. And you're a beneficiary under the Hanson family trust. Do you receive any disbursements from that?

A. No, sir.

Q. Okay. Did you review any documents before your deposition today to get ready for your deposition?

A. Yes, sir.

Q. And do you remember what those documents are?

A. They were my copies of everything that you and Mr. Jones have filed.

Q. Everything that we've filed in the lawsuit?

A. Complaints, answers, interrogatories.

Q. Did you review any documents that we've produced to you in response for discovery requests? And when I say we, Mr. Wilder.

A. Not to my knowledge. Again, I've -- I have my file of copies of everything that has been filed or has been entered into evidence in there.

Q. Okay.

A. And that is all that I have.

Page 30

Q. Do you know whether or not you've reviewed Mr. Wilder's initial disclosures?

A. You would have to help me out and remind me of which document that is. There's a lot of them. And I may not know them by the same name that you do.

(Exhibits 6 and 7 marked for identification.)

Q. (BY MR. HANSON) Okay. I'm going to give you what we've marked -- Exhibit 6 is your Charles Hanson deposition notice and No. 7 is the 30(b)(6) for Credit Control Company.

A. Yes, sir.

Q. And, if you would, just take a minute and look through Exhibit 7. And my question is: Have you seen that deposition notice before?

A. This document?

Q. Yes.

A. Yes, sir.

Q. Okay. And are you qualified to speak on each of the topics that are numbered in the deposition topics? I think it's about 20. I'm not exactly --

A. Yes, sir, I am.

Q. That's 24 topics. And you can testify about all of those topics today?

A. To the best of my ability, yes, sir.

MR. McGAHA: Okay. This is No. 8. Policy manual, I

Page 31

think, is what we can refer to it as.

(Exhibit No. 8 marked for identification.)

Q. (BY MR. McGAHA) Can you identify Exhibit No. 8? It was produced by Credit Control in this case.

A. Yes, sir.

Q. And what is this document?

A. This is what my father always referred to as his Ironclad Rules. These are rules, thoughts, theories, and philosophies of Credit Control Company that we wrote when he started the company 47 years ago.

Q. Okay. And remind me what your father's name is.

A. Charles L. Hanson.

Q. Charles L. Hanson?

A. Yes, sir.

Q. Okay. And did he come up with this document on his own?

A. To the best of my knowledge, yes, sir.

Q. And do you know when he actually wrote this document?

A. It would have been very very early in the history of the company. And, I mean, in February of 1972 when he founded it, he was the sole employee. So I would imagine within the next couple of years when he started hiring other employees is when he would have put this together.

Page 32

Q. Okay. And does -- do all the debt collectors at Credit Control get a copy of this document when they're hired?

A. Everyone certainly as part of the initial training is going to read through this document, yes, sir.

Q. Okay. And has it been updated from the first version; do you know?

A. Very little. And that's why there are certainly some things in here that don't necessarily apply to today.

Q. Okay. If you will look, the pages aren't numbered, so it's a little tough --

A. Sure.

Q. But there's a section towards the end that says: Collecting by telephone. It's about seven pages from the back. It's about the bottom tenth of the page.

A. I believe I have it.

Q. It says: Collecting by phone. And if you turn over to the next page, it goes down -- excuse me, one more -- where am I looking? Where it talks about some language underlined: "Must be paid today and in full." Do you see that part of it --

A. Yes, sir.

Q. -- where it says for instance? Does Credit Control now -- if Credit Control is collecting a debt for MEMS,

Page 33

do they always require payment in full from the debtor or not?

A. It has always been the policy of the company from Day 1 with Dad that when an account is placed with our office for collection, it is due and payable in full. Now, my collectors, I give some leeway to. They all have many many years of experience in the business. I expect them to evaluate the circumstance.

And they have the ability to set up partial payments on an account if that is the best possible situation. We're never going to ask anybody to do something that they can't do. By the same token if you owe a thousand dollars, five dollars a month is not going to make it.

They are given that leeway to make the best possible decision for our company, for the client, and for the debtor.

Q. Okay. So your collectors have some flexibility about whether payments can be made over time or whether or not payment must be made in full?

A. The goal is always going to be payment in full today. But, yes, they have the flexibility to evaluate that situation and try and make a good decision.

Q. Okay. Can your collectors accept payment by credit card?

A. Absolutely.

Page 34

Q. And can they accept payment by credit card over the phone?

A. Yes.

Q. And do your collectors suggest that the debtors or the consumers they're collecting debts from apply for credit cards to pay their debts?

A. What we are going to do is -- as part of evaluating the situation to find out what situation someone is in, we're going to try and help them find a method to get that paid. If that -- you know, personally, I have suggested that people -- well, you know, can you get an advance from your employer? Can you borrow some money from a relative? Do you have a credit card? Do you want to look at that, just as possible solutions of ways that they can get this taken care of as quickly as possible not only for our benefit but for theirs.

Q. Okay. But you were in the conference room when Mr. Wilder was testifying; correct?

A. Yes, sir.

Q. And do you have -- and he testified that Carol at Credit Control asked him to get a credit card to pay the debt that was being collected on; is that correct?

A. That is what he stated, yes.

Q. Okay. And that wouldn't be unusual for one of your collectors to suggest that a consumer or a debtor get a

Page 35

credit card to pay some of the debt or all of the debt?

A. Well, absolutely, we are going to offer suggestions of how they might can resolve it. And that certainly is an option. "Do you have a credit card?" Particularly, do you have somebody that has a fairly large bill and they say, "I can only pay $25 a month."

"Well, have you considered possibly paying this off with your credit card and then making small monthly payments to them," as a way to resolve that debt.

Q. Okay. And if you will turn over to the next page or it's actually about three pages back. It's got a list of telephone dos and telephone don'ts.

A. Yes, sir.

Q. And it says on the telephone don'ts is a list of ten things. Don't -- for instance, No. 1: "Don't antagonize people." Is there -- is there a reason your father put that into this list of things that your collectors should not do?

A. Absolutely. And that situation is, obviously, Dad wrote this before the passage of the Fair Debt Collections Practices Act. There was no -- there was no federal law that governed collection agencies at that time in 1972.

As a result, there were certainly some collection agencies that acted like it was the wild west. That is

Page 36

not the atmosphere -- you have people coming from another collection agency to work for any father; that was not the atmosphere that he wanted to create and that was not how he wanted to do business.

Q. Okay. And it also says, No. 5: "Don't adopt a quote/unquote hard-boiled attitude." Do you know what that policy means?

A. Again, dealing with some folks that may have worked in a different environment that want to come out and tell people -- be overly aggressive and possibly rude to people as opposed to his theory that we want to help you get this bill resolved.

Q. It looks like if you look at the next page, it says: "Office interviews." And I just take it from having this in your father's policy that he wrote that he would try to encourage consumers or debtors to come to the office and make payments; is that correct?

A. Yes, sir. But once again, this has not been updated. We very rarely at this point have people come to the office. Somebody is certainly welcome to. They can come by and make a payment. That happens so very very infrequently now, just by the same thing, there's something towards the beginning about we don't take payments over the telephone; that was absolutely true in 1972; that is certainly not true now.

Hanson, Charles 3/18/2019                     Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 37

Q. Okay.

A. If you call me up and say, "I've got a debit card. Can I pay this in full today," we'll absolutely do it. So that's just some things that are holdovers from other days.

Q. Okay. And did your father ever encourage collectors -- I mean, he didn't ever encourage collectors to go to somebody's house to try to collect a debt or anything?

