# Transcript of the Testimony of

# **Wilder, Ryan**

**Date:** March 18, 2019

**Case:** Ryan Wesley Wilder vs. Credit Control Company, Inc.

**Bushman Court Reporting**
Crystal Garrison, CCR
Phone:  (501) 372-5115
Fax: (501) 378-0077

## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RYAN WESLEY WILDER          ) PLAINTIFF
                            )
V.                          ) Case No. 4:18-CV-344-KGB
                            )
CREDIT CONTROL COMPANY,     )
INC.                        ) DEFENDANT.

ORAL DEPOSITION OF

RYAN WESLEY WILDER

MARCH 18, 2019

ORAL DEPOSITION OF RYAN WESLEY WILDER, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on March 18, 2019, from 9:55 a.m. to 11:22 a.m., before Crystal Garrison, Certified Court Reporter, in and for the State of Arkansas, reported by machine shorthand, at the law offices of Jack Nelson Jones, 1 Allied Drive, Building 1, Suite 1110, Little Rock, Arkansas 72202, pursuant to the Federal Rules of Civil Procedure.

## Page 2

### APPEARANCES

ATTORNEY FOR THE PLAINTIFF:
MR. COREY D. McGAHA
Crowder McGaha, LLP
5507 Ranch Drive, Suite 202
Little Rock, Arkansas 72223
cmcgaha@crodermcgaha.com

ATTORNEY FOR THE DEFENDANT:
MR. STEPHEN W. JONES
Jack Nelson Jones, P.A.
1 Allied Drive, Building 1, Suite 1110
Little Rock, Arkansas 72202
sjones@jacknelsonjones.com

## Page 3

EXAMINATION INDEX

                                        PAGE
RYAN WESLEY WILDER
    Examination by Mr. Jones..........................4
Changes and Signature..............................57
Reporter's Certificate..............................69

EXHIBIT INDEX

NO.  DESCRIPTION                                PAGE
1    Notice of Deposition, 2 pages.....................6
2    MEMS run reports, 3 pages.......................16
3    5/25/17 letter from Credit Control, 1 page.......23
4    6/26/17 letter from Credit Control, 1 page.......24
5    Complaint with Attorney General, 5 pages.........48

## Page 4

RYAN WESLEY WILDER, having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. JONES:

Q.  Would you state your name for the record, please.

A.  My name is Ryan Wesley Wilder.

Q.  Mr. Wilder, I'm Stephen Jones. I'm an attorney for Credit Control. We are here about the lawsuit that you've brought against Credit Control under the Fair Debt Collection Practices Act.

A.  Yes.

Q.  And the Arkansas version thereof. This is a discovery deposition, which means I'm trying to find out what the facts are that support your claim.

A.  Sure.

Q.  What you know and what you don't know. This isn't -- it's not quite like being in a court of law where you hear objections about hearsay and those types of things. I'm allowed to inquire about information that might lead me to find relevant information.

So even though it's hearsay, I have a right to get that because I might be able to find some other direct evidence. Your hearsay might not be admissible in court, but it might lead me to evidence that is admissible in court. So there is a little broader

1 (Pages 1 to 4)

Page 5

standard in a discovery deposition than what you've seen on TV about what goes on in a court.

A. Sure.

Q. I'm not here trying to trick you. I'm trying to find out what you know and what you don't know.

A. Uh-huh.

Q. If -- a lot of times lawyers will start a question and then switch to another question, which can be confusing. So if you're confused and you don't know what my question is, please stop me and ask me.

A. Uh-huh.

Q. I'm going to be relying on your answers at trial. So I'm relying on you to tell me when you don't understand.

A. Sure.

Q. And I'll clarify. If at any time you need to take a break to go to the restroom or get some water, please feel free to do so. If I ask you -- you have a right to consult with your attorney. But I would ask that you finish answering the last question I've asked before you consult with your attorney.

A. Sure.

Q. If you don't mind doing that. As our initial exhibit, I've provided you with a copy of the notice of deposition that I've sent to your counsel.

Page 6

A. Okay.

Q. And that would be our Exhibit 1.

(Exhibit No. 1 marked for identification.)

Q. (BY MR. JONES) Now, in the course of these proceedings, we issued some interrogatories and requests for production of documents to you. And you have provided us with a response to those discovery requests, and I noticed that there's a verification that you signed.

A. Uh-huh.

Q. And this is a copy. Now, is there anything about these responses that has changed since you signed them? I mean, have you remembered something since then that would cause you to want to change your responses to the -- to our interrogatories and requests for production of documents?

A. The only things I can think of is my address changing and I had gotten a job at a car dealership. I had told Corey that I didn't use Facebook. But then I made a Facebook profile for that car dealership. And I no longer have that dealership, but I have the Facebook.

Q. What is your user name?

A. Ryan Wilder.

Q. Ryan Wilder?

A. Yes.

Page 7

Q. Okay. Now, let me ask -- if you look at the last page, that's a verification. Is that your signature?

A. Yes.

Q. Okay. Now, I want to kind of go through these a little bit just to reconfirm because I'm going to be relying on these responses --

A. Sure.

Q. -- at trial in this matter.

A. Uh-huh.

Q. Your date of birth: January 4, 1995?

A. Yes.

Q. And what's your Social Security number?

A. ████-5788.

Q. ████-5788?

A. Yes, sir.

Q. Okay. Now, this shows that your last address was 103 Cedarwood. Have you moved since then?

A. Yes, sir.

Q. Okay. Where are you residing now?

A. 121 Wildflower Drive -- Wildflower is one word. That's in Jacksonville, Arkansas. ZIP code is 72076.

Q. So your last address before the Wildflower was the 103 Cedar Drive; is that correct?

A. Yes.

Q. Okay. And your address before 103 Cedar Drive was

Page 8

604 West Daisy Bates?

A. Yes.

Q. Now, was -- I don't know where I have this in my mind. Is that a family member's residence or was that just your residence?

