In the United States District Court
Eastern District of Arkansas
Western Division

Ryan Wesley Wilder                                               Plaintiff

v.                        Case No. 4:18-cv-344-KGB

Credit Control Company, Inc.                                     Defendant

**Plaintiff's Response to Defendant's Statement of Material Facts and Statement of Material Fact on Which He Contends a Genuine Dispute Exists to be Tried and Additional Facts that Plaintiff Believes are Material and in Dispute**

To support his opposition to Defendant's motion for summary judgment, plaintiff files his statement of material facts on which he contends a genuine dispute exists, as required by Local Rule 56.1 and Fed. R. Civ. P. 56, which is incorporated by reference into his Opposition to Defendant's Motion for Summary Judgment.

*Facts in Paragraph 1 of Defendant's Statement of Material Facts Not in Dispute*

Ryan Wesley Wilder (Wilder or Plaintiff) is an adult resident of the State of Arkansas and is a consumer within the meaning of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 2 of Defendant's Statement of Facts:* Credit Control Company, Inc. (CCC or Defendant) is a debt collection agency within the meaning of the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692, et seq and the Arkansas Fair Debt Collection Practices Act ("AFDCPA").

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 3 of Defendant's Statement of Facts:* Little Rock Ambulance Authority dba MEMS (MEMS) is a municipal ambulance and

1

emergency medical services organization operating in the Central Arkansas area including but not limited to Pulaski County, Arkansas pursuant to Arkansas Code Ann. § 14-137-108 and Little Rock City Code § 5-26, et seq. – Ordinance No. 14,062.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 4 of Defendant's Statement of Facts:* MEMS engages CCC to collect delinquent accounts for ambulance and emergency medical services. Deposition of C.D. Hanson at 48 (hereinafter "CDH Dep. at ___").

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 5 of Defendant's Statement of Facts:* On September 1, 2015 Wilder received ambulance and emergency medical services from MEMS. Ex. 1 (MEMS Trip Detail Run No. 68,475); Wilder Deposition at 17 (hereinafter RWW Dep. at. ____"). A final invoice was sent to Wilder on October 30, 2015. *Id.* No insurance payment was received for this run and no other payment was made by Wilder. RWW Dep. at 18-19.

*Response:*  Wilder agrees with the stated fact.

*Facts in Paragraph 6 of Defendant's Statement of Facts:* On April 3, 2016, MEMS electronically forward the unpaid balance for these services to CCC to initiate collection efforts. See Ex. 2 (CCC Account file 7970983, MEMS Client Ref # 15-68475). The client reference number is the last two digits of the year of service followed by the MEMS run number for that service. CCC assigned an internal account number of 70983 to this matter.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 7 of Defendant's Statement of Facts:* On December 19, 2016 Wilder received ambulance and emergency medical services from MEMS. A

2

final invoice was sent to Wilder by MEMS on February 10, 2017. Ex. 3 (MEMS Trip Detail Run No. 93,778). RWW Dep. at 19.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 8 of Defendant's Statement of Facts:* On December 20, 2017, Wilder again received ambulance and emergency services from MEMS. Ex. 4 (MEMS Trip Detail Run No. 94,095). RWW Dep. at 21. On January 24, 2017 MEMS received an insurance payment that paid part of the cost of this run. *Id.*

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 9 of Defendant's Statement of Facts:* On or about May 21, 2017, MEMS electronically forward the unpaid balances for the December 2016 services to CCC to initiate collection and copied the electronic transmission of the 2015 services originally forwarded April 3, 2016. This included the $888.75 amount for run 16-93778. See Ex. 5 (MEMS electronic transmission and CDH Dep. at 40).

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 10 of Defendant's Statement of Facts:* The 12.19.2016 services with MEMS client reference number 16-93778 was assigned CCC account file 8001750 by CCC. Ex. 6.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 11 of Defendant's Statement of Facts:* The 12.20.2016 services with MEMS client reference number 16-94095 was assigned CCC account file 8001798. Ex. 7.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 12 of Defendant's Statement of Facts:* The information communicated by MEMS contained an erroneous Social Security Number beginning 151 as opposed to Wilder's correct SSN beginning 589. As a result, CCC

did not associate that claim with the other two claims. See CDH Dep. at 44-45, 88-89.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 13 of Defendant's Statement of Facts:* Debt information is electronically forwarded by MEMS to CCC where CCC's system electronically enters it into is collection database. There is no human activity in this process. CDH Dep. at 39. Thus, CCC was not involved in entering an incorrect SSN for the 12.20.2016 services. CDH Dep. at 45.

*Response:* Wilder agrees with this stated fact.

*Facts in Paragraph 14 of Defendant's Statement of Facts:* CCC uses the Collector System from Columbia Ultimate Business Systems (CUBS) to receive and store all the information for its collection accounts. All information is entered into this system including the contemporaneous notes of conversations with debtors, information received, and actions taken. See Ex. 6 (CUBS printout for 8001750/ref. no. 16-93778); CDH Dep. at 41-45.

*Response:* Wilder agrees with the stated fact.

