In the United States District Court
Eastern District of Arkansas
Western Division

Ryan Wesley Wilder                                           Plaintiff

v.                              Case No. 4:18-cv-344-KGB

Credit Control Company, Inc.                                 Defendant


**Plaintiff's Response to Defendant's Statement of Material Facts and Statement of Material Fact on Which He Contends a Genuine Dispute Exists to be Tried and Additional Facts that Plaintiff Believes are Material and in Dispute**


**Plaintiff's Exhibit 4 – Cover**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RYAN WESLEY WILDER ) PLAINTIFF
)
V. ) Case No. 4:18-CV-344-KGB
)
CREDIT CONTROL COMPANY, )
INC. ) DEFENDANT.

------------------------------------

ORAL DEPOSITION OF

CHARLES D. HANSON

MARCH 18, 2019

------------------------------------

ORAL DEPOSITION OF CHARLES D. HANSON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on March 18, 2019, from 11:34 a.m. to 1:55 p.m., before Crystal Garrison, Certified Court Reporter, in and for the State of Arkansas, reported by machine shorthand, at the law offices of Jack Nelson Jones, 1 Allied Drive, Building 1, Suite 1110, Little Rock, Arkansas 72202, pursuant to the Federal Rules of Civil Procedure.

ORIGINAL

A P P E A R A N C E S


*ATTORNEY FOR THE PLAINTIFF:*

    MR. COREY D. McGAHA
    Crowder McGaha, LLP
    5507 Ranch Drive, Suite 202
    Little Rock, Arkansas 72223
    cmcgaha@crodermcgaha.com


*ATTORNEY FOR THE DEFENDANT:*

    MR. STEPHEN W. JONES
    Jack Nelson Jones, P.A.
    1 Allied Drive, Building 1, Suite 1110
    Little Rock, Arkansas 72202
    sjones@jacknelsonjones.com

EXAMINATION INDEX

                                                       PAGE
CHARLES D. HANSON
     Examination by Mr. McGaha.........................4
     Examination by Mr. Jones.........................87

Changes and Signature...............................95

Reporter's Certificate..............................97

EXHIBIT INDEX

NO.  DESCRIPTION                                      PAGE

6    Notice of Deposition, 4 pages....................30

7    Notice of 30(b)(6) Deposition, 4 pages...........30

8    Policy Manual/Ironclad Rules, 16 pages...........31

9    Raw data received from MEMS, 11 pages............39

10   E-mails between Carol and Randy, 2 pages.........80

11   Complaint filed with AG's Office, 30 pages.......82

CHARLES D. HANSON,

having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. McGAHA:

Q.    Mr. Hanson, I'm Cory McGaha; I represent Ryan Wilder in this case.

A.    Yes, sir.

Q.    And would you please state your name for the record.

A.    Charles D. Hanson, H-A-N-S-O-N.

Q.    And, Mr. Hanson, you were in the conference room when Mr. Wilder was deposed just a few minutes ago for about an hour; is that correct?

A.    Yes, sir.

Q.    And you heard everything he had to say about the case?

A.    Yes, sir.

Q.    Okay.    Mr. Hanson, what is your work and home addresses?

A.    The work address is Credit Control Company Incorporated, 10201 West Markham, Suite 104, Little Rock, Arkansas 72205.    My home address is 2124 Arkansas Valley Drive, Little Rock, Arkansas 72212.

Q.    And how long have you lived at your home address?

A.    About five years, I believe.    That's actually the family home.    I moved back in there to take care of my

credit card to pay some of the debt or all of the debt?

A.   Well, absolutely, we are going to offer suggestions of how they might can resolve it.  And that certainly is an option.  "Do you have a credit card?"  Particularly, do you have somebody that has a fairly large bill and they say, "I can only pay $25 a month."

     "Well, have you considered possibly paying this off with your credit card and then making small monthly payments to them," as a way to resolve that debt.

Q.   Okay.  And if you will turn over to the next page or it's actually about three pages back.  It's got a list of telephone dos and telephone don'ts.