A. No, sir.

Q. And Credit Control doesn't do that today; do you?

A. I think the only time that that happened was in the very very early days when Dad was the sole employee.

Q. Okay.

A. I've heard tales that he used to do that.

Q. Okay.

A. But after his first employee, that never happened again. And we do not do that today.

Q. Okay. And do your collectors know that they don't go to consumer's or debtor's houses today to collect debts?

A. Absolutely.

Q. Okay.

A. I think if I asked that, they would all be very upset.

Q. Is there any other policies or procedures that

Page 38

Credit Control has reduced in writing, other than Exhibit No. 8?

A. In writing, the only other thing that we would have is an exact printout of the FDCPA.

Q. The actual text --

A. Yeah.

Q. -- of the FDCPA?

A. Not annotated or anything else. I go to the website and I print out from the government website: Here is the Fair Debt Collection Practices Act. And everyone in my office has a copy of it somewhere.

Q. If when a collector is hired and they read what is in Exhibit No. 8, are they ever required to go back and read it again after the initial hire?

A. No, sir. It is certainly available. They have that opportunity. But they're not required to, no.

Q. And so, Exhibit No. 8 is stored in Credit Control's normal course of business and it relates to debt collection activities in general; correct?

A. Yes, sir.

Q. Not to Ryan Wilder specifically?

A. Absolutely, that's correct.

Q. Did you do anything to investigate the claims that Ryan Wilder made in the complaint when it was served on Credit Control?

Page 39

A. I certainly reviewed all of our notes, which I believe you have a copy of.

Q. Anything else?

A. No, sir. Not to my knowledge.

(Exhibit No. 9 marked for identification.)

Q. (BY MR. McGAHA) I'm going to hand you Exhibit 9. This is a document that, Mr. Hanson, was produced by Credit Control in this case.

MR. McGAHA: Did I give you two of those, Steve?

MR. JONES: Not unless they're stapled together. No, just one. Do you need this one back?

MR. McGAHA: Yeah. Sorry.

A. This is -- the very first page of this is a printout of the data that I received from MEMS ambulance at the point that they assigned the account to me. I understand it is very difficult to read. It is not meant to be read by humans. It is an electronic file assignment.

I get these files from MEMS. And then I have programs that parse out that data and put it into the right categories as far as name, address, Social Security number, balance, all of these things. But this is the raw data that I received from MEMS on the account.

Q. And you just receive this in some type of software

Page 40

program from MEMS, I take it; is that correct?

A. Yes. They transmit it to me usually on a weekly basis. And then I run it through my programs that reformat it to be acceptable to my collection software and then load it into our computer system that way.

Q. And can you tell me -- it looks like there's -- it says 5/21/17 and 04/03/16. Are those dates?

A. Yes, sir.

Q. Okay. So how many accounts were placed for collection with Credit Control?

A. Three accounts. There were two on 05/17. If you'll see about halfway down where it states his name again?

Q. Uh-huh.

A. That is the second of the two accounts placed on that date. The entry at bottom was the account that was placed with our office on April the 3rd of 2016. So there are three accounts in total.

Q. Okay. And will you turn the page?

A. Yes, sir.

Q. And the second page, just for reference -- I mean, at the top, it says AGN/amount 888.75. And then it says received 479.74. In which account does -- or what is this document?

A. This --

Q. There's about four pages of some type of document

10 (Pages 37 to 40)

Page 41

that relates to a specific account.

A. Right.

Q. And what is that?

A. What this is -- and there should be, again, three of these. Three are the printouts from my collection system of the information that we have. And it breaks down -- on this one, it has my account number. If you will look -- let's see -- in the left-hand column about two-thirds of the way down where it says client reference number, 16-93778, that is MEMS run number. So that's how you can relate that to the trip information from MEMS.

Q. And just so we're all on the same page, we're at the second, third, fourth, and fifth page of Exhibit 9 is a printout from Credit Control's collection software on one of Ryan Wilder's account; correct?

A. Yes, sir. On that run that's referenced there as a client reference number.

Q. Okay. And below that, it has financial information for this account, and it's got some numbers there on the left like (39) and (54). What do those numbers mean?

A. Those numbers are -- just relate to where in my system that that particular piece of information is stored. It's a reference -- it's an internal reference number that tells me that line 39 on the fiscal screen

Page 42

contains the batch number or that type of information.

Q. And what is the name of your collection system?

A. It is the -- it's called The Collector System from Columbia Ultimate Business Systems or CUBS, as they're commonly referred.

Q. And below the financial information, there's a little field that says note for account 81750?

A. Yes, sir.

Q. Okay.

A. That is my internal account number for this one run.

Q. And then it looks to me the parentheticals start in a chronological --

A. Yes, sir.

Q. -- number system. Can you explain that to me?

A. Well, when you're down into that section, these notes are our memo fields. And they're numbered just sequentially. And it is as you enter them, so it will be chronological. It will have a time and a date stamp and then the -- whatever the action or the note was.

Q. So it looks like something happened on May the 21st, 2017, when this account was placed for collection; correct?

A. Yes, sir.

Q. And is this just basically notations that the account was opened up?

Page 43

A. The --

Q. When you look at (9) through, you know, (16)?

A. Yes.

Q. Okay.

A. This is -- again, this is when the account was assigned from 9 to, yeah, 16, these are all just internal system-generated notes. The computer actually puts those on there where it just checks various things as this account -- is it in Arkansas or is it an out-of-state account? Do we have phone numbers on the account? It makes those checks.

Q. Okay. Looks like, fair to say, 1 through 15 is basically an automated process?

A. Yes, sir.

Q. And what about 16 through 21 that happened on May 22nd? What does that mean?

A. 16 -- it says 0PRIM. What that means -- if I have multiple accounts on one individual, we packet those accounts together. And the initial part of that is also a system-generated deal. And that's what that line 15 says: The system added it to that packet because we have more than one account on Mr. Wilder. You know, obviously, the reason we do that is somebody's got ten ambulance runs, I don't want to call him ten times and he doesn't want me to call him ten times. We're going

Page 44

to associate those together so that we can make one telephone call and handle all of the business at one time.

Q. Okay. And then it looks like from (22) down to about (54), some things happened on May the 24th of 2017 with these -- I guess these three accounts; is that correct?

A. At this point, I believe we only had two of the accounts tied together. We did not have the previous account -- we had tied together the two that came in on the same day. We did not have the account from the previous year as part of that packet.

Q. Okay. Why didn't you have the account from the previous year as part of the packet?

A. Because it initially came over with a different Social Security number. When my system ties these things together, I have a weighted scale that says: If the name, address, Social Security number, date of birth are all the same, then that's going to be the same individual; we're going to tie them together.

If I have just a name or even a name and an address, I'm not going to packet those together because I don't have an assurance that that is the same guy. Even with an address, it could be is a Jr. or a Sr. I need more information to make sure that I am dealing with the same

Page 45

person.

So when the previous account had come over to us with a different Social Security number, my system didn't associate that and thought it must not be the same guy. So it was just the two that were assigned on the May 21st date that were packeted together.

Q. Okay. So, starting at -- let's just go through this.

A. Okay.

Q. Starting at (22), it looks like there is a certain entry. It says 13:03. Is that a time?

A. Yes, sir.

Q. Okay. Is that 1:03 --

A. Yes, sir.

Q. -- in the afternoon --

A. Uh-huh.

Q. -- on May 24th? And what does this indicate happened at that time when it says: Per tie name is Ryan Wesley Wilder?

A. This is the point where the collector is first looking at the account. And that is the initials at the end is the initials of whoever made the notes.

Q. And who made the note?

A. That's CLZ is Carol.

Q. And Carol's alias is what?

Page 46

A. Carol Lewis.

Q. And Carol's real name is what?

A. Carol ███.

Q. And that's subject to Mr. Jones' designation under the confidentiality order as protected information.

A. Right.

MR. JONES: Thank you.