A. These residences, we are renting currently.

Q. Okay.

A. 604 was rental. 103 was rental.

Q. But that is you and your?

A. It was me and my girlfriend and a few other roommates who also attended the same college as us.

Q. Okay. Now, are you and your girlfriend still together?

A. Yes.

Q. And what is her name?

A. Ashley Beach.

Q. And if I understand this, before the Daisy Bates, you resided on campus?

A. Yes.

Q. And before that it was 248 Frost Road in Caddo Valley?

A. Those would be over breaks. Before that it was 1517 Ellen Street in Hope, Arkansas.

Q. Is that your family -- your parents' residence?

A. No. I lived with my grandmother back then, and she

Page 9

rented the house on Ellen Street out for about a year.

Q.   And what about the address in Emmet? That's from 2001 to 2014?

A.   Practically, that's about where I lived most of my time growing up and going to school and whatnot.

Q.   And were you raised by your grandmother at that address or by your parents?

A.   My mother – generally – my grandmother had a house beside this address; I'd kind of bounce to and fro. But generally, mail would come to 7991 67 East, and generally that's where I stayed.

Q.   And does Ashley Beach now -- she resides with you at 121 Wildflower Drive address?

A.   Yes.

Q.   Now, I asked you about relatives in Arkansas. And one of the reasons for that is, there will be a jury trial.

A.   Sure. ·

Q.   And we're going to be looking at who potential jurors are. And I would want to know who are people who might have some disposition for or against you.

A.   Right.

Q.   And so, that's my reason for asking that. Who are family members -- I'm really concerned about family members over the age of 18.

Page 10

A.   Okay.

Q.   Who might be able to be impanelled on a jury, I would want to know that. Now, you've -- obviously, Ryley is your son; and I'm assuming he's well under the age of 18?

A.   That is my daughter.

Q.   Daughter?

A.   Yes.

Q.   Okay.

A.   And her last name is actually Wilder. And Ryley is spelled R-Y-L-E-Y.

Q.   Okay. And who is May Leigh Fellows?

A.   She is my mother.

Q.   And is Nancy Brown your grandmother?

A.   Yes.

Q.   And now you said -- I see that Cheney Callahan is in high school, so she is not 18?

A.   She is 18. She turned 18 in January.

Q.   Okay. And Charles Callahan is your younger brother. How old is he?

A.   He was born in 1999, so.

Q.   About 20?

A.   19.

Q.   19?

A.   He'll turn 20 in July.

Page 11

Q.   I also asked you to identify any church, club, associations. These are places where you might be involved where you might have friends and acquaintances who could show up on the jury panel.

A.   Sure.

Q.   That is my reason for inquiring about this. And you have none. I take it then, you don't attend a church?

A.   I think, if anything, some Sundays I play at First Baptist Church on Pleasant Valley Drive.

Q.   Okay.

A.   And maybe -- when it comes to clubs, maybe music things, ensembles at school. Educational, I graduated last fall. But I take a post baccalaureate class at the college right now, so.

Q.   And if I understand you, when you graduated, you graduated with a music degree; is that correct?

A.   Yes, a bachelor's of art in music.

Q.   Now, you've identified the Facebook account that I think you've indicated you fairly recently opened?

A.   Yes. That would have been towards the end of – just the middle end of December when I made that account. It wasn't too long after I spoke to Corey and said that I did not have an account.

Q.   But before that Facebook account, did you -- you did not have any social media accounts?

Page 12

A.   If you consider SnapChat a social media account, I had a SnapChat. I wasn't very active on it. But I did have one of those accounts.

Q.   What was your user name on SnapChat?

A.   If I had to think of a handle, the e-mail I use would probably be The Ryan Wilder.

Q.   The Ryan Wilder?

A.   Yes. That's a little embarrassing.

Q.   Well, I don't -- no more embarrassing than The Ohio State University.

A.   Sure, sure, sure.

Q.   And what -- The Ryan Wilder at SnapChat?

A.   I don't think there was an at SnapChat.com. I think it was just at my G. Mail -- yeah, at gmail.com.

Q.   Is theryanwilder@gmail.com your standard e-mail address?

A.   No. I haven't used it in a while, I don't think. I have three e-mail addresses. I honestly don't remember why I opened that one up. It's practically inactive, but I still have a few accounts linked to it. I'm sure the SnapChat account is still linked to it. I also have an Amazon Prime account linked to that e-mail as well.

Q.   What other e-mail addresses do you use?

A.   Ryan Wesley 123.

Q.   Is Wesley W-E-S-L-E-Y?

Page 13

A. Yes.

Q. So it's ryanwesley123@ --

A. gmail.com.

Q. And do you have another account? You mentioned three, and so that's why I was asking?

A. Yes. It's rwwilder@ualr.edu.

Q. Do you still actively use that account?

A. I think both of those accounts I use pretty often.

Q. Okay.

A. Yes.

Q. Now, have you ever been involved in another lawsuit of any kind?

A. No.

Q. Okay. So you've never -- there's not a divorce or a bankruptcy or --

A. (Shaking head.)

Q. And I bring these up because a lot of times people don't think of those as lawsuits.

A. Sure.

Q. But us lawyers look at them as legal proceedings and a lawsuit because they're brought in a court, so.

A. Right.

Q. And I think you've indicated that you've never been arrested for or charged with a criminal offense?

A. Right.

Page 14

Q. And then I asked you about your educational background. And you indicated that you graduated from Hope High School in 2013?