*Facts in Paragraph 15 of Defendant's Statement of Facts:* On May 24, 2017 CCC's collector Carol, listed as CLZ on its internal note system, contacted Wilder telephonically regarding MEMS account 8001750. The conversation was cordial. RWW Depo. At 26. Carol properly identified herself and, during the conversation, Wilder informed her he had health insurance but did not know his membership number. He later called back and gave her his membership information which Carol forwarded to MEMS on May 25, 2017. See Ex. 8 (CUBS printout); CDH Dep. 43, 60-61.

*Response:* Wilder agrees with the stated fact.

4

*Facts in Paragraph 16 of Defendant's Statement of Facts:* On May 25, 2017 a validation letter was sent to Wilder by CCC stating "RE: MEMS AMBULANCE 16-93778", stating the principal due of $888.75, stating CCC was a debt collector and this was an effort to collect a debt and setting forth Wilder's rights as required by the FDCPA. Ex. 8 (5.25.2017 letter from CCC).

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 17 of Defendant's Statement of Facts:* Payment $479.74 was received by MEMS from Wilder's health insurer on or about June 16, 2017. Ex. 3 (MEMS Trip Detail Run No. 93,778).

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 18 of Defendant's Statement of Facts:* On June 26, 2017, CCC sent Wilder a letter updating the amount owed to reflect the June 16 payment. Ex. 9 (6.26.2017 letter from CCC to Wilder).

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 19 of Defendant's Statement of Facts:* On July 21, 2017, Carol called Wilder at 10:00 am and asked to speak to "Ryan." CDH Dep. at 67-68; RWW Dep. at 34. Wilder acknowledges that he had been waiting for her to call. *Id.* at 40. Wilder's version of this call is that he had been working until 2:00 am and was awakened by Carol's call. He states that he answered the call but was silent other than possibly grunting. *Id.* When he said nothing, the caller said words to the effect of, "That's ok. Well be seeing you soon" and hung up. *Id.* Wilder characterizes this language as a threat. *Id.* at 35.

*Response:* Wilder agrees with the stated facts with the caveat that he was not waiting for Carol to call him on that specific day, at that specific time. See Wilder's Statement of Facts below.

5

*Facts in Paragraph 20 of Defendant's Statement of Facts:* Wilder then called Carol. He admits he "was not happy" and "then I was hot." RWW Dep. at 36. He also admits it was likely he used profanity. RWW Dep. at 36, 42, and "maybe I could have behaved a little bit better and like used less profanities…But, yeah, I wasn't happy." *Id.* at 43. The person responded, "I'm not going to let you talk to me like that" and "Once you've calmed down and you're ready to pay, then you call back." *Id.* She then hung up. *Id.*

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 21 of Defendant's Statement of Facts:* Wilder then called back again and was directed to C.D. Hanson, operations manager of CCC. CDH Dep. at 26, 43. He expressed his anger at Carol and his perception of disrespect. RWW Dep. at 43-44. He admits he used profanity toward Hanson and that Hanson stated "Oh, I'm not going to let you talk to my employees like that." *Id.* Hanson then volunteered to place Wilder in "do not contact" status so that there would be no further contact initiated by CCC. *Id.* at 46, 51. After that, he received no more calls initiated by CCC. *Id.* at 47.

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 22 of Defendant's Statement of Facts:* On July 24, 2017, Wilder called and spoke to Carol who told him he had to pay in full or "we're done here." RWW Dep. at 45. This was his last contact with CCC. *Id.* at 46-47.

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 23 of Defendant's Statement of Facts:* Wilder has abandoned his claims under 15 U.S.C. §§ 1692e(8) and 1692e(11) and Ark. Code Ann. § 17-24-506(b)(8) and 17-24-506(b)(11). Ex. 10 (3.15.2019 email from Mr. McGaha).

6

*Response:* Wilder agrees with the stated facts.

*Facts in Paragraph 24 of Defendant's Statement of Facts:* When CCC was first founded in 1972, it adopted policies which would later compare favorably by to the FDCPA when the latter was enacted. CDH Dep. at 31, 35-36, Ex. 11.

*Response:* Wilder agrees with CCC adopting policies in 1972, but disagrees that whether the policies compare favorable to the FDCPA is a fact.

**Wilder now lists additional facts, which are material and in dispute:**

1.      Each time MEMS provided ambulance services to Wilder, he gave them permission to bill his insurance. Plaintiff's Exhibits 1-3 designated Confidential and filed under seal.

2.      The first time Wilder and Credit Control Co. communicated was on May 24, 2017. Exhibit 4, CD Hansen Dep. 45:10-45:24, 53:25-55:8; 61:20-62.:2.

3.      Credit Control knows that if a debtor or consumer provides it with insurance information and Credit Control forwards that insurance information to MEMS, then MEMS will request a 45-day hold on collections, which is what happened to Wilder's account.  Exhibit 4, CD Hansen Dep., p. 48:5-48:17.