A.   Yes, sir.

Q.   And it says on the telephone don'ts is a list of ten things.  Don't -- for instance, No. 1:  "Don't antagonize people."  Is there -- is there a reason your father put that into this list of things that your collectors should not do?

A.   Absolutely.  And that situation is, obviously, Dad wrote this before the passage of the Fair Debt Collections Practices Act.  There was no -- there was no federal law that governed collection agencies at that time in 1972.

     As a result, there were certainly some collection agencies that acted like it was the wild west.  That is

not the atmosphere -- you have people coming from another collection agency to work for any father; that was not the atmosphere that he wanted to create and that was not how he wanted to do business.

Q.    Okay.  And it also says, No. 5:   "Don't adopt a quote/unquote hard-boiled attitude."  Do you know what that policy means?

A.    Again, dealing with some folks that may have worked in a different environment that want to come out and tell people -- be overly aggressive and possibly rude to people as opposed to his theory that we want to help you get this bill resolved.

Q.    It looks like if you look at the next page, it says: "Office interviews."  And I just take it from having this in your father's policy that he wrote that he would try to encourage consumers or debtors to come to the office and make payments; is that correct?

A.    Yes, sir.  But once again, this has not been updated.  We very rarely at this point have people come to the office.  Somebody is certainly welcome to.  They can come by and make a payment.  That happens so very very infrequently now, just by the same thing, there's something towards the beginning about we don't take payments over the telephone; that was absolutely true in 1972; that is certainly not true now.

Q.   Okay.

A.   If you call me up and say, "I've got a debit card. Can I pay this in full today," we'll absolutely do it. So that's just some things that are holdovers from other days.

Q.   Okay.  And did your father ever encourage collectors -- I mean, he didn't ever encourage collectors to go to somebody's house to try to collect a debt or anything?

A.   No, sir.

Q.   And Credit Control doesn't do that today; do you?

A.   I think the only time that that happened was in the very very early days when Dad was the sole employee.

Q.   Okay.

A.   I've heard tales that he used to do that.

Q.   Okay.

A.   But after his first employee, that never happened again.  And we do not do that today.

Q.   Okay.  And do your collectors know that they don't go to consumer's or debtor's houses today to collect debts?

A.   Absolutely.

Q.   Okay.

A.   I think if I asked that, they would all be very upset.

Q.   Is there any other policies or procedures that

person.

So when the previous account had come over to us with a different Social Security number, my system didn't associate that and thought it must not be the same guy. So it was just the two that were assigned on the May 21st date that were packeted together.

Q.   Okay. So, starting at -- let's just go through this.

A.   Okay.

Q.   Starting at (22), it looks like there is a certain entry. It says 13:03. Is that a time?

A.   Yes, sir.

Q.   Okay. Is that 1:03 --

A.   Yes, sir.

Q.   -- in the afternoon --

A.   Uh-huh.

Q.   -- on May 24th? And what does this indicate happened at that time when it says: Per tie name is Ryan Wesley Wilder?

A.   This is the point where the collector is first looking at the account. And that is the initials at the end is the initials of whoever made the notes.

Q.   And who made the note?

A.   That's CLZ is Carol.

Q.   And Carol's alias is what?

them, they will file it.  There are certainly circumstances where we acquire insurance information and pass it along to them for them to file that claim and they keep us apprised of the status of that claim.

Q.   Do you know whether MEMS had Ryan Wilder's insurance information before they placed the accounts with Credit Control for collection?

A.   No, sir, I do not know at what point -- I do know that if they acquire insurance information, either from me or from -- if the individual calls them up and gives them that insurance information, they will call and advise me:  We are filing insurance on this.  Will you please put a hold on the account until we see what happens.

Q.   Okay.  And later on, it looks like MEMS requested a 45-day hold; is that correct?

A.   Yes, sir.

Q.   Okay.  So when -- does Credit Control have a contract with MEMS to collect ambulance bills that haven't been paid?

A.   We do not have a contract with them.  We have collected for them for over 20 years.

Q.   Okay.  But you have an oral agreement that --

A.   It is a handshake agreement --

Q.   Okay.

A.   -- that we're going to do the best job we can for you.   And if you have a problem with that, we'll try and correct it.   But I'm not going to hold you to anything. I want you to be happy.