Q. (BY MR. McGAHA) Okay. And every time you see CLZ, that's Carol Lewis or Carol ███?

A. Yes, sir, that's correct.

Q. Okay. And 1305, something -- what happens at 1305 or 1:05 in the afternoon on May the 24th?

A. First line, line 22, she pulls up the account, she's looking at it, per tie, in that case, she's meaning the account that is tied to this one. She's looking at both of them and saying that his full name is Ryan Wesley -- looks like misspelled, but Ryan Wesley Wilder.

Her next -- 1305, her next step, she's checking online to see if there is Medicaid available for this individual. And she says that, per her check, nothing was found.

Q. And at this point, she's collecting on the two MEMS accounts or she is working on the two MEMS accounts that were placed for collection on May 21st, 2017, for Ryan Wesley Wilder; correct?

Page 47

A. Yes, sir.

Q. Okay. And then what happens at the next entry in (27) at 1:05 or 13:05 on May 24th, 2017?

A. Okay. "Checked electronic notes," meaning the first part of those notes in there with that information from our client. She's reviewing those and, at that point, no insurance had been paid. And then at 1307 is when she calls and makes the first attempt to contact Mr. Wilder.

Q. Okay. And (27), you said it indicates no insurance has been paid. Did Credit Control at that point know whether any claim had been submitted to Mr. Wilder's insurance?

A. No, sir.

Q. And does it rely on MEMS for that information? Does Credit Control rely on MEMS to submit medical bills to insurance companies --

A. Absolutely.

Q. -- before they're placed at Credit Control?

A. Yes, sir.

Q. Okay.

A. They will do so if they have that information.

Q. And you know that how?

A. Just from having worked with them for over 20 years, that if they have insurance information available to

Page 48

them, they will file it. There are certainly circumstances where we acquire insurance information and pass it along to them for them to file that claim and they keep us apprised of the status of that claim.

Q. Do you know whether MEMS had Ryan Wilder's insurance information before they placed the accounts with Credit Control for collection?

A. No, sir, I do not know at what point -- I do know that if they acquire insurance information, either from me or from -- if the individual calls them up and gives them that insurance information, they will call and advise me: We are filing insurance on this. Will you please put a hold on the account until we see what happens.

Q. Okay. And later on, it looks like MEMS requested a 45-day hold; is that correct?

A. Yes, sir.

Q. Okay. So when -- does Credit Control have a contract with MEMS to collect ambulance bills that haven't been paid?

A. We do not have a contract with them. We have collected for them for over 20 years.

Q. Okay. But you have an oral agreement that --

A. It is a handshake agreement --

Q. Okay.

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 49

A. -- that we're going to do the best job we can for you. And if you have a problem with that, we'll try and correct it. But I'm not going to hold you to anything. I want you to be happy.

Q. Okay. Do you know whether MEMS uses any other collection agencies or debt collectors to collect their debts?

A. They do not. They have in the past, but they do not currently, to my knowledge.

Q. Okay. How long has Credit Control been collecting bills for MEMS?

A. It is over twenty years.

Q. Okay.

A. I believe it may have been '98 or it may have been prior to that. But it has been at least 20 years.

Q. Okay. And does Credit Control collect on a contingency basis for MEMS?

A. Yes, sir.

Q. Okay. And what is the percentage that Credit Control retains when it collects?

A. If we collect an account without a legal case, if we just collect the account, we get 40 percent of the amount collected.

Q. Okay.

A. If we don't collect anything, we don't make

Page 50

anything. If it comes to the fact that we have to get Mr. Jones involved and a lawsuit is filed, then our commission rate goes to 50 percent to help offset attorney's fees.

Q. Okay. So, when Credit Control is assigned the accounts from MEMS for collections, it is also assigned the right to file a lawsuit against the consumers?

A. We -- if a lawsuit is being filed, it is filed in MEMS name.

Q. Okay.

A. It is not under our name.

Q. And why does Credit Control get a larger percentage if a lawsuit is filed if Credit Control is not filing in its own name?

A. Because there is additional work on our part to verify all of the information and make sure that this account should be sued. Is it viable? We're going to do that work and there is more time and effort.

Q. Okay. So Credit Control -- tell me exactly what Credit Control does on a typical collection case if a consumer doesn't pay and it determines that maybe they have assets to satisfy a judgment. It sounds like Credit Control does something -- makes some type of determination that a lawsuit should be filed. What does it do?

Page 51

A. Well, the very first step of that is we're going to look -- I'm going to look at the account and make sure several just basic criteria are met. Is the balance sufficient, you know, for whatever county we're going to have to sue in? If I've got to go to Washington County, it better be a little bit more than coming here. So we make sure the balance is sufficient.

We're going to, you know, just make the basic checks, you know, is the account within the statute of limitations. We're going to go online and double check. Is this guy in bankruptcy? Just to save us that time, even though he may not have said anything about it, we'll go online and just make sure that that's not the case.

I'm going to look to see did we talk to this guy. I've -- we've always been of the position that I don't want to sue a man unless I've given him the opportunity to pay voluntarily. So I'm going to look -- except for very extenuating circumstances, I'm going to make sure that we have talked to him and given him the opportunity for voluntary payment.

And then I'm going to look: Do we have assets? Is there anywhere -- what will we do if we get a judgment? Do we have anywhere to go? And if the guy's address is the Salvation Army and he doesn't have a job, I'm not

Page 52

going to recommend him for suit. That's just throwing good money after bad.

Q. Okay. Anything else?

A. Those are the initial criteria that we're going to look at. And at that point, we will prepare an affidavit of the account and send it to our client for them to make the final approval. It is -- whether we file that suit or not is entirely up to my client. They get to make that decision: Yes, go forward with it or no, stop.

Q. Okay.

A. And then -- at that point, we start putting paperwork together and Mr. Jones gets involved.

Q. Okay. Let's go back to the collection notes.

A. Okay.

Q. In (28), there's an asterisks besides that. What does the asterisks indicate, if anything?

A. At some point just in the way that it stores notes, it's just a natural breakpoint in the computer system --

Q. Okay.

A. -- just for display purposes. It has no -- it has no meaning for a particular line.

Q. Okay. And it says 13:06, you know, name: Ryan Wilder. Again, it's got CLZ. Is this a telephone call that's being made?

13 (Pages 49 to 52)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 53

A. Yes.

Q. Or what is happening in (28), I guess down through (38)?

A. Okay.

Q. What's going on there?

A. All right. At that point, I believe -- well, on line 28, it states the name -- she added a space after the comma and before the first name. So anytime any adjustment is made, it puts a -- actually --

Q. Okay.

A. Let me correct that. She removed the space because you see on the first page that's how it's supposed to be: Last name comma first name.

Q. Okay.

A. So that was just a format. The next line, 029. That is -- it says gotcha. What that is -- we have -- in the CUBS system, we have action codes. It's a three-digit code that says. And there's hundreds of them, as you saw down later on: Client requests 45-day hold. We have -- there's a three-digit action code that I type in. And as soon as I type that three numbers in, it places in the notes: Client requests 45-day hold, just so that I'm not typing that a hundred times a day.

Q. Shorthand?

A. Absolutely. The notation on line 19 "gotcha" is an

Page 54

action code. When they put that action code, I have two in particular, one that says "gotcha" and one that says "contact." What that means is we have picked up the phone and we have called the debtor. The very first time we talk to an individual, they use the code that says "gotcha." I got it. I have talked to this guy.

On all subsequent contacts with this individual, they use the code that says "contact." That is a tracking mechanism that we use to see, okay, we're evaluating collectors: How many phone calls did you make? How many people did you talk to? It allows us to track that very easily.