A. Yes.

Q. At the time you answered this, you were going to graduate. But you now have, in fact, graduated from UALR. And this says with a BA in music?

A. Yes.

Q. Okay. I thought you said earlier Master of Arts. Did I --

A. No.

Q. It's a BA?

A. I said Bachelor of Arts.

Q. Okay. I misheard. I'm sorry.

A. Sure.

Q. And then I asked you about your previous employment history. And the Pizza Hut, is that the most recent job you've had or the oldest job? Are these from the oldest to the newest or is this from the most recent to the least recent?

A. This would have been based in Little Rock. The most recent to the least recent. I think by the time -- when I was meeting with Corey then, I was in the process of getting hired at a car dealership in Sherwood, Arkansas. So I started working there. And I worked there for

Page 15

almost a month and then I quit. And I started working as a substitute teacher most recently.

Q. Okay. What was the car dealership you worked at?

A. Crane Kia of Sherwood.

Q. And when did you work there?

A. I'd say sometime from the beginning of December to the beginning of January -- end of December, beginning of January.

Q. And you said since then you've been substitute teaching?

A. Yeah. I started working as a substitute teacher starting last Tuesday.

Q. And which school districts are working in?

A. So far just the Pulaski County School District.

Q. Now, you indicated you have a BA in music?

A. Yes.

Q. Did you also take any education courses? Would you be able to -- I mean, are you certified or capable of being certified to teach music or --

A. I think there are means of an alternative --

Q. Okay.

A. -- way to go about getting a certificate in education. I'm going to look into that by speaking to the Department of Education or something downtown.

Q. When did you work at Applebee's and P.F. Chang's?

Page 16

A. Those were over the summer a few years ago.

Q. Okay.

A. These dates are pretty -- they're accurate. I worked at P.F. Chang's from April of 2016 to July of 2016, and I worked at Applebee's for a few weeks and then I quit that.

Q. Okay. So let's get into the substance -- a little bit more of the substance of your complaint.

A. Okay.

Q. You indicate that -- well, let me back up. Let me ask you to look -- that's for your lawyer.

A. Sure.

Q. These are trip details we obtained from MEMS.

A. Okay.

Q. Which is also Little Rock Ambulance Service is their name.

A. Okay.

Q. And I know the trip details. The trips are what's at issue in this case. And what I wanted you to do is look at these and tell me if there's anything about them that you believe is inaccurate.

A. Okay. Yeah, I think this is all accurate.

Q. Okay. Let me mark that as Exhibit 2.

A. Okay.

(Exhibit No. 2 marked for identification.)

4  (Pages 13 to 16)

## Page 17

Q. (BY MR. JONES) Let me hand this back to you so that we can kind of go through it.

A. Okay.

Q. This first one, which if you look at upper right-hand corner, it gives a run number of 68,475. And this reflects your Social Security number as 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.

A. Yes.

Q. Which is consistent with what you told me?

A. Uh-huh.

Q. You'll have to answer yes or no. You can't do uh-huh --

A. Sure.

Q. -- because it's hard on the court reporter.

A. Sure. Yes.

Q. And this indicates that this particular -- I'm trying to see where the date is on here. There it is. Call started September 17th of 2015. So, that's been three and a half years ago. Do you remember that incident? You would have been picked up at UALR?

A. Oh, yes. If it's me being picked up, then yes.

Q. You were transported from UALR PD to UAMS.

A. Okay. Yes. I thought it was asking about a phone call.

Q. No.

## Page 18

A. Okay.

Q. Then I'm looking down beneath it where it says trip notes?

A. Okay.

Q. And it shows on October 30 that the final invoice was mailed.

A. Okay.

Q. And then it doesn't show any other notes until 2017 where on July 3rd, its indicates that you called about the status of the account and you were referred to Credit Control.

A. Yes.

Q. Okay. And that -- and on the 24th, you called again and you -- and spoke to Tim?

A. Yes.

Q. Now, have you ever made a payment on this account?

A. No.

Q. And this note down here indicates no payments were received from insurance. Did you have insurance in 2015 that would have covered the trip?

A. Yes.

Q. Was it ever submitted to your insurance company to your knowledge?

A. I honestly don't know.

Q. You didn't submit it?

## Page 19

A. Yeah. I -- I figured that maybe they just would in the ambulance ride, I guess. I always kept my QualChoice card with me. But I guess there was no payments from insurance.

Q. Okay. But you -- you've made no payment on this account?

A. No.

Q. Let me ask you to look at the second page.

A. Sure.

Q. Well, let's change the order of these -- well, let me see here. Let's change the order. Move the second page to the third page.

A. Okay.

Q. So we're dealing with date of services 12/19/2016.

A. Okay.

Q. And the run number is 93778.

A. Uh-huh.

Q. Now, this has your correct Social Security number?

A. Yes.

Q. Okay. And this was a transportation from 371 Club Road Apartment D to St. Vincent in Sherwood?

A. Yes.

Q. Do you remember that transport?

A. Yes.

Q. What is 371 Club Road? Was that a friend's

## Page 20

apartment?

A. Friend's apartment, yes.

Q. So you don't dispute that you were transported as stated on here by MEMS from --

A. No.

Q. Okay. Now, in looking at the trip notes, it shows that on February 10th, the final invoice was mailed. With the payment in full due in ten days.

A. Okay.

Q. And then it shows that there was insurance information received from Credit Control.

A. Okay.

Q. And then it says reported the insurance payment to Credit Control on 621.

A. Okay.

Q. And then it shows on July 3rd that you called to ask about the status of the account and that you called again on July 24th to speak to Tim.