4.      Even though Credit Control knew MEMS would request a 45-day hold to see if insurance would pay on the ambulance bill, the next communication after Wilder's first communication with Credit Control demanded payment of the account in full: "We have been authorized by our client to demand payment in full," and the with a "Principal" and "Balance Due" of $888.75. Exhibit 4, CD Hansen Dep., p. 56:1-57:25, Document 13-8.

5.      Wilder applied for a Capital One Credit Card to pay Credit Control on the bill and received a hard inquiry on his credit report from Capital One.

Plaintiff's Exhibit 5 designated Confidential and filed under seal. RWWilder 00007.

6.     One of Credit Control's "Telephone Don'ts" is "1. Don't Antagonize People." Document 13-11, p. 15.

7.     Another is "5. Don't threaten the debtor at any time." *Id.*

8.     Credit Control's collectors know that they don't go to consumer's or debtor's house to collect debts. Exhibit 4, Hansen Dep. p. 35:14-37:13.

9.     CD Hansen for Credit Control, recommends whether to sue a consumer or debt to collect debts, but MEMS has the ultimate decision about whether to sue. Exhibit 4, Hansen Dep. 49:19-52:13.

10.    Even though Credit Control knew MEMS would request a 45-day hold to see if insurance would pay on the ambulance bill, the next communication after Wilder's first communication with Credit Control demanded payment of the account in full: "We have been authorized by our client to demand payment in full," and the with a "Principal" and "Balance Due" of $888.75. Document 13-8.

11.    The "$888.75" was later reduced by insurance payment. Document 13-9.

12.    The letter Credit Control relayed to Wilder showing the reduced balance stated: "May we suggest you have your attorney determine your liability towards this obligation." Document 13-9.

13.    After the balance was reduced, Wilder offered to pay Credit Control $40 per month. Document 13-6, p. 3 (080)–(084).

14.    Credit Control considered recommending filing a legal action against Wilder to collect the debt, but MEMS must ultimately authorize the debt collection lawsuit be filed.

15.   Wilder considered the, "That's ok. We'll be seeing you soon," comment a threat as follows:

Q:   The only thing you said was huh?

A:   Practically, yes. Like I don't – I believe that was the only thing that was said. There was – nothing else was said. If anything, I might have also made a noise when I answered the phone, but I don't even think I did that. I think I just answered the phone and they knew that I answered the phone because the ringing stopped. And then she asked to speak to me, and I mumbled a word. And then she said, "That's okay. We'll be seeing you soon," and she hung up the phone.

Q:   Okay.

A:   Uh-huh.

Q:   And you interpreted that as a threat?

A:   Yes.

Q:   A threat to do what?

A:   I don't know. A threat to sue me. A threat to – "we'll be seeing you soon," like what – like I've heard people say that in the past, like it's never been a good thing, never been a good thing. I don't understand an instance where that would be a good thing for someone to say that to you in a way that, like – okay, maybe a family member will say, okay, yeah, we'll be seeing you soon. We'll see you Sunday or something like that. But that was not the context whatsoever.

Q:   Well, did you understand that Credit Control was going to follow up on the debt?

9

A:      I – no. I didn't know what they were wanting from me because I had offered to pay them. I had called them trying to get ahold of Carol, and I didn't get ahold of her. And then she called me saying these things when I was, in fact, willing to pay. I got a whole credit card for that reason, you know.

Q:      But you had been anticipating contact from Credit Control?

A:      Maybe.

Q:      Well, I think you indicated that you were waiting for them to call you?

A:      Yeah. Because Carol knew that I had a credit card and that I was willing to pay. She had that information. And she should understand from the previous calls that I was practically docile, you know, willing to pay. She said I was argumentative at one point, and that's a stretch. That is a stretch.

But, yeah, she should have known at that point – you know, if I'm going to go out of my way to get a hard inquiry on my credit report to get a credit card – and I've never had a credit card before. I didn't know how to use credit cards back then.

If she knew that I was going to go out of my way to get a credit card and she had this information from the person I spoke to at the office, the she should know – she should be understanding that I was willing to pay them. So to hit me with something like that, that's just ridiculous, especially when I was willing to pay. Document 13-13, p. 11-12.

16.     Credit Control considered recommending filing a legal action against Wilder to collect the debt, but MEMS must ultimately authorize the debt collection lawsuit be filed. Exhibit 4, Hansen Dep., 73:5-73:18, 75:15-78:19.

17.     Wilder reported the call and the threat of a lawsuit with Credit Control to the Arkansas Attorney General's Office. Plaintiff's Exhibit 6.

18.     CD Hansen did not deny to the Arkansas Attorney General's Office that he threatened legal action against Wilder and that statement to a consumer would be a "common practice." Exhibit 4, CD Hansen Dep. 75:17-78:19.

Respectfully submitted,

Corey D. McGaha
Ark. Bar No. 2003047
William T. Crowder
Ark. Bar No. 2003138
CROWDER MCGAHA, LLP
5507 Ranch Drive, Suite 202
Little Rock, AR 72223
Phone: (501) 205-4026
Fax: (501) 367-8208
cmcgaha@crowdermcgaha.com
wcrowder@crowdermcgaha.com

11