Q.   Okay.   Do you know whether MEMS uses any other collection agencies or debt collectors to collect their debts?

A.   They do not.   They have in the past, but they do not currently, to my knowledge.

Q.   Okay.   How long has Credit Control been collecting bills for MEMS?

A.   It is over twenty years.

Q.   Okay.

A.   I believe it may have been '98 or it may have been prior to that.   But it has been at least 20 years.

Q.   Okay.   And does Credit Control collect on a contingency basis for MEMS?

A.   Yes, sir.

Q.   Okay.   And what is the percentage that Credit Control retains when it collects?

A.   If we collect an account without a legal case, if we just collect the account, we get 40 percent of the amount collected.

Q.   Okay.

A.   If we don't collect anything, we don't make

anything. If it comes to the fact that we have to get Mr. Jones involved and a lawsuit is filed, then our commission rate goes to 50 percent to help offset attorney's fees.

Q.   Okay. So, when Credit Control is assigned the accounts from MEMS for collections, it is also assigned the right to file a lawsuit against the consumers?

A.   We -- if a lawsuit is being filed, it is filed in MEMS name.

Q.   Okay.

A.   It is not under our name.

Q.   And why does Credit Control get a larger percentage if a lawsuit is filed if Credit Control is not filing in its own name?

A.   Because there is additional work on our part to verify all of the information and make sure that this account should be sued. Is it viable? We're going to do that work and there is more time and effort.

Q.   Okay. So Credit Control -- tell me exactly what Credit Control does on a typical collection case if a consumer doesn't pay and it determines that maybe they have assets to satisfy a judgment. It sounds like Credit Control does something -- makes some type of determination that a lawsuit should be filed. What does it do?

A.    Well, the very first step of that is we're going to look -- I'm going to look at the account and make sure several just basic criteria are met.  Is the balance sufficient, you know, for whatever county we're going to have to sue in?  If I've got to go to Washington County, it better be a little bit more than coming here.  So we make sure the balance is sufficient.

We're going to, you know, just make the basic checks, you know, is the account within the statute of limitations.  We're going to go online and double check.  Is this guy in bankruptcy?  Just to save us that time, even though he may not have said anything about it, we'll go online and just make sure that that's not the case.

I'm going to look to see did we talk to this guy.  I've -- we've always been of the position that I don't want to sue a man unless I've given him the opportunity to pay voluntarily.  So I'm going to look -- except for very extenuating circumstances, I'm going to make sure that we have talked to him and given him the opportunity for voluntary payment.

And then I'm going to look:  Do we have assets?  Is there anywhere -- what will we do if we get a judgment? Do we have anywhere to go?  And if the guy's address is the Salvation Army and he doesn't have a job, I'm not

going to recommend him for suit.  That's just throwing good money after bad.

Q.    Okay.  Anything else?

A.    Those are the initial criteria that we're going to look at.  And at that point, we will prepare an affidavit of the account and send it to our client for them to make the final approval.  It is -- whether we file that suit or not is entirely up to my client.  They get to make that decision:  Yes, go forward with it or no, stop.

Q.    Okay.

A.    And then -- at that point, we start putting paperwork together and Mr. Jones gets involved.

Q.    Okay.  Let's go back to the collection notes.

A.    Okay.

Q.    In (28), there's an asterisks besides that.  What does the asterisks indicate, if anything?

A.    At some point just in the way that it stores notes, it's just a natural breakpoint in the computer system --

Q.    Okay.

A.    -- just for display purposes.  It has no -- it has no meaning for a particular line.

Q.    Okay.  And it says 13:06, you know, name:  Ryan Wilder.  Again, it's got CLZ.  Is this a telephone call that's being made?

A.   Yes.

Q.   Or what is happening in (28), I guess down through (38)?

A.   Okay.

Q.   What's going on there?

A.   All right.  At that point, I believe -- well, on line 28, it states the name -- she added a space after the comma and before the first name.  So anytime any adjustment is made, it puts a -- actually --

Q.   Okay.

A.   Let me correct that.  She removed the space because you see on the first page that's how it's supposed to be:  Last name comma first name.