Q. Okay. So this indicates that Carol Lewis actually talked to Ryan Wilder on that day at that time?

A. Yes, sir.

Q. She called and Ryan picked up the phone?

A. Correct.

Q. And then what's going on in 30 and 31?

A. 30, 31. Gave the mini Miranda.

Q. That's to comply with the FDCPA; correct.

A. Yes, sir. This is an attempt to collect a debt. Any information obtained will be used for that purpose. Mr. says -- meaning Mr. Wilder. Mr. says he has QualChoice through personal policy. Mr. says he does not have -- he has no copy of his insurance card. He

Page 55

did update his address. At the point where it was assigned to us, we had the Frost Road in Caddo Valley. He gave us his new address and we updated it on the front page of the account.

Q. Okay.

A. Line 36: "I got new address and told Mr. to find insurance information and call me back ASAP." And that was the end of their conversation.

Q. Okay. Does anything in 22 through 38 indicate to you that Carol told Ryan how much money Credit Control was trying to collect at this point?

A. No, sir. It does not state in those notes.

Q. Okay.

A. Again, some of that is -- some of this is shorthand when you're talking to a lot of people. That's why we use some of these action codes to get through. There is just the basic process that we are going to go through on every call.

Q. Okay.

A. And, you know, identifying the debtor, identifying ourself, the client, the amount, giving the mini Miranda, and asking for payment in full.

Q. Okay.

A. That is the stock process on every call that they should know.

Page 56

Q. Okay. And the next line, (39)?

A. Yes, sir.

Q. What does that mean?

A. Request letter RO1 validation letter. Now, if you will look back on line 17, third from the top: Sent notice RO1, which is the validation letter. The -- I believe that's the one you've got on top under there, that went out -- the account was placed with us on 5 -- the evening of 5/21. So when we run our mail on 5/22, that first notice went out to Mr. Wilder.

Q. Okay.

A. What Carol did in line 39 that you asked me about because she had gotten a new address from Mr. Wilder, she corrected that address and requested that that validation letter be sent out to the new address.

Q. I'm going to hand you --

MR. McGAHA: Let's mark this as No. 9.

THE REPORTER: 10.

MR. JONES: They're already introduced.

MR. McGAHA: Well, I've got the redacted copy introduced.

MR. JONES: Okay. Go ahead. I don't care if it's in there twice.

Q. (BY MR. McGAHA) I'm going to hand you what is Exhibit No. 3.

14 (Pages 53 to 56)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 57

A. Okay.

Q. And it's the letter we filed with Mr. Wilder's complaint.

A. Yes, sir.

Q. And it's got some redactions in it. And you'll see that we've marked it as Complaint Exhibit 2. But is that the letter that, according to the line in parenthesis 39 in the collection notes that we've been talking about, is Exhibit 3 the letter that went out?

A. Yes, sir. And, actually, you will see on line 50 -- line 39 is where the collector requested the letter.

Q. Okay. And it went out later that day?

A. And line 50 sent letter 01. That's when it was processed and sent to our vendor that does the mail.

Q. Okay. So this letter that's deposition Exhibit 3 according to parentheses 50 went out on May the 24th, 2017?

A. On -- in line 50, May 24th, we processed the letter and send it to our outsourced vendor. They print it the following day and mailed it, yes, sir.

Q. What paren number is that?

A. Line 50.

Q. Any one other than 50? That's the only line that indicates it went out?

A. Correct.

Page 58

Q. Okay. Now, look on the letter on Exhibit 3, it says: The principal amount owed $888.75.

A. Yes, sir.

Q. And the balance was $888.75.

A. Yes, sir.

Q. Was that amount the combined amount for both accounts?

A. No, sir.

Q. Okay. What was that amount?

A. This is the -- this is the amount that is owed on this account, which is the one -- the one we're looking at the notes on.

Q. Okay. But it's not -- so was Carol -- according to these collection notes, was Carol trying to collect one of the MEMS accounts from Ryan Wilder on this day or both?

A. Both of them. Both of the ones that were assigned on that date.

Q. Okay. But this amount, the principal amount is only the amount on one account; correct?

A. Correct.

Q. It's not the amount on the second account?

A. You are correct. There was a separate letter sent out.

Q. Okay.

Page 59

A. I believe that's the last account, yes. The very last account, line 12: Sent notice RO1 in the amount of 402.74.

Q. Okay. Thank you. And does Credit Control have a copy of that letter?

A. The way that our mailing system works, my -- I have an outsource vendor in Michigan that has a book of all of our letters. I transmit to them a file every day that looks a lot like this stuff.

Q. Okay.

A. That has all of the -- basically the fill-in-the-blank information. I tell them I want to send this letter right here with -- fill in today's date, fill in this account number, this name and this address and this amount. I have the records of when I transmitted the information to them. I do not keep actual hard copies of these letter.

Q. Does the vendor keep hard copies of the letters?

A. Again, they have a copy of the form. If you're asking: Can I get them to send me a copy of this? No. I can certainly recreate it. And I can provide a transmission history of when that -- what information was sent to them that corresponds to this letter that they do have the hard copy of.

Q. Okay. So the vendor just has a letter with, for

Page 60

lack of a better word, blank fields for the name, the address, the amount --

A. Like mail merge fields, yes.

Q. Okay. We'll go back to -- just (40), we're back on page 3. Looks like maybe Carol checked for a Facebook account?

A. Uh-huh.

Q. Okay. That's on (40). And what does parentheses, you know, 41 through 44. What is that indicating?

A. All right. At 41 is where she had changed the status code from active. Every account that comes in initially has a status of ACT, which just means active, act now, meaning we just got it; we don't really know where they are.

On line 42, she's indicating that the debtor called, Mr. Wilder called in to our office and, again, the line 43 following, she's just indicating that she had -- this was a contact with a debtor.

Q. So 42 indicates that Ryan called?

A. Yes.

Q. At 1:20 on May 24th?

A. Yes, sir.

Q. And Carol talked to him?

A. Correct.

Q. Okay. Go ahead. I'm sorry.

15 (Pages 57 to 60)

Page 61

A. 44 through 49: Mr. said he found his insurance information and said he called QualChoice. They gave him his info, his member I.D. And he provided his member I.D. and his group number for QualChoice.

Q. Okay. And go all the way down through 54.

A. Okay. Collectors note: "I told Mr. sometimes they need his signature. And if so, I will call him back. E-mail CHBC" -- that's internal -- "to us since MH" -- another admin employee -- "only does Medicaid insurance."

Q. Okay.

A. Basically at that point, she's saying she got his insurance information; she forwarded it out internally to me and another gentleman so that we could provide that information to them, which is what the following, line 55, is where early the next morning, that -- e-mailed insurance information to Tim, my client.

Q. And Tim works for MEMS?

A. Yes, sir.

Q. And then 56 and 57, it looks like MEMS requested a 45-day hold on collections. Is that basically what's going on?

A. Yes, sir. Again, that's an action code. Anytime that they call and say, "Hey, we've filed insurance on this account," I use that action code that puts it on a

Page 62

45-day hold, just to give them time to get that filed and then let us know how we need to proceed.

Q. Okay. And then it looks like there's at least one call on June the 1st, in (58) through (71). What do these collection notes indicate happened?

A. All right. 58 through 71: 11:50 June 1st, debtor called. Mr. Wilder called in our office, contact. "Mr. was argumentative. I gave Mr. all the info I could to let him know." At that point, she's -- the account is on a hold status. But at this -- and he's calling in to ask us about that. We advised him we have given that information to our client to file that claim. That claim has been filed, but here is where it stands right now.

Q. Okay.

A. And, you know, I don't know who initially brought it up. But it's talking about his credit bureau report. If this is going to drag out, he may want to look about seeing about trying to get the funds together and get this paid before it negatively impacts him. And that's -- at 69, she suggested that, you know, he might look at getting a debit or credit card to try and resolve these in case insurance does not pay.