A. Yes.

Q. Okay. Now, this reflects that, in fact, QualChoice paid $479.74 on the account.

A. Okay.

Q. Did you pay any additional amount on this account?

A. No.

Q. Let me ask you to look at the third page, which is

Crystal Garrison, CCR

Wilder, Ryan 3/18/2019                 Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 21

dated 12/20/2016, Run No. 94095. I think this may have been the focus of some confusion at some point.

A. Okay.

Q. This reflects on the trip details your correct Social Security number; am I right?

A. Yes.

Q. Okay. And do you remember being transported -- the next day after you were transported to St. Vincent, this reflects you were transported from St. Vincent to Bridgeway?

A. Yes.

Q. Okay. And you remember that occurring?

A. Yes.

Q. Okay. So you don't dispute that transport?

A. No.

Q. Then this shows that the first -- in the trip notes, the first entry is a July 24th entry by Tim Hewlett where it says: "Patient called. I verified the information was correct. Said address is his mother's address and gave me his new address, wanted to know if he could pay us directly. Advised him to pay Credit Control."

And then you told him you didn't want to talk with them because they're mean. And he advised you to call 225-2050 and report that to Bill.

Page 22

A. Okay.

Q. Do you remember that conversation?

A. Yes.

Q. Was there anything else in that conversation that's not reflected in these notes?

A. I guess not specifically. I mean, I remember calling and, you know, just speaking to him and asking if I could call them directly because, you know, I didn't particularly want to deal with Credit Control. I thought that I would be able to pay them directly, but he said no. And I wasn't sure whether or not that was true. But I was willing to pay them, yes.

Q. Did you ever submit any payment to MEMS or Credit Control?

A. No.

Q. Okay.

A. No.

Q. Now, this also reflects that QualChoice paid on this account the $292.26.

A. Okay.

Q. You don't dispute that?

A. No.

Q. But on all three of these accounts, you've never paid any additional amount on any of these accounts?

A. No.

Page 23

MR. JONES: I move for the introduction of 2.

(Exhibit No. 3 marked for identification.)

Q. (BY MR. JONES) Okay. Let me ask you to look at what I'll identify as Exhibit 3. This is a letter dated May 25th.

A. Okay.

Q. Will you hand me Exhibit 2?

A. Yes.

Q. Thank you. I don't -- the court reporter gets real upset when we don't keep up with her exhibits.

A. Okay.

Q. Do you remember receiving this letter from Credit Control?

A. Yes.

Q. And was this the first communication you had with Credit Control or had somebody called you before this?

A. I honestly don't remember. I believe it is. But I honestly don't remember.

Q. Okay. Now, I'm -- this particular copy was attached to your complaint.

A. Okay. Yes.

Q. So it came from you?

A. Yes.

Q. And it has this blacked-out area.

A. Okay.

Page 24

Q. The original one you received did not have that blacked out; did it?

A. I don't think so.

Q. Okay. So, there is -- do you know if in the re line, it says MEMS ambulance? You'd have to remember because it's blacked out right now.

A. Okay. It would have to be, I'm sure, because that would have been the only -- that would have been the only, I guess, billing.

Q. Well, when you got this letter, you knew it dealt with MEMS?

A. Yes.

MR. JONES: Okay. I move for the introduction of Exhibit 3.

(Exhibit No. 4 marked for identification.)

Q. (BY MR. JONES) Now, let me ask you to look at what we've marked as Exhibit 4.

A. Do you need this one?

Q. This is a letter dated June 26th, 2017, from Credit Control company?

A. Yes.

Q. Okay. And in this one, the re line is not blacked out and it does show MEMS ambulance?

A. Okay.

Q. And you remember receiving this letter?

6 (Pages 21 to 24)

Wilder, Ryan 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 25

A. Yes.

Q. And you knew that this dealt with the MEMS ambulance claim?

A. Yes.

Q. And it was reflecting that the balance due had been reduced from 888.75 to 409.01?

A. Yes.

Q. And you knew when you received this that Credit Control was a collection agency trying to collect on the MEMS account?

A. Yes.

MR. JONES: Move for introduction of 4.

Q. (BY MR. JONES) Now, let me ask you -- I want to talk about your interaction with Credit Control.

A. Okay.

Q. And I want to hand you a copy of your complaint.

A. Sure.

Q. So we can kind of use that as a guideline. Well, I think all this goes with it.

A. Okay.

Q. And I realize a lot of this is legal things that you would be relying on your lawyer for --

A. Okay.

Q. -- but what I'm concerned about is the factual allegations --

Page 26

A. Sure.

Q. -- they're based upon.

A. Okay.

Q. Going to page 5 and starting with paragraph 19 --

A. Okay.

Q. -- this reflects that on May 24, you were called by Credit Control to collect on a medical bill for $888.75.

A. Okay.

Q. Do you remember that call?

A. Yes.

Q. What was the nature of that call? Or what was the content of that call?

A. I think, honestly, the nature -- there was no hostility at all yet. I think Carol called. I think she was the first person I spoke to. She was the first person I spoke to. She called me looking to retrieve this debt. Yeah. And it says that I did state that I had insurance. She inquired about that. So, I gave her that insurance information. So -- and everything was still -- was still cordial back then. Everything was still cool.

Q. Did y'all discuss the fact that if insurance didn't cover the bill, that you would be responsible for the balance?

A. Yes.

Page 27

Q. So she told you that?

A. I think so, yes.

Q. Then we talked already about May 25th, you got the letter -- the letter was mailed. And that was our Exhibit 2.

A. Okay.

Q. And it requested payment in full.

A. Okay.

Q. Now, you indicated that in paragraph 24 that Credit Control dunned you for the full $888.75 even though you had told them that you had received -- you had insurance?