Q.   Okay.

A.   So that was just a format.  The next line, 029. That is -- it says gotcha.  What that is -- we have -- in the CUBS system, we have action codes.  It's a three-digit code that says.  And there's hundreds of them, as you saw down later on:  Client requests 45-day hold.  We have -- there's a three-digit action code that I type in.  And as soon as I type that three numbers in, it places in the notes:  Client requests 45-day hold, just so that I'm not typing that a hundred times a day.

Q.   Shorthand?

A.   Absolutely.  The notation on line 19 "gotcha" is an

action code.  When they put that action code, I have two in particular, one that says "gotcha" and one that says "contact."  What that means is we have picked up the phone and we have called the debtor.  The very first time we talk to an individual, they use the code that says "gotcha."  I got it.  I have talked to this guy.

On all subsequent contacts with this individual, they use the code that says "contact."  That is a tracking mechanism that we use to see, okay, we're evaluating collectors:  How many phone calls did you make?  How many people did you talk to?  It allows us to track that very easily.

Q.   Okay.  So this indicates that Carol ▆▆▆▆ actually talked to Ryan Wilder on that day at that time?

A.   Yes, sir.

Q.   She called and Ryan picked up the phone?

A.   Correct.

Q.   And then what's going on in 30 and 31?

A.   30, 31.  Gave the mini Miranda.

Q.   That's to comply with the FDCPA; correct.

A.   Yes, sir.  This is an attempt to collect a debt. Any information obtained will be used for that purpose. Mr. says -- meaning Mr. Wilder.  Mr. says he has QualChoice through personal policy.  Mr. says he does not have -- he has no copy of his insurance card.  He

did update his address. At the point where it was assigned to us, we had the Frost Road in Caddo Valley. He gave us his new address and we updated it on the front page of the account.

Q. Okay.

A. Line 36: "I got new address and told Mr. to find insurance information and call me back ASAP." And that was the end of their conversation.

Q. Okay. Does anything in 22 through 38 indicate to you that Carol told Ryan how much money Credit Control was trying to collect at this point?

A. No, sir. It does not state in those notes.

Q. Okay.

A. Again, some of that is -- some of this is shorthand when you're talking to a lot of people. That's why we use some of these action codes to get through. There is just the basic process that we are going to go through on every call.

Q. Okay.

A. And, you know, identifying the debtor, identifying ourself, the client, the amount, giving the mini Miranda, and asking for payment in full.

Q. Okay.

A. That is the stock process on every call that they should know.

Q.   Okay.   And the next line, (39)?

A.   Yes, sir.

Q.   What does that mean?

A.   Request letter RO1 validation letter.   Now, if you will look back on line 17, third from the top:   Sent notice RO1, which is the validation letter.   The -- I believe that's the one you've got on top under there, that went out -- the account was placed with us on 5 -- the evening of 5/21.   So when we run our mail on 5/22, that first notice went out to Mr. Wilder.

Q.   Okay.

A.   What Carol did in line 39 that you asked me about because she had gotten a new address from Mr. Wilder, she corrected that address and requested that that validation letter be sent out to the new address.

Q.   I'm going to hand you --

     MR. McGAHA:   Let's mark this as No. 9.

     THE REPORTER:   10.

     MR. JONES:   They're already introduced.

     MR. McGAHA:   Well, I've got the redacted copy introduced.

     MR. JONES:   Okay.   Go ahead.   I don't care if it's in there twice.

Q.   (BY MR. McGAHA)   I'm going to hand you what is Exhibit No. 3.

A.   Okay.

Q.   And it's the letter we filed with Mr. Wilder's complaint.

A.   Yes, sir.

Q.   And it's got some redactions in it.  And you'll see that we've marked it as Complaint Exhibit 2.  But is that the letter that, according to the line in parenthesis 39 in the collection notes that we've been talking about, is Exhibit 3 the letter that went out?