Q. And that takes us over to (72).

A. Yes, sir.

Page 63

Q. What is in (72)?

A. Every week I get a report from Tim at MEMS ambulance of pending insurance, Medicare, Medicaid payments. He will report this account had a payment of such and such or this claim was denied for whatever reason or at the very bottom is a list of accounts where he has no status update for me. It is still pending. And that is a note on here, per Tim's payment report: Nothing yet.

Q. Okay.

A. He is not reporting any change in their status.

Q. And (73) and (74). Something happens on June 19th. What is going on?

A. Again, 73, 74, those are system-generated notes that as it's checking -- the system is checking to see: Have we made contact with this account? Have we attempted contact? If not, then the system is going to try and move it to put it in front of the collector to make sure that nothing falls through the cracks and we are taking care of the account as we should. But that is entirely computer-system generated.

Q. Okay. And it looks like in 75 through 77 on June 22nd, those are not computer-system generated?

A. You are correct.

Q. What is going on there?

A. Line 75 is where we had posted a payment to the

Page 64

account. Transaction code indicates that this was not paid in our office. It was paid directly to our client in the amount of 479.74. It lists our commission rate and our commission percentage.

Q. Okay.

A. And line 76, the final note, again, we're posting these things off of reports from our client that this action code there on line 76 is reporting the payment of 479.74. And he's telling me the insurance has paid all that they're going to; we're not going to continue to hold it for another payment.

Q. Okay.

A. The insurance is done. The debtor owes the balance of the account. And so, the status that had been HLD or hold is then taken off and is back to an active account. 77 is just the collector's notes that she was looking at her daily payment list. And she's checked it and said: Yes, we did get a payment on there.

Q. Okay. And then it looks like from June the 26th in parentheses that go down from basically 78 to 85, Carol is doing something to work the account?

A. Yes, sir.

Q. What is going on in those?

A. From, let's see -- 78.

Q. Yeah. 78 to 85 on June the 26th.

16 (Pages 61 to 64)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 65

A. She did call residence to debtor, spoke with Mr. Wilder. He said at that time he was unable to get a credit card. And said monthly payments were offered. But, you know, her suggestion that he was offering $40 a month, you know, on $1,200 here. She said, "Well, you need to see what you can do and I'll talk to you next week." And she actually at that point did request a letter that was sent on that date.

Q. Carol requested this letter that is notated on 85?

A. Yes.

Q. And is that the letter in Exhibit 4?

A. Let's see. Yes, sir. June 26. Yes, sir, it is.

Q. Okay. And is this -- Exhibit 4, is that a form letter or is that something that Carol would actually type out?

A. No. None of our letters are hand-typed. They are all done just like this one.

Q. And why does that letter suggest that somebody contact their attorney?

A. Because they owe a debt that is unpaid and at that point had not made reasonable arrangements with our office to resolve it. And the suggestion is you talk with an attorney to see what your liability is and what the suggestion is on how you should resolve this debt.

Q. Okay. So, at that point, are you or Carol deciding

Page 66

whether or not to potentially file a lawsuit against Mr. Wilder or suggest that MEMS file a lawsuit against Mr. Wilder?

A. At this point, that determination has not been made.

Q. Okay. Thank you. And then on July the 5th and (86) and 87, it looks like Carol maybe tried to call and nobody answered; is that basically --

A. Yes.

Q. -- what's going on?

A. Called residence, recorded message saying not accepting calls at this time.

Q. Same thing on July the 6th or is that something different in (88)?

A. On 88, again, she changed the status from the active, which it went to, just by default when we took it off of a client insurance hold.

Q. Okay.

A. She changed it at that point to we have no arrangements on this account. And then 88, 89, and 90, again, are just the system-generated messages.

Q. Okay. And then we get into what appears to be the contentious call in (91) or a series of calls in (91) to 107. Is that basically what's happening?

A. It appears.

Q. I'm sorry. If you look at 93, it talks about

Page 67

Carol's notes are that Ryan was cussing when he called?

A. Yes, sir.

Q. Okay. Is there a call before the one that's registered in (93)? On July 21st?

A. On July 21st, 91 through 107 is a record of one telephone call.

Q. Of one telephone call?

A. Yes, sir.

Q. Okay.

A. "Called residence contact." And then 93 begins the notes of that call.

Q. So, according to this, that Carol and Ryan talked for 15 minutes that day --

A. Well --

Q. -- on one call?

A. Okay. Let me correct myself then.

Q. Okay.

A. I was getting ahead of myself. They talked from -- the length of that time, it began at 10:17. At line 93 are the beginnings of my notes when he called and spoke with me.

Q. Okay.

A. And it's -- it appears to be a little disjointed here. The reason for that is Carol is on the phone with this guy and she has the account up. As soon as -- as

Page 68

soon as they hang up and he calls back and wants to talk to me, I have her get out of the account because I need to be able -- in our system, only one person can be in an account at a time. And if I've got to talk to the individual, then I need to have full access to the account.

Q. Okay.

A. So I make notes. And then when I get off, she went back and put the notes of her conversation with him.

Q. Okay. So let me get this straight. In (91) at 10:17 a.m. on July 21st, 2017, what does that line indicate?

A. Which?

Q. (91).

A. That she attempted to call residence to Mr. Wilder.

Q. And what does (92) indicate?

A. 92 is that she got him on the phone.

Q. Are those two separate phone calls?

A. No. That is one telephone call.

Q. Okay.

A. That is just our follow-up notation.

Q. Okay. And then at 10:32 is when you start talking to Ryan?

A. Yes, sir.

Q. And what do your notes indicate happened from 93 to

17 (Pages 65 to 68)

Hanson, Charles 3/18/2019                           Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 69

105?

A. HGO, my shorthand for he telephoned office. Said he was mad that the last person he talked to hung up on him.

Q. Okay.

A. As he was -- he began the call with profanity. I had known that we had an issue with this gentleman and when his name came up on my caller ID, I answered the telephone. I gave him my name. I told him that he could speak with me; I'd be glad to help him get this account paid in full right now.

Q. Okay.

A. He indicated to me that his credit card has a limit, so he could not pay it over the phone with his credit card. I gave him our mailing address. I said if he wanted to send us a money order paid in full, here's our address. At this point, he's wanting more to talk about the call and not about the debt.

He complained to me that he thought it was disrespected. I advised him that I would mark the account right now as DNC, do not contact, and we would not call him again.

And that is my standard practice. The FDCPA says cease and desist should be in writing. I've never required that. All I need is somebody to tell me, "I

Page 70

don't want to talk to you." And that's sufficient. I'll mark the account as do not contact and we will not call them again.

Q. Okay.

A. If they don't want to let me to help them, I can't. I did ask him again if he wanted to pay this account in full or not. He made a suggestion I won't repeat and hung up the phone.

Q. All right. I want to be clear because I think that you said that he couldn't make a credit card payment over the phone; is that correct?

A. No, sir. What he had told me is -- I asked if he was going to pay it in full. He advised me that he could not because he had a monetary cap on his credit card.

Q. Okay.

A. He didn't have enough credit to pay the account in full.

Q. And when you get to the point where you're collecting on the debt, do you only take payment in full?

A. Yes, sir.

Q. Okay. Why is that?

A. Again, as I stated, this is always the policy of the office that payment in full is due today. I give my

Page 71

collectors some leeway because they're spending time with the account. They've investigated. They've talked to these people. They know what their situation is. And if they feel it is in the best interest to break this into two or three payments, I give them to discretion. If I'm talking to somebody, this is probably the first time I've ever seen this account and generally the first time I'm looking at it, I'm on the phone with an ear full. I don't know the background. I don't know the history. I haven't investigated that. And I'm -- I mean, there's no possible way I could do that for every account in the office; that's why those folks are there. So I stick with the policy that if you're going to talk with me, I'm going to help you get it paid in full today.