A. Right.

Q. When you say that Credit Control dunned you, are you talking about the May 25th letter?

A. Yes.

Q. Okay. There wasn't any other telephone conference at that point in time?

A. I don't think so, no. It was the letter.

Q. Now, you indicate in 25 that based on the services that Credit Control provides, that Credit Control knows that a consumer's health insurance would reduce the principal amount of a consumer's medical bill?

A. Okay.

Q. That is if the insurance company makes a payment.

Page 28

A. Okay.

Q. And to your knowledge, do insurance companies always make payments on submitted medical bills?

A. To my knowledge, generally, yes. From my history, yes.

Q. So from your history, you would expect it to make a payment?

A. Yes.

Q. Okay. As long as it's a covered expense?

A. Yes.

Q. Do you know whether Credit Control's experience is that insurance companies always make payments on submitted bills?

A. I can't say for sure.

Q. You don't know what Credit Control's experience is?

A. Right. I can't say.

Q. Now, in paragraph 27 --

A. Uh-huh.

Q. -- you state that the May 25th collection letter, which we have introduced as Exhibit 4.

A. Okay.

Q. No, Exhibit 3?

A. Yes. I still have Exhibit 4, if you need that back.

Q. Well, on Exhibit 3 -- okay. It says the May 25 letter does not identify the name of the creditor, but

7 (Pages 25 to 28)

Wilder, Ryan 3/18/2019                    Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 29

that's because it's blacked out.

A. Okay.

Q. The one you received, your best memory is it said MEMS ambulance?

A. Yes.

Q. Just like the subsequent letter did?

A. Yes.

Q. Now, on paragraph 29, which is on page 7, it states that after receiving the May 25, 2017 collection letter, Ryan Wilder called Credit Control?

A. Okay.

Q. Is that accurate?

A. Sure. Yes.

Q. And is that the conversation where you gave the insurance information to Carol?

A. Yes.

Q. And you said there was no hostility?

A. No. At this point, no hostility.

Q. Now, 30 says on this phone call Credit Control told Ryan Wilder the medical bill had been filed with his insurance company. Did they tell you it had been or that they would forward the medical information to MEMS?

A. I believe it was that they would forward it to MEMS.

Q. Okay. Now, on 31, you state that you did not understand why Credit Control had demanded payment in

Page 30

full for $888.75 if the medical bill had been filed with his insurance company.

A. Okay.

Q. Now, of course, at this time, you had just given the insurance information to Carol during the conversation?

A. Yes.

Q. However -- and at that time, there had been no insurance payment made; is that correct?

A. I can't say for sure. If we were looking back, it might have been I didn't understand why MEMS didn't have that insurance information from QualChoice rather than Credit Control. I do remember just giving Carol my account information for my insurance company.

Q. But if a QualChoice payment had not been made yet as of May 25th, then the full amount owed would be the $888.75?

A. Okay.

Q. Do you agree that's correct?

A. Sure, yes.

Q. And then later, in 32, you reflect that insurance did, in fact, pay a portion of the bill which reduced the balance to 409.71?

A. Okay.

Q. And that on June 26th, Credit Control sent you a second letter, the one we've marked as Exhibit 4.

Page 31

A. Okay.

Q. And it did not state that Credit Control was a debt collector?

A. Yes.

Q. But you knew Credit Control was a debt collector?

A. Yes.

Q. Okay. Now, it says in paragraph 38, which is on page 8.

A. Okay.

Q. I mean, some of this talks about what's in the letter.

A. Sure.

Q. And the letter is what the letter is.

A. Right.

Q. So, we don't need to beat that horse.

A. Okay.

Q. But it says that -- in paragraph 38 that after receiving the June 26th collection letter, Ryan Wilder and Credit Control spoke over the phone again.

A. Okay. Yes.

Q. Who initiated that phone call; do you remember? Did you call Credit Control?

A. I believe Credit Control called me.

Q. You think Carol called you?

A. Yes.

Page 32

Q. Okay. Now, this indicates in paragraph 40 that you offered to pay $40 a month towards the medical bill?

A. $40 a month.

Q. $40 a month?

A. Yes.

Q. Okay. You made that offer?

A. Yes.

Q. And then you say that Carol and Credit Control rejected the offer to pay $40 a month?

A. Yeah. She said it was too low.

Q. And then you indicate Credit Control reported these two medical bills to TransUnion?

A. Yes.

Q. Now, you also say in July of 2017, that you applied for a credit card intending to use it to pay towards the two medical bills with Credit Control?

A. Yes. And that was due to Carol's recommendation.

Q. And who did you apply to for the credit card, if you remember?

A. I have the credit card in any wallet, if I can get it out.

Q. Yeah, sure.

A. I don't want to mess that up. It's Capital One.

Q. And so, you did receive the credit card from Capital One?

8  (Pages 29 to 32)

Wilder, Ryan 3/18/2019             Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 33

A. Yes.

Q. And was there a sufficient credit on it to have paid the bill?

A. Maybe not in full. I think she said that I could pay, you know, just what was on the account. Back then, my credit only allowed me to have $300 a month on the card. And she said something about making minimum payments on the card as well. But, yeah, that's practically it. She suggested I got a credit card so I could pay towards it, so I did. She said supposedly it helped her when she had debt, she just used a credit card.

Q. But, in fact, the credit card never was used to pay the bill?

A. No, I never used it.

Q. Now, in 44, you say: "After not reaching Carol at Credit Control." Does that mean you tried to call her?

A. Yes.

Q. But did you leave a message?

A. I -- whoever answered, I told them to just say that, hey, I called. And they said they would just tell them that I called. I didn't leave a message specifically on her voice mail. I didn't get in touch with her. They didn't direct me to her voicemail or anything like that.