A.   Yes, sir.  And, actually, you will see on line 50 -- line 39 is where the collector requested the letter.

Q.   Okay.  And it went out later that day?

A.   And line 50 sent letter 01.  That's when it was processed and sent to our vendor that does the mail.

Q.   Okay.  So this letter that's deposition Exhibit 3 according to parentheses 50 went out on May the 24th, 2017?

A.   On -- in line 50, May 24th, we processed the letter and send it to our outsourced vendor.  They print it the following day and mailed it, yes, sir.

Q.   What paren number is that?

A.   Line 50.

Q.   Any one other than 50?  That's the only line that indicates it went out?

A.   Correct.

A.   44 through 49:  Mr. said he found his insurance information and said he called QualChoice.  They gave him his info, his member I.D.  And he provided his member I.D. and his group number for QualChoice.

Q.   Okay.  And go all the way down through 54.

A.   Okay.  Collectors note:  "I told Mr. sometimes they need his signature.  And if so, I will call him back.  E-mail CHBC" -- that's internal -- "to us since MH" -- another admin employee -- "only does Medicaid insurance."

Q.   Okay.

A.   Basically at that point, she's saying she got his insurance information; she forwarded it out internally to me and another gentleman so that we could provide that information to them, which is what the following, line 55, is where early the next morning, that -- e-mailed insurance information to Tim, my client.

Q.   And Tim works for MEMS?

A.   Yes, sir.

Q.   And then 56 and 57, it looks like MEMS requested a 45-day hold on collections.  Is that basically what's going on?

A.   Yes, sir.  Again, that's an action code.  Anytime that they call and say, "Hey, we've filed insurance on this account," I use that action code that puts it on a

45-day hold, just to give them time to get that filed and then let us know how we need to proceed.

Q.    Okay.  And then it looks like there's at least one call on June the 1st, in (58) through (71).  What do these collection notes indicate happened?

A.    All right.  58 through 71:  11:50 June 1st, debtor called.  Mr. Wilder called in our office, contact. "Mr. was argumentative.  I gave Mr. all the info I could to let him know."  At that point, she's -- the account is on a hold status.  But at this -- and he's calling in to ask us about that.  We advised him we have given that information to our client to file that claim.  That claim has been filed, but here is where it stands right now.

Q.    Okay.

A.    And, you know, I don't know who initially brought it up.  But it's talking about his credit bureau report. If this is going to drag out, he may want to look about seeing about trying to get the funds together and get this paid before it negatively impacts him.  And that's -- at 69, she suggested that, you know, he might look at getting a debit or credit card to try and resolve these in case insurance does not pay.

Q.    And that takes us over to (72).

A.    Yes, sir.

argumentative or belligerent, I will never --

Q.   You're not going to pass that off to another collector?

A.   No.

Q.   Okay.   And then it looks like in (106) to (107) that you did a search for assets for Ryan?

A.   That is -- I did not do one.   That is a notation for Carol that that is what I want to happen.

Q.   Okay.

A.   It is my directive to her to search for assets.   In line 107, the previous status code was RDP, refused definite payment.   At that point, I changed the status to DNC, do not contact.

Q.   And the search for assets, though, indicates that you were thinking about filing a lawsuit against Ryan at that point?

A.   The indication search for assets is to tell me is that viable.

Q.   Okay.   And what's happening in (108) to (109)?

A.   108 and 109, Mr. Wilder calls our office.

Q.   Okay.

A.   Again, with a DNC status, we're not going to send mail; we're not going to make a telephone call.   That certainly doesn't prevent them from calling us.   And if they want to initiate that call, then we'll go from

there. He did call our office. At that point, he apologized to Carol and told her that she had woke him up; he had worked late and had a small child that kept him up, that information.

And she asked him at that point if he wants to pay this thing. And he again is saying -- is telling all the reasons to justify his past behavior and asked why he got hung up on. And she told him that it was probably the same reason that you're going to: Because I'm not here to argue with you. If you'd like to pay it, we'll go with that. But outside of that, just continuing arguments is not good for anybody.

Q.    Okay. And in, I think, about 118 and 119, Carol's notes indicate that she told Ryan she was going to hang up on him again; am I reading that right?