If -- I've had folks tell me: Well, this collector offered me $200 a month to pay that and you're asking me to pay in full. "Well, if you'd like, I can give you right back to her and you can take that deal. But if you're talking to me, it will be payment in full."

Q. Okay. Even if it's a collector in the same office?

A. We're all in the same office.

Q. Right. But I'm just saying -- I don't want to put words in your mouth, but I want to get this straight. If a consumer or a debtor is calling and they're talking

Page 72

to you about paying on an account for Credit Control and you said the first time it's escalated to you, you're always going to ask for payment in full?

A. Yes, sir.

Q. But if you transferred this phone call over to Carol, Carol had the authority or the discretion to break up the account in smaller payments?

A. Yes, sir.

Q. Okay. Can you tell from 93 to 105 whether -- did Ryan actually offer to pay Credit Control any money on this date --

A. No, sir.

Q. -- by credit card?

A. (Shaking head.)

Q. Okay.

A. His only statement to me about paying is when I asked him for payment for full, he said that was more than his limit on that card, so he could not do that. And that was the point I offered our mailing address.

Q. And does it indicate whether or not you offered to transfer him back to Carol?

A. No, sir. I did not.

Q. You didn't, okay.

A. That is a very rare occurrence and it certainly does not happen with anybody that is going to be

18  (Pages 69 to 72)

Crystal Garrison, CCR

Bushman Court Reporting                                                     501-372-5115

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 73

argumentative or belligerent, I will never --

Q. You're not going to pass that off to another collector?

A. No.

Q. Okay. And then it looks like in (106) to (107) that you did a search for assets for Ryan?

A. That is -- I did not do one. That is a notation for Carol that that is what I want to happen.

Q. Okay.

A. It is my directive to her to search for assets. In line 107, the previous status code was RDP, refused definite payment. At that point, I changed the status to DNC, do not contact.

Q. And the search for assets, though, indicates that you were thinking about filing a lawsuit against Ryan at that point?

A. The indication search for assets is to tell me is that viable.

Q. Okay. And what's happening in (108) to (109)?

A. 108 and 109, Mr. Wilder calls our office.

Q. Okay.

A. Again, with a DNC status, we're not going to send mail; we're not going to make a telephone call. That certainly doesn't prevent them from calling us. And if they want to initiate that call, then we'll go from

Page 74

there. He did call our office. At that point, he apologized to Carol and told her that she had woke him up; he had worked late and had a small child that kept him up, that information.

And she asked him at that point if he wants to pay this thing. And he again is saying -- is telling all the reasons to justify his past behavior and asked why he got hung up on. And she told him that it was probably the same reason that you're going to: Because I'm not here to argue with you. If you'd like to pay it, we'll go with that. But outside of that, just continuing arguments is not good for anybody.

Q. Okay. And in, I think, about 118 and 119, Carol's notes indicate that she told Ryan she was going to hang up on him again; am I reading that right?

A. Yes.

Q. Okay.

A. He had asked why she hung up on him before. And she advised him, "Well, the same reason I'm going to do it again if we're not getting anywhere." That has certainly been my directive to my collectors on the phone.

Q. Can you tell from looking at the collection notes when Carol hung up on him the first time?

A. That would have been the call on July 21st, where he

Page 75

ended up calling me back and stated that the last person -- he was mad because the last person hung up on him. That was that call of 10:17.

Q. That one-minute call or so?

A. That's a start time. It does not reflect an end time.

Q. Okay.

A. It was somewhere, obviously, between 10:17 and then when I talked to him at 10:32.

Q. Okay.

A. So it was in that window.

Q. It looks like that call goes all the way to the next page, the call on July 24th, all the way to (128)?

A. Yes, sir.

Q. And what happens -- the remaining of the notes, it appears to be just computer-generated except for the A.G. complaint in 132 and 133; is that correct?

A. Yes, sir. That is my notation, CDH, that I received the complaint from the Attorney General and responded to it that day and the copy was in my file, which you have.

Q. Let's look at the AG complaint. I'm going to hand you Exhibit 5 and did you read the AG complaint that Ryan filed and was forwarded to you from the Arkansas Attorney General's Office?

A. Yes, sir.

Page 76

Q. Okay. And did you have a response to that complaint?

A. Yes, sir.

Q. Okay. And it looks like if you turn over -- it's a third page of the exhibit, but it's the second page of the e-mail that, I guess, is somehow -- it has Edith Collins at the header. And Ryan reports --

A. I'm assuming that is someone at the Attorney General's office.

Q. Yeah. If you'll look at -- turn over one more page. It says: "Explain the circumstances surrounding your complaint." This is on page 3 of Exhibit No. 5. And in the middle of that, Ryan says: "Then she said 'that's okay; we'll be seeing you soon.'" And you were here when Ryan testified about that earlier today; correct?

A. Yes, sir.

Q. And then down a little bit, it says: "I called one last time and the quote/unquote owner answered and he threatened to take legal action against me if I didn't pay this bill. I was willing to; however, considering how I was treated by his employee, I did not want to go through this company."

Did you threaten to take legal action against Ryan or did you say anything like you're handing it over to your attorney or how accurate, in your opinion or from

19 (Pages 73 to 76)

Page 77

your memory, is this statement that Ryan was threatened with legal action?

A. The statement that I give by rote and have done for 30 years in a situation like this, I'm going to ask him if he wants to pay the bill. If he says no and particularly in a case where I've flagged the account as do not contact so that we're not going to call and we're not going to send letters, so our collection efforts at that point are done, I will advise somebody, "Well, at this point, we're going to have to review this for possible legal action." And I certainly do make that statement and I stand by it.

Q. Do you remember -- do you specifically remember what you told Ryan? Did you tell him you were going to review it for legal action?

A. Specifically, will I -- since I am under oath -- tell you I absolutely remember every word of this phone call? No, sir, I do not.

Q. You don't? Okay.

A. What I'm stating is based on my notes and just common practices.

Q. Okay. And turn over to the next page. It says August 15, 2007. This is page 4 of Exhibit No. 5.

A. Yes, sir.

Q. Did you write this --

Page 78

A. Yes, sir. I did.

Q. -- in response to Ryan's complaint? And you can take the time to read it. But in response to his complaint, you never denied on page 4 of Exhibit 5 that you had threatened to take legal action against Ryan if he didn't pay this bill; correct?

A. My very last line on this response.

Q. Okay.

A. "As of this date, his balance is still outstanding and I have forwarded this account to our legal department for review."

Q. You're saying that as of August the 15th, you did that?

A. As of this date, this is where the account stands. As to what date that happened, it would have been prior to that. But, again, as of August 15th, when I was replying to him, this is exactly where the account stands. He still owes the money and the account is with our legal department to review for a potential lawsuit.

Q. Okay. Did you talk with Carol Lewis about the Attorney General's complaint when it came in?

A. No, sir.

Q. You didn't?

A. (Shaking head.)

Q. Okay. And so, you didn't know on August 15th, 2017,

Page 79

whether Carol had said something like "that's okay; we'll be seeing you soon," when you responded to the AG complaint?

A. My response was based entirely on the notes on the file.

Q. Okay. Any reason that you didn't talk to Carol about the complaint?

A. Well, basically, because I'm going to go with the notes on the file. It was a month later or so since their last conversation. Since that time, she's probably talked to 2,000 people. And I would not expect anybody's memory to go in a lot of detail. That's why we have our notes and that's what we're going to go by.

Q. Would you expect that she may remember somebody cussing at her?

A. Potentially, but also not necessarily. Some of the things that my father talked about in those ironclad rules is this is, obviously, a contentious business. People get upset. That is just part of the business. And one of the things he says is that you got to let it go. You can't take this home with you. You don't want to take it home and kick the dog or be mean to your wife. You let it go and you move on to the next call.