Q. Then you're talking about on July 20, you worked a

Page 34

late shift. And then on July -- at 10:00 o'clock on July 21st, Carol called you?

A. Yes.

Q. And this -- you said this woke you up?

A. Yes.

Q. As you had been sleeping because you had been working a late shift until 2:00 a.m.?

A. Yes.

Q. And then you indicated she said something that you did not understand or, I guess, didn't register or however you want to describe it?

A. Right. Within terms of it didn't register. She just said, hey -- like she was like -- with an intimidating voice, she was like, "Is this Ryan," or, "Could I speak to Ryan?"

And then at that point, I guess it didn't quite register what was going on because I was still, you know, groggy from, you know, the call waking me up. And then I didn't say anything. I might have made a noise like "huh" or something like that. And then that's when she said, "That's okay. We'll be seeing you soon." And then she hung up.

Q. Okay. When she said, "We'll be seeing you soon" --

A. Yes.

Q. -- did you take that to mean that they would follow

Page 35

up on the debt and they'd be contacting you later?

A. I thought of it as a threat.

Q. Why did you think it was a threat?

A. Because with an intimidating voice, she stated, "We'll be seeing you soon," and she hung up the phone. So, you -- people -- I don't think anyone would interpret that as a non-threat, you know, with such an intimidation factor, you know, like -- I definitely perceived it as a threat.

Passive aggressive behavior such as hanging up the phone and not trying to be cordial or respectful in any way -- yeah.

Q. Well, did you get angry during the conversation?

A. During that conversation?

Q. Yes.

A. No. There weren't -- the only words spoken were, you know, she asked to speak to me and I don't recall saying anything. I might have made a noise because I woke up and then she said, "That's okay. We'll be seeing you soon." And then she hung up the phone immediately after. Then that's when anger appeared from me, just directly after that.

Q. Did you immediately call her back?

A. I tried. I tried, yes.

Q. Well, I'm looking at Carol's notes. And she

Page 36

indicates that -- well, that's all right. Did you ultimately get in contact with her that day?

A. Yes.

Q. Okay. Did she call you back or --

A. No. I called back the number that had called me, which might have been a direct phone number to her office. I'm not sure. But I had a different phone number on my phone as well that came from Credit Control, so I called that number.

And then I got ahold of someone, which I believe it was her. The voice sounded familiar and it was a woman. And, you know, I wasn't happy. I was just saying, like, "Oh, I want to speak to, you know, the person who called me saying like these things to me." And then I was hot. And then she -- that person hung up on me again.

Q. Did you use profanity?

A. Yes. Yes. I'm sure I did. I know specifically towards C.D. Hanson, I said a specific thing that I recall. But the profanity might have -- towards Carol, it was just a -- just to end the conversation kind of thing, like, "Oh, I don't F-ing care," something of those regards, yeah. But whatever I said to C.D. Hanson was direct. But, yeah, there was profanity.

Q. Let's go back to the first call where Carol called and woke you up.

9 (Pages 33 to 36)

Crystal Garrison, CCR

Bushman Court Reporting            501-372-5115

Wilder, Ryan 3/18/2019                                   Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 37

A. Yes.

Q. You said she called; you were kind of groggy and said huh?

A. Yes.

Q. What did she say to you?

A. Before that?

Q. Well, I mean, you said she called?

A. Yes.

Q. You answered the phone?

A. Yes.

Q. What did she say?

A. She was asking for Ryan. Like I just woke up and I guess they knew that I had answered the phone or something like that. And then she asked to speak to me.

Q. Okay. And you said at that point there was no hostility?

A. Well, not in the past calls. Like in the past calls, there wasn't.

Q. Well, no. I'm talking about the call on July 21st.

A. Okay.

Q. And I'm talking about the initial contact where she calls; you answer.

A. Uh-huh.

Q. And she says -- she's asking for Ryan?

A. From my end, there was no hostility. From her end,

Page 38

with an intimidating voice she asked for Ryan, yes. Immediately, she was like, "Yeah, can I speak to Ryan," just in an intimidating kind of way.

Q. I mean, the way you're describing it doesn't sound intimidating to me.

A. Tone. It was her tone. Like I don't really strike myself as an intimidating person, but it was her tone.

Q. She called you in a forceful tone?

A. Yes.

Q. "Can I speak to Ryan?"

A. Yes.

Q. In kind of abrupt, if you will, or forceful way?

A. Yes.

Q. Okay. And then you responded what?

A. I responded like, "huh," just because I was confused as to what was going on, yes.

Q. Did it -- did you then realize who it was?

A. Maybe a split second before she said, "That's okay. We'll be seeing you soon," and then she hung up. Like it took me just a second to register who it was.

Q. Well, I mean, I'm trying to understand the content.

A. Okay.

Q. So what you said was she called?

A. Yes.

Q. You picked up the phone?

Page 39

A. Yes.

Q. She asked to speak to Ryan in a forceful voice?

A. Yes.

Q. You said huh?

A. Yes.

Q. And she said, "That's okay. We'll be seeing you soon," and hung up?

A. Yes.

Q. Nothing else was said?

A. Nothing else was said.

Q. The only thing you said was huh?

A. Practically, yes. Like I don't -- I belive that was the only thing that was said. There was -- nothing else was said. If anything, I might have also made a noise when I answered the phone, but I don't even think I did that. I think I just answered the phone and they knew that I answered the phone because the ringing stopped. And then she asked to speak to me, and I mumbled a word. And then she said, "That's okay. We'll be seeing you soon," and she hangs up the phone.