A.    Yes.

Q.    Okay.

A.    He had asked why she hung up on him before. And she advised him, "Well, the same reason I'm going to do it again if we're not getting anywhere." That has certainly been my directive to my collectors on the phone.

Q.    Can you tell from looking at the collection notes when Carol hung up on him the first time?

A.    That would have been the call on July 21st, where he

ended up calling me back and stated that the last person -- he was mad because the last person hung up on him. That was that call of 10:17.

Q. That one-minute call or so?

A. That's a start time. It does not reflect an end time.

Q. Okay.

A. It was somewhere, obviously, between 10:17 and then when I talked to him at 10:32.

Q. Okay.

A. So it was in that window.

Q. It looks like that call goes all the way to the next page, the call on July 24th, all the way to (128)?

A. Yes, sir.

Q. And what happens -- the remaining of the notes, it appears to be just computer-generated except for the A.G. complaint in 132 and 133; is that correct?

A. Yes, sir. That is my notation, CDH, that I received the complaint from the Attorney General and responded to it that day and the copy was in my file, which you have.

Q. Let's look at the AG complaint. I'm going to hand you Exhibit 5 and did you read the AG complaint that Ryan filed and was forwarded to you from the Arkansas Attorney General's Office?

A. Yes, sir.

Q.   Okay.   And did you have a response to that complaint?

A.   Yes, sir.

Q.   Okay.   And it looks like if you turn over -- it's a third page of the exhibit, but it's the second page of the e-mail that, I guess, is somehow -- it has Edith Collins at the header.   And Ryan reports --

A.   I'm assuming that is someone at the Attorney General's office.

Q.   Yeah.   If you'll look at -- turn over one more page. It says:   "Explain the circumstances surrounding your complaint."   This is on page 3 of Exhibit No. 5.   And in the middle of that, Ryan says:   "Then she said 'that's okay; we'll be seeing you soon.'"   And you were here when Ryan testified about that earlier today; correct?

A.   Yes, sir.

Q.   And then down a little bit, it says:   "I called one last time and the quote/unquote owner answered and he threatened to take legal action against me if I didn't pay this bill.   I was willing to; however, considering how I was treated by his employee, I did not want to go through this company."

Did you threaten to take legal action against Ryan or did you say anything like you're handing it over to your attorney or how accurate, in your opinion or from

your memory, is this statement that Ryan was threatened with legal action?

A.   The statement that I give by rote and have done for 30 years in a situation like this, I'm going to ask him if he wants to pay the bill.  If he says no and particularly in a case where I've flagged the account as do not contact so that we're not going to call and we're not going to send letters, so our collection efforts at that point are done, I will advise somebody, "Well, at this point, we're going to have to review this for possible legal action."  And I certainly do make that statement and I stand by it.

Q.   Do you remember -- do you specifically remember what you told Ryan?  Did you tell him you were going to review it for legal action?

A.   Specifically, will I -- since I am under oath -- tell you I absolutely remember every word of this phone call?  No, sir, I do not.

Q.   You don't?  Okay.

A.   What I'm stating is based on my notes and just common practices.

Q.   Okay.  And turn over to the next page.  It says August 15, 2007.  This is page 4 of Exhibit No. 5.

A.   Yes, sir.

Q.   Did you write this --

A.    Yes, sir.  I did.

Q.    -- in response to Ryan's complaint?  And you can take the time to read it.  But in response to his complaint, you never denied on page 4 of Exhibit 5 that you had threatened to take legal action against Ryan if he didn't pay this bill; correct?

A.    My very last line on this response.

Q.    Okay.

A.    "As of this date, his balance is still outstanding and I have forwarded this account to our legal department for review."

Q.    You're saying that as of August the 15th, you did that?

A.    As of this date, this is where the account stands.  As to what date that happened, it would have been prior to that.  But, again, as of August 15th, when I was replying to him, this is exactly where the account stands.  He still owes the money and the account is with our legal department to review for a potential lawsuit.

Q.    Okay.  Did you talk with Carol Lewis about the Attorney General's complaint when it came in?

A.    No, sir.

Q.    You didn't?

A.    (Shaking head.)

Q.    Okay.  And so, you didn't know on August 15th, 2017,