Q. I tell you what. You want a break?

A. Sure.

Page 80

MR. McGAHA: Okay. Let's take a break. Let me figure out where we're going and how much more I got.

(Brief recess.)

(Exhibit No. 10 marked for identification.)

Q. (BY MR. McGAHA) I'm going to hand you Exhibit 10.

A. Okay.

Q. Is this -- do you know what this document is?

A. Yes, sir. This is copies of an e-mail. The original is the second part that was sent from Randy Hanson to Carol where he asked just for her to take a minute and reply to this: "Independent from your notes, can you tell me what you remember about the conversation with the debtor, how payment plan was discussed, who suggested amount and length of time, et cetera, why it was rejected if you remember. Or if you have no independent memory without your notes, let me know."

Q. Okay.

A. And then the top part of it is her reply to that request.

Q. And is there any other written statement about Carol Lewis or Carol ███ about Ryan Wilder's complaint, other than this e-mail?

A. No, sir.

Q. And any recordings of phone calls that are at issue in this complaint?

Hanson, Charles 3/18/2019                Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 81

A. No, sir.
Q. Okay. Does Credit Control ever record phone calls to or from consumers or debtors?
A. Our telephone system has a very very limited ability to do that. And I believe I'm the only one that has it enabled on their phone. And I have used it very very -- it's not an automated -- it's not every call recorded anything. I have a button I can press that will record it as a digital file in our phone system.
I've used it very very sparingly over the last few years. Generally, the only time I use it is when we have somebody actually making physical threats, I hit the record button to make sure I had that just for, you know, evidentiary purposes. But other than that, I do not by practice record telephone calls.
Q. Okay. And did you record Ryan Wilder's telephone call?
A. No, sir.
Q. Okay. Have you ever given a deposition before?
A. No, sir.
Q. Have you ever testified in court before?
A. Yes, sir.
Q. And what was that about?
A. This was mid '90s as a witness on a debt collection case and, actually, this was when I was doing freelance

Page 82

consulting; somebody didn't pay me.
Q. Okay. So you had to sue somebody to collect some money?
A. That was owed.
Q. That you were owed for work?
A. Yes, sir.
Q. And you had to go to court and testify?
A. Yes, sir.
Q. Okay. Has Credit Control ever been sued under the Federal Fair Debt Collection Practices Act or the Arkansas Fair Debt Collection Practices Act before?
A. Yes, sir. I really cannot give you details on it because that was pretty much before my time.
Q. Okay.
A. It hasn't happened in the last twenty years.
(Exhibit No. 11 marked for identification.)
Q. (BY MR. McGAHA) Okay. If you'll look -- well, I'm going to have to mark this, even though part of is it duplicative, as Exhibit 11. And the first of it is various complaints to the Attorney General's office as a Consumer Financial Protection Bureau that --
A. Yes, sir.
Q. -- Credit Control produced in this case. If you'll just take a minute to flip through these and tell me if you were aware of any other complaints to the Attorney

Page 83

General's office or to the Consumer Financial Protection Bureau about Credit Control exists other than what is in Exhibit No. 11, to your knowledge?
A. There may be some in here and there may not. With the Consumer Financial Protection Bureau, I -- just offhand, I don't know if I included all of them. Over 50 percent of the complaints I have answered through there, my response was: This is not us. You have the wrong company. So I didn't necessarily include all those.
Q. There's another Credit Control that is a debt collector; correct?
A. There are a dozen agencies nationwide that use some version of Credit Control. There's apparently a pretty large one in Virginia. And every time I see a complaint from a debtor in Virginia, I'll pull it up: It's not ours; you got the wrong guy. So I may not have included all of those, but anything that was ours you do have --
Q. Okay. Anything that --
A. -- a copy of, yes, sir.
Q. -- was related to an account that Credit Control was actually trying to collect from a debtor or consumer --
A. Yes, sir.
Q. -- was included in Exhibit 11?
A. Yes, sir.

Page 84

Q. Okay. If you turn over to -- there's one in here that talks about Ms. Lewis that's dated May 16th, 2017.
A. Okay.
Q. Looks like it's on pages 10, 11, 12, and 13 of Exhibit No. 11. And did you do anything to investigate this complaint with the Attorney General's office that was made against Credit Control for something that Ms. Lewis had done or allegedly had done, I guess, to be fair?
A. If you don't mind, let me --
Q. Sure, take your time.
A. -- read through it real quick and refresh my memory. I'm trying to find the corresponding answer to this.
Q. That's -- one of the reasons for my question was I didn't know that -- was it in response to it or if I was some how missing it?
A. Yeah. I'm not -- yes, there definitely was a response to it, but --
Q. Do you remember if Credit Control did any investigation about this complaint that was made to the Arkansas Attorney General's Office about Carol Lewis?
A. Well, yes, sir. I mean, anytime that a complaint comes in, I'm going to be the one that is going to review it. And I'm going to review the notes. And I will reply to the Attorney General in writing.

Crystal Garrison, CCR
Bushman Court Reporting                                        501-372-5115

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 85

Q. Would you just mind giving that to Mr. Jones and having him send that over to me?

A. Yes, sir.

Q. Whatever you've got in writing, if you have anything?

A. Absolutely. I will have copies of all my correspondence with the Attorney General's office.

Q. Okay.

A. And if I didn't provide it to you, I apologize.

Q. That's not a big deal.

A. I certainly meant to.

Q. That's okay. But do you have any recollection as we sit here today about investigating this one? It's from 2017, so you may not.

A. No, sir. Not to -- not without really reading through my reply. I think that would refresh my memory. But as it is, I don't necessarily trust my memory far enough to swear to it.

Q. Okay. Have you asked Carol Lewis or has anyone else at Credit Control ever asked Carol Lewis other than in the e-mails in Exhibit 10 whether or not she said, "We'll be seeing you soon," to Ryan Wilder on a telephone call?

A. No, sir.

Q. You haven't specifically asked that question?

Page 86

A. As of the date that we were served with this lawsuit, other than this right here, neither myself nor my brother have had any conversations with Ms. Lewis about this account just strictly for this reason. There has been no conversations other than what you have in front of you.

Q. And what's the reason for that?

A. Because at that point is -- well, did y'all talk about -- did you say this -- this is an ongoing lawsuit. I want everything in writing.

Q. Okay. I gotcha.

A. So that's why we requested her to provide it that way and intentionally have not discussed this case with her.

Q. Is that the usual policy of Credit Control is to just get a statement in writing by e-mail or something if there's a complaint made against one of the collectors?

A. Well, again --

Q. An actual lawsuit.

A. Well, I have no standing policy on lawsuits. But on a complaint, either just to me or through one of these, if there are any questions that I may have outside of what is in the notes, then, yes, I will ask either in writing or -- it depends upon the severity of the

Page 87

complaint. If I have a guy just calling to complain to me, I may just go up and ask the collector: "All right. You tell me what happened."

Q. Okay.

A. "Let me get your feeling on that situation."

Q. Okay. Any other documents other than the collection notes we've been through and Ms. Lewis' statement and the e-mail that's in Exhibit 10 that have to do with the phone calls between Credit Control and Ryan or Carol and Ryan?

A. No, sir.

Q. That's it?

A. Yes, sir.

MR. McGAHA: Okay. I don't have anything else. I appreciate you being here.

THE WITNESS: Yes, sir.

MR. JONES: I've got a few.

EXAMINATION

QUESTIONS BY MR. JONES:

Q. One, I wanted to go through Exhibit 9 just to avoid some confusion. Looking at that first page on Exhibit 9, which you indicated is the electronic data that is sent to you by MEMS?