Q. Okay.

A. Uh-huh.

Q. And you interpreted that as a threat?

A. Yes.

Q. A threat to do what?

Page 40

A. I don't know. A threat to sue me. A threat to -- "we'll be seeing you soon," like what -- like I've heard people say that in the past, like it's never been a good thing, never been a good thing. I don't understand an instance where that would be a good thing for someone to say that to you in a way that, like -- okay, maybe a family member will say, okay, yeah, we'll be seeing you soon. We'll see you Sunday or something like that. But that was not the context whatsoever.

Q. Well, did you understand that Credit Control was going to follow up on the debt?

A. I -- no. I didn't know what they were wanting from me because I had offered to pay them. I had called them trying to get ahold of Carol, and I didn't get ahold of her. And then she called me saying these things when I was, in fact, willing to pay. I got a whole credit card for that reason, you know.

Q. But you had been anticipating contact from Credit Control?

A. Maybe.

Q. Well, I think you indicated that you were waiting for them to call you?

A. Yeah. Because Carol knew that I had a credit card and that I was willing to pay. She had that information. And she should understand from the

10 (Pages 37 to 40)

Wilder, Ryan 3/18/2019                                 Ryan Wesley Wilder v. Credit Control Company, Inc.

Page 41

previous calls that I was practically docile, you know, willing to pay. She said I was argumentative at one point, and that's a stretch. That is a stretch.

But, yeah, she should have known at that point -- you know, if I'm going to go out of my way to get a hard inquiry on my credit report to get a credit card -- and I've never had a credit card before. I didn't know how to use credit cards back then.

If she knew that I was willing to go out of my way to get a credit card and she had this information from the person I spoke to at the office, then she should know -- she should be understanding that I was willing to pay then. So to hit me with something like that, that's just ridiculous, especially when I was willing to pay.

Q. You indicated that you immediately called her back, but she didn't answer the call?

A. I tried calling back that same number that had called me. And then I had a different number from them somewhere just in the memory of my call history and whatnot or I might have even looked up the number on Google. I just remember calling a different number.

Q. Okay.

A. Uh-huh.

Q. But you talked to her when you called the different

Page 42

number?

A. Yes, I believe so. Uh-huh.

Q. And what occurred in that conversation?

A. I just said I want to speak to whoever just called me like waking me up, you know, this early. One might say that 10:00 o'clock isn't early. But I believe that 10:00 o'clock is early when you go to work for a while before and you deal with these customers who are still ordering pizzas before they close the store. When you have a newborn, just a month old, maybe a month old, maybe a few weeks old, you know, crying in the middle of the night. I think 10:00 o'clock is fairly early. And I think it's my right to be groggy and not really expect such a call. So, yeah, I was hot. I was not happy.

Q. Okay. Now, in fairness, there's no way Carol knew that you were working till 2:00 o'clock in the morning?

A. Yeah. So I called back and tried to explain that. And I tried to explain all of that. She didn't care. C. D. Hanson didn't care.

Q. Okay. What was the content of your conversation with Carol when you called her back?

A. I just remember saying that I wanted to speak to whoever called me. I remember saying that I did -- I do remember saying things like, oh, I didn't understand what was going on at the time. I remember trying to

Page 43

explain that. I remember cussing as well.

Honestly, looking back -- I don't regret getting mad. But, I mean -- even with that threat. But, I mean, maybe I could have behaved a little bit better and like used less profanities in whichever calls I used profanities in. People might argue that that's immature. But, yeah, I just wasn't happy.

Q. What did Carol say?

A. She just said -- she was just saying things like, "Oh, oh, oh, slow your roll," like, "I'm not going to let you talk to me like that," things along that nature. And said that, once you've calmed down and you're ready to pay, then you call back. And then she just hung up on me. She wasn't trying to listen to anything I said or any kind of reasoning that I had.

Q. Then I take it you called back another time?

A. Yes.

Q. And that's when you spoke with C. D. Hanson?

A. Yes.

Q. What happened in that conversation with Mr. Hanson?

A. With that one, you know, I just complained about Carol. And I said, "Hey, like you know she's calling me disrespecting me. I have been willing to pay." And he's just saying things like, "Oh, I'm not going to let you talk to my employees like that," which I respect

Page 44

that because not many managers would allow that.

But, I mean, when it comes from the standpoint of you are the person who's going to pay and then, you know, these people -- they're being disrespectful towards you. Generally, I'm very respectful towards people until they are disrespectful towards me.

And so, I didn't appreciate that fact that there was, I guess, no discipline on that end, I guess. I don't know what -- how that works, what specifically goes on in those offices. But they -- no discipline on that end.

Q. So you were upset with that?

A. Yes. Oh, yeah.

Q. Did you communicate your unhappiness to Mr. Hanson?

A. Yes.

Q. Were you angry and using angry words?

A. Yes, yes.

Q. Did you use vulgarity when you spoke to Mr. Hanson?

A. Yes, yes. Maybe not until the end of the conversation because at that point I was calmer than I was when I spoke to Carol. But the final words of my conversation, yes, I used profanity.

Q. So when you spoke to Carol, you were pretty hot?

A. Yes, uh-huh.

Q. Then you indicate that over the weekend, you sought

11 (Pages 41 to 44)

Page 45

advice from your supervisor on how to handle it?

A. Yes.

Q. Who was your supervisor?

A. Diane. She still works at the Pizza Hut on Cantrell road.

Q. So this indicates on July 24th, you called C.D. Hanson and left him a voicemail?

A. Yes.

Q. And then you called and spoke to Carol who refused to transfer the call?

A. Yes.

Q. What happened in that conversation?

A. She said, "Oh, you're not going to speak to my supervisor." I called her a caseworker -- I guess I didn't specifically know that I was speaking to Carol then because -- I don't know. I just didn't know. And I was trying to get ahold of my caseworker and things were cordial until she realized who I was.