A. Yes, sir.

Q. And it shows on 5/21/17, there were two accounts

Page 88

sent to you, both saying Wilder, Ryan. One for Run No. 16-93778 and one for 16-94095?

A. Yes, sir.

Q. And then you had one from 4/3/16, which was Run No. 15-68475?

A. Yes, sir.

Q. Now, looking at the first two, what MEMS was sending you did not packet those two things together?

A. Right. And I may have misspoke earlier just on what packeted with what. And, yes, the correct answer to that is: The very first account, Run 16-93778 packeted with the oldest Account, 15-68475. The middle account, 16-94095, was not part of that packet because it did not completely match up.

That is the one that came in with the incorrect Social Security number. And because of that reason, my system is going to look at it and say, we got -- the name is the same, but we got two different Social Security numbers; so we have different people, so it did not become part of that packet.

Q. Let me ask you to look at looks like the fourth page from the back, which is going to be your internal system for Account No. 8001798. And it shows the client reference number of 16-94095.

A. Okay. Yes, sir.

22 (Pages 85 to 88)

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 89

Q. And that's the one that has the 151 Social Security number that is incorrect?

A. Correct.

Q. Now, from this, can you tell which collector this was assigned to?

A. Yes, sir.

Q. Okay. Which one was it?

A. I can tell you on line 14 at the bottom, the initials MAB would be Mary Scott/Mary ████.

Q. Okay. So it was not assigned to Ms. Lewis?

A. No, sir.

Q. Okay. And was this account ever associated with the Ryan Wilder who is the plaintiff in this case?

A. Not until --

Q. Or packeted, I guess?

A. Yes, sir. Not until May 30th of 2018, line 22. You see my note where I added it to the package because that was the point where we were served with the lawsuit and I realized that we had three accounts on the same individual. But that was the first time that was included in the account.

Q. Okay. But the two accounts that would have been packeted together were the 16-93778 and the 15-68475?

A. Yes, sir. The two accounts where the Social Security number agreed.

Page 90

Q. Now, you've talked somewhat about reviewing a case for litigation or a lawsuit -- filing a lawsuit?

A. Yes, sir.

Q. And you've indicated what some of the factors were. As a matter of company policy, do you recommend filing a lawsuit if a consumer does not have a job?

A. No, sir.

Q. Okay. Will you explain that?

A. Well, we're going to look at all the factors to see if it's viable. But that is certainly a very big factor. As y'all know, it costs money to file a lawsuit. And I don't want to throw good money after bad. If I'm looking at an account and the individual is unemployed, I have no way to execute on that judgment; I have no way to get my money back. I don't want to spend any for no reason. So that is one of my criteria for filing a suit. If we get a judgment, what would we do with it?

Q. And was a review ever done of Mr. Wilder's employment to determine whether litigation would be viable?

A. Well, the review is taking place at the point where if we're going to order an affidavit from our client before I even waste their time by sending that over to them, we're going to look and see: Does it meet all of

Page 91

our qualifications? One of which being employment.

And I don't -- I'm not personally going out and trying to locate where they're working. I'm dependent upon my collector's activity and their notes. And on this file, there was no place of employment, so I wouldn't let it go past ordering an affidavit from our client.

Q. Now, do all claims that are submitted by MEMS to insurance companies receive payment --

A. Oh, no.

Q. -- from insurance companies?

A. No, sir.

Q. Okay. Can you elaborate on that?

A. Just a ballpark figure: The first of the month, I looked -- one of my admin guys who does a lot of just putting things together. In the first two months of this year, he sent MEMS ambulance 1,200 accounts that we had acquired insurance information on, either directly -- most often directly from the debtor.

Occasionally, sometimes he's able to find them on state Medicaid website. We've gotten this information and we forward it on to our client so that they can file those claims. If I get a 40 percent hit rate, I think we've had a good day.

60 percent of them are going to come back and say no

Page 92

coverage for this date of service: Payment was applied to deductible, does not have insurance coverage for ambulance runs, or any number of things where the insurance company is going to come back and is say, no, we're not paying it.

Q. So when you look at being provided insurance information, you look at it as a potential source of payment, but you don't look at it as a fact of payment?

A. Absolutely. We do ask people for that information, as we did in this case: Well, do you have QualChoice? Can you give us these policy numbers? And we'll get it and try and get it filed. But just on a percentage basis, more than half the time, the answer is no, the insurance is not going to pay it for a variety of reasons.

Q. And when MEMS submits the insurance information that you provide to them, is it standard that they're going to ask for a 45-day hold while they wait for insurance?

A. That's -- they always say a 30-day code. My action code actually makes it 45 because I know things don't necessarily happen as quickly as anybody plans on. But that is our standard policy. That action code to put the account on hold for 45 days in our system. And that's the point where I start getting reports back from them that tell me a payment has been made or it's still

23 (Pages 89 to 92)

Hanson, Charles 3/18/2019                          Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 93

pending; we don't know. And we generally get those on a weekly basis to try to keep on top of those.

Q. Now, do you have staff meetings with your collectors?

A. Yes, sir.

Q. How frequently?

A. Monday morning meeting. It's the first thing every Monday morning, 8:00 o'clock. Did one this morning.

Q. Do you ever review your policies and procedures and statement of purpose and your father's ironclad rules?

A. Yes, sir. To varying degrees. The main part of the Monday morning meeting is just an update. Where do we stand? What are our collection numbers? What are the new business numbers? How many people did we talk to? Those types of things and whatever contest my brother has come up with for motivational purposes, it may have that.

But other than statistical, there is always -- well, not always. But there is often some procedural issue. Sometimes it's just the -- my big point in this morning's meeting was how we're going to handle credit cards for a particular client for their benefit.

So just procedural things: If you get a payment from this client, this is how we're going to handle it internally. Anything like that, we're certainly going

Page 94

to cover. And, you know, certainly, general philosophy of things.

Sometimes there are reminders, this is -- as I had stated earlier: This is how a phone call goes. These are the things we've got to do on every call. A couple times a year, I'll print out the mini Miranda and pass it around, just so that everybody knows.

It's not an ongoing every-time thing just because, honestly, every collector I've got has been doing this for over 20 years. If I were dealing with people that have only been doing it for a couple of years that need more education, we would certainly do that.

Q. You have four collectors; is that what you said?

A. Yes, sir.

Q. How long have those collectors been with Credit Control?

A. Actually, Ms. Lewis is the rookie -- she's only been there about 15 years -- up to Ms. Scott who just celebrated her 31st year.

MR. JONES: Okay. That's all I've got.

MR. McGAHA: I don't have any more questions. I pass the witness, I guess.

MR. JONES: We're done.

MR. McGAHA: Thank you, Mr. Hanson.

Page 95

CHANGES AND SIGNATURE

WITNESS NAME: CHARLES D. HANSON

DATE: MARCH 18, 2019

PAGE LINE     CHANGE          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Page 96

I, CHARLES D. HANSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
CHARLES D. HANSON

THE STATE OF _____ )
COUNTY OF _____ )

Before me, _____, on this day personally appeared CHARLES D. HANSON, known to me (or proved to me under oath or through_____) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

Crystal Garrison, CCR

Bushman Court Reporting                                    501-372-5115

Hanson, Charles 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 97

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF CHARLES D. HANSON
MARCH 18, 2019

I, CRYSTAL GARRISON, Certified Shorthand Reporter in and for the State of Arkansas, hereby certify to the following:

That the witness was duly sworn by the officer and that the transcript of the ORAL DEPOSITION is a true record of the testimony given by the witness;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of _____, 2019.

_____
Crystal Garrison, CCR # 613
Bushman Court Reporting
620 West Third Street, Suite 302
Little Rock, Arkansas 72201
(501) 372-5115

Crystal Garrison, CCR

Bushman Court Reporting                                    501-372-5115