And then she said, "Oh, the way you spoke to me with the last call, before the weekend, I'm not going to let you get in touch with C. D. Like I'm not a caseworker. I'm a blah blah blah." I don't know. I still to this day don't know her position. She said, "You can either pay in full because we're not going to accept monthly payments anymore. You can either pay in full or we're

Page 46

done here." And then that was it.

Q. Okay. So you all hung up at that point?

A. Yes.

Q. And then you called again to talk to Mr. Hanson?

A. I don't -- I think it was over after that.

Q. Did you ever talk to Mr. Hanson more than the one time?

A. More than the one time, no.

Q. Okay. Do you remember him telling you in that conversation that he would place you on the Do Not Contact list?

A. Yes.

Q. Okay. Did you understand what that meant?

A. Yes.

Q. That Credit Control would no longer make any affirmative efforts to contact you?

A. Yes. And they did not.

Q. And they did not?

A. Yes.

Q. Okay. So, you initiated the contact to call Carol where Carol, you said, wouldn't forward your phone call and -- but you initiated that call? That wasn't her calling you; that was you calling them?

A. That was me calling them, yes.

Q. And so, after July 21st then of -- or July 24, 2017,

Page 47

you had no further contact with Credit Control?

A. No.

Q. Okay. They didn't send you any letters?

A. I don't -- no, no, no.

Q. They didn't make any more phone calls?

A. No.

Q. You indicate then on August 10, you received notification that Credit Control had reported to TransUnion a third collection account?

A. Yes.

Q. Okay. And I don't want to belabor this. I think we've gotten to the point that you recognize that the third collection account was a legitimate account; it was the transportation from St. Vincent to Bridgeway?

A. I think it was -- I don't -- no, I think it was something else because I think that, once I disputed it, they took it out. And so, I just had the original two that were on my credit report. I had -- I disputed it with TransUnion.

Q. And they removed it?

A. Yes.

Q. Okay. But, I mean, we've looked at the trip details in Exhibit 2.

A. Okay.

Q. And they show three separate trips; correct?

Page 48

A. Okay.

Q. And you've not paid on any of these three trips?

A. No.

MR. JONES: If I understand correctly -- let's go off the record.

(Brief discussion off the record.)

Q. (BY MR. JONES) So there's -- as it turns out then, there's been no further contact from Credit Control. Nothing subsequent to your July 24th conversation with Carol has occurred that you take exception with?

A. Right.

Q. Okay. You made a complaint to the Arkansas Attorney General's Office?

A. Yes.

Q. Okay. I have here a -- it's really a series of documents. I don't want to give you that one. I marked on that one.

A. Okay.

MR. JONES: Well, I need to mark this. This is going to be Exhibit 5.

(Exhibit No. 5 marked for identification.)

Q. (BY MR. JONES) Now, this first letter is a letter from the Attorney General's Office to you?

A. Uh-huh.

Q. Dated August 8, I think, reflecting their receipt of

12 (Pages 45 to 48)

Wilder, Ryan 3/18/2019                    Ryan Wesley Wilder.v. Credit Control Company, Inc.

Page 49

your complaint.

A. Okay. Yes.

Q. And then immediately following it, it is a copy of an e-mail apparently printed on Edith Collins' e-mail account. But this -- and I am assuming Edith Collins is an employee of the Attorney General's Office.

A. Okay.

Q. But what this reflects is your consumer complaint, if I understand it. Is that -- if you'll review it, is that what you remember?

A. Yes. Yes.

Q. Okay. Now, the -- there's a document at the back that says August 15, 2017. That is a response from Mr. Hanson.

A. Okay. That's this page. Yes.

Q. Okay. And then finally, there is a letter to you dated August 28th from the consumer protection, from Liz Garcia, investigator with the AG's office?

A. Yes.

Q. And so, this is essentially the complete file, if you will, on the Attorney General complaint that you made?

A. Yes.

Q. Now, turning to the third page, which is the substance of your complaint, where it says that --

Page 50

explain the circumstances surrounding the complaint.

A. Okay.

Q. So what this says here is: "They called this morning and woke me up."

A. Uh-huh.

Q. "And I answered."

A. Uh-huh.

Q. "The lady speaking said something I couldn't quite make out, so I didn't say anything back."

A. Uh-huh.

Q. Then she said, "That's okay, we'll be seeing you soon."

A. Yes.

Q. And that's the extent of the conversation with Carol?

A. Yes. That specific instance.

Q. And you said: "So at this point I was very angry. I called that number back a few times and no answer."

A. Okay.

Q. "So I called the office number and asked for my caseworker and they hung up on me."

A. Yes.

Q. "I tried that again, but I was angry at this point. The next person I spoke to argued back and forth and she hung up on me."

Page 51

A. And I believe that was Carol. I believe both times it was Carol; it had to be.

Q. And then you said you called one last time and the owner answered. "He threatened to take legal action against me if I didn't pay this bill." What did Mr. Hanson say that was threatening to take legal action?

A. He said, "We're going to put you on the do not call list, but I'll hand this off to my legal team," or something along those lines.

Q. Okay.

A. Yes.

Q. So he didn't tell you that they were going to abandon efforts to collect?

A. He just said I was going to be on the do not call list.

MR. JONES: Okay. Move the introduction of 5. Okay. Now, let's go off the record for a moment.

(Brief discussion off the record.)

MR. JONES: The area we're going into is confidential under seal.

MR. McGAHA: And we are designating the following testimony as confidential under the existing protective order. When we get the transcript from the court reporter, we'll make that clear, too.

Pages 52-56 have been redacted.