# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**RYAN WESLEY WILDER**                                    **PLAINTIFF**

**v.**                        **Case No. 4:18-cv-00344-KGB**

**CREDIT CONTROL COMPANY INC.**                          **DEFENDANT**

## OPINION AND ORDER

Before the Court is defendant Credit Control Company, Inc.'s ("Credit Control") motion for summary judgment (Dkt. No. 11). Credit Control seeks summary judgment on plaintiff Ryan Wesley Wilder's claims pursuant to the federal Fair Debt Collection Practices Act ("FDCPA"), Pub. L. 95-109; 91 Stat. 974, codified as 15 U.S.C. §§ 1692-1692p, and the Arkansas Fair Debt Collection Practices Act ("AFDCPA"), Arkansas Code Annotated §§ 17-24-501, *et seq*. Mr. Wilder filed a response in opposition to the motion (Dkt. No. 16). For the following reasons, the Court grants Credit Control's motion for summary judgment and dismisses Mr. Wilder's claims (Dkt. No. 11).

### I.        Factual And Procedural Background

Credit Control filed a statement of material facts not in dispute, and Mr. Wilder responded (Dkt. Nos. 13, 15). The following facts are taken from Mr. Wilder's response to Credit Control's statement of material facts not in dispute (Dkt. No. 15), unless otherwise specified by notation.

Mr. Wilder is an adult resident of the State of Arkansas and is a consumer within the meaning of the FDCPA (*Id*., at 1). Credit Control is a debt collection agency within the meaning of the FDCPA and the AFDCPA (*Id*., at 1-2). Little Rock Ambulance Authority, doing business as MEMS ("MEMS"), is a municipal ambulance and emergency medical services organization operating in the Central Arkansas area including but not limited to Pulaski County, Arkansas,

pursuant to state and local authority (*Id.*, at 2). MEMS engages Credit Control to collect delinquent accounts for ambulance and emergency medical services (*Id.*).

On September 17, 2015, Mr. Wilder received ambulance and emergency medical services from MEMS (Dkt. No. 15, at 2). MEMS sent a final invoice to Mr. Wilder on October 30, 2015 (*Id.*; Dkt. No. 13-1, at 1). No insurance payment was received for this run, and no other payment was made by Mr. Wilder (Dkt. Nos. 13-1, at 1; 15, at 2). The September 17, 2015, services were assigned a "run number" of 68,475 (Dkt. No. 13-1, at 1).

On April 3, 2016, MEMS electronically forwarded the unpaid balance for the September 17, 2015, services to Credit Control to initiate collection efforts (Dkt. Nos. 13-2, at 1; 15, at 2). The client reference number for this incident is 15-68475 (Dkt. No. 15, at 2). The client reference number is the last two digits of the year of service followed by the MEMS run number for that service (*Id.*). Credit Control assigned an internal account number of 70983 to this matter (*Id.*).

On December 19, 2016, Mr. Wilder received ambulance and emergency medical services from MEMS (*Id.*). Mr. Wilder signed an authorization guaranteeing payment for these services (Dkt. No. 17-1, at 6). A final invoice for the December 19, 2016, services was sent to Mr. Wilder by MEMS on February 10, 2017 (Dkt. Nos. 13-3, at 1; 15, at 3). This invoice was assigned a run number of 93,778 (Dkt. No. 13-3, at 1). This invoice includes "trip notes" that indicate "Qualchoice paid $479.74 6/16/17." (*Id.*).

On December 20, 2016, Mr. Wilder again received ambulance and emergency services from MEMS (Dkt. No. 15, at 3). Mr. Wilder signed an authorization guaranteeing payment for these services (Dkt. No. 17-2, at 7). The invoice for these services was assigned a run number of 94,095 (Dkt. No. 13-4, at 1). On January 24, 2017, MEMS received an insurance payment that paid part of the cost of the December 20, 2016, services (Dkt. Nos. 13-4, at 1; 15, at 3).

On or about May 21, 2017, MEMS electronically forwarded the unpaid balances for the December 2016 services to Credit Control to initiate collection and copied the electronic transmission of the 2015 services originally forwarded April 3, 2016 (Dkt. No. 15, at 3). This included the $888.75 amount for run 16-93778 (*Id.*, at 3). The December 19, 2016, services with MEMS client reference number 16-93778 were assigned as Credit Control file 8001750 by Credit Control (*Id.*). The December 20, 2016, services with MEMS—client reference number 16-94095—was assigned Credit Control account file 8001798 (*Id.*).

The information communicated by MEMS contained an erroneous Social Security Number ("SSN") beginning 151 as opposed to Mr. Wilder's correct SSN beginning 589 (*Id.*). As a result, Credit Control did not associate the December 20, 2016, claim for services with the two other claims (Dkt. No. 15, at 4). Debt information is electronically forwarded by MEMS to Credit Control where Credit Control's system electronically enters it into its collection database (*Id.*). There is no human activity in this process (*Id.*). Thus, Credit Control was not involved in entering an incorrect SSN for the December 20, 2016, services (*Id.*).

Credit Control uses the Collector System from Columbia Ultimate Business Systems ("CUBS") to receive and store all the information for its collection accounts (Dkt. No. 15, at 4). All information is entered into this system including the contemporaneous notes of conversations with debtors, information received, and actions taken (*Id.*).

On May 24, 2017, Credit Control's collector "Carol," listed as CLZ on its internal note system, contacted Mr. Wilder telephonically regarding MEMS account 8001750 (*Id.*). The conversation was cordial (*Id.*). Carol properly identified herself, and, during the conversation, Mr. Wilder informed her that he had health insurance but that he did not know his membership number

(Dkt. No. 15, at 4). He later called back and gave her his membership information, which Carol forwarded to MEMS on May 25, 2017 (*Id.*).

Mr. Hanson also testified that Credit Control, on May 24, 2017, did not know whether a claim had been submitted to Mr. Wilder's insurance (Dkt. No. 13-12, at 13). Mr. Hanson further testified that Credit Control relies on MEMS to submit medical bills to insurance companies (*Id.*). Mr. Hanson also stated that Credit Control will acquire insurance information and pass it along to MEMS for MEMS to file a claim and that MEMS keeps Credit Control apprised of the status of such claims (*Id.*). Mr. Hanson explained that, "if [MEMS] acquire[s] insurance information, either from me or from—if the individual calls them up and gives them that insurance information, they will call and advise me: We are filing insurance on this. Will you please put a hold on the account until we see what happens." (*Id.*). On May 25, 2017, Credit Control's records indicate that MEMS requested a 45-day hold on Mr. Wilder's account (Dkt. No. 13-6, at 2).

Mr. Hanson further testified that, "if a lawsuit is being filed, it is filed in MEMS name," not "under [Credit Control's] name." (Dkt. No. 13-12, at 14). Mr. Hanson explained that Credit Control will evaluate whether to file suit, "[a]nd at that point, we will prepare an affidavit of the account and send it to our client for them to make the final approval." (*Id.*). He further elaborated that "whether we file that suit or not is entirely up to my client. They get to make that decision . . . ." (*Id.*).

On May 25, 2017, a validation letter was sent to Mr. Wilder by Credit Control stating: "RE: MEMS AMBULANCE 16-93778;" a principal due of $888.75; that Credit Control was a debt collector and this was an effort to collect a debt; and setting forth Mr. Wilder's rights as required by the FDCPA (Dkt. No. 15, at 5). The May 25, 2017, letter from Credit Control to Mr. Wilder included the following language:

> We have been authorized by our client to demand payment in full.
>
> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you the name and address of the original creditor, if different from the current creditor.

(Dkt. No. 13-8).

Credit Controls records indicate that, on June 1, 2017, Carol spoke with Mr. Wilder and recommended that he "get a debit card to cover both accounts in case ins[urance] does not pay . . . ." (Dkt. No. 13-6, at 2). Payment of $479.74 was received by MEMS from Mr. Wilder's health insurer on or about June 16, 2017 (*Id*.).

Credit Control's records also show that, on June 26, 2017, Carol spoke with Mr. Wilder and that Mr. Wilder indicated that he could not get a credit card and that he offered to pay $40.00 a week (Dkt. No. 13-6, at 3). Carol told Mr. Wilder that she would call back next week (*Id*.). Also, on June 26, 2017, Credit Control sent to Mr. Wilder a letter updating the amount owed to reflect the June 16 insurance payment (*Id*.). This letter states that the "Balance Due" is $409.01 (Dkt. No. 13-9). This letter included the statement: "May we suggest you have your attorney determine your liability towards this obligation." (*Id*.).

Mr. Hanson testified that, on July 5, 2017, Credit Control's records indicate that Carol attempted to call Mr. Wilder and that nobody answered (Dkt. No. 13-12, at 18).

On July 21, 2017, Carol called Mr. Wilder at 10:00 a.m. and asked to speak to "Ryan." (Dkt. No. 15, at 5) Mr. Wilder acknowledges that he had been waiting for her to call, but he disputes that he was waiting for her to call on that specific day and time (*Id*.). Mr. Wilder's version of this call is that he had been working until 2:00 a.m. and was awakened by Carol's call (*Id*.). He states that he answered the call but was silent other than possibly grunting (*Id*.). When he said

nothing, the caller said words to the effect of, "That's ok. We'll be seeing you soon," and hung

up (Dkt. No. 15, at 5). Mr. Wilder characterizes this language as a threat (*Id.*). In his deposition,

Mr. Wilder described his reaction to Carol's statement:

Q:      The only thing you said was huh?

A:      Practically, yes. Like I don't—I believe that was the only thing that was
        said. There was—nothing else was said. If anything, I might have also
        made a noise when I answered the phone, but I don't even think I did that.
        I think I just answered the phone and they knew I answered the phone
        because the ringing stopped. And then she asked to speak to me, and I
        mumbled a word. And then she said, "That's okay. We'll be seeing you
        soon," and she hung up the phone.

. . .

Q:      And you interpreted that as a threat?

A:      Yes.

Q:      A threat to do what?

A:      I don't know. A threat to sue me. A threat to—"we'll be seeing you soon,"
        like what—like I've heard people say that in the past, like it's never been a
        good thing, never been a good thing. I don't understand an instance where
        that would be a good thing for someone to say that to you in a way that,
        like—okay, maybe a family member will say, okay, yeah, we'll be seeing
        you soon. We'll see you Sunday or something like that. But that was not
        the context whatsoever.

Q:      Well, did you understand that Credit Control was going to follow up on the
        debt?

A:      I—no. I didn't know what they were wanting from me because I had offered
        to pay them. I had called them trying to get ahold of Carol, and I didn't get
        ahold of her. And then she called me saying these things when I was, in
        fact, willing to pay. I got a whole credit card for that reason, you know.

Q:      But you had been anticipating contact from Credit Control?

A:      Maybe.

Q:      Well, I think you indicated that you were waiting for them to call you?

A:     Yeah, because Carol knew that I had a credit card and that I was willing to pay. She had that information. And she should understand from the previous calls that I was practically docile, you know, willing to pay. She said I was argumentative at one point, and that's a stretch. That is a stretch.

But, yeah, she should have known at that point—you know, if I'm going to go out of my way to get a hard inquiry on my credit report to get a credit card—and I've never had a credit card before. I didn't know how to use credit cards back then. If she knew that I was going to go out of my way to get a credit card and she had this information from the person I spoke to at the office, then she should know—she should be understanding that I was willing to pay them. So to hit me with something like that, that's just ridiculous, especially when I was willing to pay.

(Dkt. No. 13-13, at 11-12).

Mr. Wilder then called Carol (Dkt. No. 15, at 6). Mr. Wilder admits that he "was not happy" and that "then [he] was hot." (*Id.*). He also admits it was likely he used profanity and that "maybe [he] could have behaved a little bit better and like used less profanities . . . [b]ut, yeah, [he] wasn't happy." (*Id.*). The person responded, "I'm not going to let you talk to me like that" and "[o]nce you've calmed down and you're ready to pay, then you call back." (*Id.*). She then hung up (*Id.*).

Mr. Wilder then called back again and was directed to C.D. Hanson, the operations manager of Credit Control (*Id.*). Mr. Wilder expressed his anger at Carol and his perception of disrespect (*Id.*). Mr. Wilder admits that he used profanity toward Mr. Hanson and that Mr. Hanson stated, "Oh, I'm not going to let you talk to my employees like that." (*Id.*). Mr. Hanson then volunteered to place Mr. Wilder in "do not contact" status so that there would be no further contact initiated by Credit Control (*Id.*). After that, Mr. Wilder received no more calls initiated by Credit Control (*Id.*).

In response to a question during his deposition about whether he threatened to take legal action against Mr. Wilder, Mr. Hanson testified:

The statement I give by rote and have done for 30 years in a situation like this, I'm going to ask him if he wants to pay the bill. If he says no and particularly in a case where I've flagged the account as do not contact so that we're not going to call and we're not going to send letters, so our collection efforts at that point are done, I will advise somebody, "Well, at this point, we're going to have to review this for possible legal action." And I certainly do make that statement and I stand by it.

(Dkt. No. 13-12, at 21). Mr. Hanson further testified that one of the factors considered in determining whether to pursue litigation against Mr. Wilder was the fact that Mr. Wilder was not employed (*Id.*, at 24).

On July 24, 2017, Mr. Wilder called and spoke to Carol who told him he had to pay in full or "we're done here." (Dkt. No. 15, at 6). This was Mr. Wilder's last contact with Credit Control (*Id.*).

Credit Control asserts that, when it was first founded in 1972, it adopted policies which would later compare favorably to the FDCPA (Dkt. No. 13, ¶ 24). The record evidence includes Credit Control's policies. One of Credit Control's "Telephone Don'ts" is "Don't Antagonize People." (Dkt. No. 13-11, at 15). Another such policy is "Don't threaten the debtor at any time." (*Id.*). Mr. Hanson testified that his collectors know that they do not go to the home of debtors to collect debts (Dkt. No. 13-12, at 11).

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d

365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest

merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.

1984).

The initial burden is on the moving party to demonstrate the absence of a genuine issue of

material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to

establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121

F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986).

### III.    Discussion

In his complaint, Mr. Wilder asserts that Credit Control violated the FDCPA and the

AFDCPA by:

> (1) attempting to collect an amount of money not owed by Ryan Wilder for a[]
> medical bill, (2) providing a verification rights notice that did not identify the name
> of the creditor to whom the debt was owed, (3) demanding payment in full of an
> amount of money that Ryan Wilder did not owe and that overshadowed the
> verification rights notice, (4) sending a second collection letter that did not identify
> Credit Control Company, Inc. as a debt collector, (5) telling Ryan Wilder "That's
> ok. We will be seeing you soon" or words to that effect after Ryan Wilder and
> Credit Control Company, Inc. could not agree to payments toward the debt, and (6)
> reporting false information to Trans Union, a credit reporting agency, about Ryan
> Wilder's debt.

(Dkt. No. 1, at 1). Mr. Wilder concedes that he has abandoned his claims that the second

collection letter did not identify Credit Control as a debt collector and that Credit Control reported

false information to a credit bureau (*see* Dkt. Nos. 10, at 1; 11, at 2; 16, at 12). Thus, the Court

dismisses without prejudice Mr. Wilder's claims under 15 U.S.C. §§ 1692e(8) and 1692e(11) and

Arkansas Code Annotated §§ 17-24-506(b)(8) and 17-24-506(b)(11). Mr. Wilder also concedes

that Credit Control's collection letters adequately identified the creditor and, therefore, agrees

that summary judgment should be entered in Credit Control's favor on that claim (Dkt. No. 16, at 12). Accordingly, the Court dismisses with prejudice Mr. Wilder's claim that Credit Control failed to identify the creditor to whom Mr. Wilder owed a debt.

Credit Control moves for summary judgment on Mr. Wilder's remaining claims under 15 U.S.C. §§ 1692d, 1692d(2), 1692e, 1692e(5), 1692(e)(1), and 1692g and under Arkansas Code Annotated §§ 17-24-505(a), 17-24-505(b)(2), 17-24-506(a), 17-24-506(b)(5), 17-24-506(b)(1), and 17-24-508(a).

### A. Claims Under 15 U.S.C. §§ 1692d and 1692d(2) and Arkansas Code Annotated §§ 17-24-505(a) and 17-24-505(b)(2)

Credit Control moves for summary judgment on Mr. Wilder's claims under 15 U.S.C. §§ 1692d and 1692d(2) and Arkansas Code Annotated §§ 17-24-505(a) and 17-24-505(b)(2). Mr. Wilder contends that the Court should allow a jury to decide whether Carol's alleged statement to Mr. Wilder constitutes a violation of the FDCPA and the AFDCPA. For the reasons discussed below, the Court grants Credit Control summary judgment on these claims.

Section 1692d prohibits a debt collector form "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Section 1692d provides a nonexhaustive list of such conduct, including "[t]he use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." 15 U.S.C. § 1692d(2). Mr. Wilder contends that Carol's alleged statement—"That's okay. We'll be seeing you soon"—constitutes harassment under the FDCPA and the AFDCPA. Credit Control does not concede that Carol made this alleged statement but, for purposes of moving for summary judgment only, accepts Mr. Wilder's contention. "Whether attempts to contact a debtor by telephone amounts to harassment or annoyance turns on evidence regarding the volume, frequency, pattern, or substance of the phone calls." *Fox v. ProCollect,*

*Inc.*, Case No. 4:17-cv-00634, 2019 WL 386159, at *2 (E.D. Ark. Jan. 30, 2019) (citing *Kuntz v. Rodenburg LLP*, 838 F.3d 923, 926 (8th Cir. 2016)). District courts in the Eighth Circuit apply the "unsophisticated consumer" test to claims under §§ 1692d and 1692d(2). *See VanHorn v. Genpack Servs., LLC*, Case No. 09-1047-cv-S-GAF, 2011 WL 4565477 (W.D. Mo. Feb. 14, 2011); *Bryant v. Bonded Account Service/Check Recovery, Inc.*, 208 F.R.D. 251, 256 (D. Minn. 2000) (holding that the language of a dunning letter did not "abuse an unsophisticated reader" in violation of § 1692(d)(2)) (internal quotation marks omitted). Summary judgment in favor of defendant is appropriate where the record evidence establishes that no reasonable jury could find the required level of harassment. *Kuntz*, 838 F.3d at 926.

The Court concludes that no reasonable juror could conclude that Credit Control engaged in any harassing, oppressive, or abusive conduct in violation of § 1692d. Mr. Wilder's argument admittedly hinges upon an interpretation of the phrase: "That's okay. We'll be seeing you soon," as a statement that is harassing, oppressive, or abusive. Mr. Wilder does not argue that Credit Control's phone calls or letters were otherwise in violation of § 1692d.

In *VanHorn*, the court concluded that no reasonable trier of fact could infer an intent to annoy, abuse, or harass because there was no egregious conduct such as calling back immediately after plaintiff hung up, calling him at work, or making threatening, profane, or insulting statements. 2011 WL 4565477, at *4. Further, in *Gallagher v. Gurstel, Staloch & Chargo, P.A.*, 645 F. Supp. 2d 795, 799 (D. Minn. 2009), the district court granted summary judgment in favor of defendant on plaintiff's § 1692d claim because the court determined that "a single laugh during a single phone call," without more, could not support a claim under § 1692d.

Here, there is no evidence that Credit Control called during unprotected calling hours[1] or that Credit Control made any phone calls to Mr. Wilder after he requested that Credit Control stop calling him. The only statement that Mr. Wilder points to as proof of an alleged violation of § 1692d is Carol's alleged statement: "That's okay. We'll be seeing you soon." Viewed from the perspective of an unsophisticated consumer, the Court concludes that no reasonable juror could conclude that this single ambiguous statement, without more, constitutes "egregious conduct or intent to annoy, abuse, or harass" Mr. Wilder. Accordingly, the Court grants Credit Control summary judgment on Mr. Wilder's claims under §§ 1692d and 1692d(2) and Arkansas Code Annotated §§ 17-24-505(a) and 17-24-505(b)(2).

**B.    Claims Under 15 U.S.C. §§ 1692e, 1692e(5), and 1692e(10) and Arkansas Code Annotated §§ 17-24-506(a), 17-24-506(b)(5), and 17-24-506(b)(10)**

Credit Control also moves for summary judgment on Mr. Wilder's claims under 15 U.S.C. § 1692e, 1692e(5), and 1692e(10) and Arkansas Code Annotated §§ 17-24-506(b), 17-24-506(b)(5), and 17-24-506(b)(10). Mr. Wilder argues that there are genuine issues of material fact still in dispute as to whether Credit Control violated these statutes when Credit Control issued threats to instigate litigation against Mr. Wilder.

The Court grants summary judgment in favor of Credit Control on Mr. Wilder's claims under 15 U.S.C. §§ 1692e, 1692e(5), and 1692e(10) and Arkansas Code Annotated §§ 17-24-506(b), 17-24-506(b)(5), and 17-24-506(b)(10). The FDCPA subjects debt collectors to civil liability for "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The FDCPA defines "communication" very broadly

---

[1] Protected calling hours are after 8 a.m. and before 9 p.m., local time at the consumer's location, absent knowledge of circumstances to the contrary. 15 U.S.C. § 1692c(a)(1).

as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). For the purposes of this action, Mr. Wilder specifically alleges violations of § 1692e in general and violations of §§ 1692e(5) and 1692(10) specifically. Under these subsections, the FDCPA prohibits debt collectors from falsely threatening "to take any action that cannot legally be taken or that is not intended to be taken," *Id*. § 1692e(5), and using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id*. § 1692e(10). Sections 17-24-506(b), 17-24-506(b)(5), and 17-24-506(b)(10) of the AFDCPA are nearly identical to their FDCPA counterparts.

To determine whether a communication from a debt collector is false, misleading, or deceptive in violation of § 1692e or its subsections, the communication must be viewed through the eyes of an unsophisticated consumer. *See Janson v. Katharyn B. Davis, LLC*, 806 F.3d 435, 437 (8th Cir. 2015). "Language in a debt-collection letter cannot be viewed in isolation; the letter must be viewed 'as a whole' to determine whether it runs afoul of the FDCPA." *Hubbell v. Am. Accounts & Advisors, Inc.*, No. 13-1157, 2013 WL 5944264, at *6 (D. Minn. Oct. 7, 2013) (citing *Adams v. J.C. Christensen & Assocs., Inc.*, 777 F. Supp. 2d 1193, 1196 (D. Minn. 2011)).

Furthermore, the Eighth Circuit Court of Appeals has held that a materiality standard applies to claims brought under § 1692e. *Hill v. Accounts Receivable Servs., LLC*, 888 F.3d 343, 346 (8th Cir. 2018). In *Hill*, the plaintiff asserted that the defendant debt collector submitted documents containing false statements to the lower court, including false statements relating to the amount of interest owed by the plaintiff and the defendant's status as assignee of the debt. 888 F.3d at 346 n.2. The Eighth Circuit concluded that defendant's "inadequate documentation of the assignment did not constitute a materially false representation, and the other alleged inaccuracies in the exhibits [were] not material." *Id*. at 346.

In support of its holding that a materiality standard applies to claims under § 1692e, the Eighth Circuit also cited *Hahn v. Triumph Partnerships LLC*, 557 F.3d 755 (7th Cir. 2009), where the Seventh Circuit Court of Appeals stated that "[§ 1692e] is designed to provide information that helps consumers to choose intelligently, and by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)." 557 F.3d at 757-58 (citations omitted). In *Hahn*, the plaintiff alleged a violation of § 1692e because she received a letter saying that she owed $1,134.55, and according to the letter, $1,051.91 of this amount was an "AMOUNT DUE" and the remaining $82.64" was "INTEREST DUE." 577 F.3d at 756. The plaintiff further alleged, and defendant conceded, that the $82.64 was interest accrued after the loan was assigned to the collector, and the $1,134.55 included interest accrued prior to the assignment. *Id.* at 756-57. The Seventh Circuit concluded that this statement, to the extent it was false, was immaterial because "[a] dollar due is a dollar due." *Hahn*, 557 F.3d at 757.

On the undisputed record evidence before the Court, the Court grants Credit Control summary judgment as a matter of law on each of Mr. Wilder's § 1692e claims because the Court determines that no reasonable juror could conclude that Credit Control's alleged actions constituted material violations of § 1692e or any of its subparts.

Further, the Court concludes that no reasonable juror could conclude that Credit Control violated § 1692e or any of its subparts by attempting to collect an amount not owed in its May 25, 2017, letter to Mr. Wilder. Credit Control's May 25, 2017, letter stated Mr. Wilder owed a principal amount due of $888.75 (Dkt. No. 13-8, at 1). The day before, on May 24, 2017, Mr. Wilder spoke to Carol and informed her that he had insurance, and he provided Carol with his insurance information (Dkt. No. 15, at 4). Viewing this record evidence in the light most favorable

to Mr. Wilder, the Court concludes that no reasonable juror would view the May 25, 2017, letter as an attempt to collect an amount not owed. There is uncontroverted record evidence that Mr. Wilder incurred the $888.75 debt because of medical services he received on December 19, 2016, and that he signed an authorization to incur those charges. The fact that Mr. Wilder had insurance does not mean that he did not owe the $888.75 debt. As there are no genuine issues of material fact in dispute regarding this claim, the Court grants Credit Control summary judgment as a matter of law on this claim.

Mr. Wilder's remaining § 1692e claims appear to focus upon two statements by Credit Control: (1) the statement "May we suggest you have your attorney determine your liability towards this obligation" in the June 26, 2017, letter to Mr. Wilder, and (2) the alleged statement by Carol to Mr. Wilder of "That's okay. We'll be seeing you soon." Mr. Wilder argues that, because the undisputed record evidence is that only MEMS could authorize a lawsuit against Mr. Wilder, both threats by Credit Control were false and violate § 1692e. The Court grants summary judgment in favor of Credit Control with respect to these statements for the following reasons.

In the context of debt-collection letters, other district courts in this circuit have found that "letters that do not *explicitly* threaten[] that legal action will be taken do not violate the FDCPA." *Muharemovic v. Client Servs., Inc.*, Case No. 4:17-cv-2361 CDP, 2017 WL 6316827, at *4 (E.D. Mo. Dec. 11, 2017) (quoting *Adams v. J.C. Christensen & Assocs., Inc.*, 777 F. Supp. 2d 1193, 1196 (D. Minn. 2011)). "A letter does not violate §§ 1692e, 1692e(5)[,] and 1692e(10) if it merely relays the possibility that some future legal action might be taken if payment is not made." *Hubbell*, 2013 WL 5944264, at *3 (citing *Peters v. Gen. Serv. Bureau, Inc.*, 277 F.3d 1051, 1056 (8th Cir. 2002) (other citations omitted)).

Viewing the statement in the June 26, 2017, letter in the context of Mr. Wilder's communications with Credit Control, the Court concludes that even an unsophisticated consumer would not be misled by the statement "[m]ay we suggest you have your attorney determine your liability towards this obligation." There is no record evidence that the statement in the June 26, 2017, letter was false, deceptive, or that an unsophisticated consumer would been misled by it in violation of § 1692e generally. The statement in the June 26, 2017, letter only admonished Mr. Wilder to seek legal advice regarding his putative debt. There is no record evidence that establishes a false statement of fact here. Viewing the letter in the light most favorable to Mr. Wilder, this language in the letter did not threaten litigation, nor would an unsophisticated consumer believe that the letter or that this language specifically threated litigation. The Court concludes that no reasonable juror could determine that the statements in this letter were materially false, deceptive, or misleading to an unsophisticated consumer or to Mr. Wilder in violation of § 1692e.

Furthermore, applying the unsophisticated consumer standard and viewing the undisputed record evidence in the light most favorable to Mr. Wilder, the Court concludes that no reasonable juror could conclude that the statements in the June 26, 2017, letter constituted a "threat" or were a "false" or "deceptive" means to collect a debt in violation of §§ 1692e(5) and 1692e(10) specifically. Section 1692e(5) prohibits "threats to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). Section 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). The language at issue—"May we suggest you have your attorney determine your liability towards this obligation"—includes no threat, explicit or implicit, of legal action against Mr. Wilder nor does it suggest that Credit Control

intends to engage in any action or in an action Credit Control cannot legally take. Rather, it is an admonition that Mr. Wilder seek legal advice about the debt he allegedly owed. No reasonable juror could conclude that this language would lead an unsophisticated consumer to believe that Credit Control was threatening litigation. Accordingly, the Court concludes that no reasonable juror could conclude that the language in the June 26, 2017, letter to Mr. Wilder violated §§ 1692e(5) or 1692e(10).

The Court also concludes that no reasonable juror could conclude that the alleged statement directed by Carol to Mr. Wilder—"That's okay. We'll be seeing you soon"—violated §§ 1692e, 1692e(5), and 1692e(10) for these same reasons. There are no false statements of fact alleged, and the Court rejects the proposition that a reasonable juror could conclude that such a statement equates to a threat, explicit or implicit, of legal action against Mr. Wilder.

The undisputed record evidence indicates that Mr. Wilder first spoke to Carol on May 24, 2017, and that the conversation was cordial (Dkt. No. 15, at 4). After Mr. Wilder's insurance was applied to a portion of his debt, he again spoke to Carol on June 1, 2017, during which conversation Carol and Mr. Wilder discussed the possibility of Mr. Wilder making payments or using a card to pay off his debt (Dkt. No. 13-6, at 2-3). During that phone call, Carol told Mr. Wilder that she would call him back (*Id*., at 3). Then, on July 5, 2017, Carol called Mr. Wilder back but received no answer (Dkt. No. 13-12, at 18). On July 21, 2017, Carol called Mr. Wilder at 10:17 a.m. (Dkt. No. 13-12, at 18). Mr. Wilder testified that he said nothing, other than grunting, and that Carol said, "That's okay. We'll be seeing you soon." (Dkt. No. 13-13, at 11). Mr. Wilder testified that he understood this as a "threat to sue me." (*Id*.). Mr. Wilder conceded, however, that he had been expecting Carol to call him back (*Id*.).

Mr. Wilder then immediately called Carol back, admitting that he used profanity and that "maybe [he] could have behaved a little bit better . . . ." (*Id*., at 6). According to Mr. Wilder, Carol told him to call her back "[o]nce you've calmed down and you're ready to pay . . . ." (*Id*.).

Mr. Wilder then called back and was directed to speak to Mr. Hanson. Mr. Wilder admitted that he used profanity towards Mr. Hanson and that Mr. Hanson volunteered to place Mr. Wilder in "do not contact" status (Dkt. No. 15, at 6). Mr. Hanson testified that he gave a "rote" statement to Mr. Wilder that he was going "to review this for possible legal action." (Dkt. No. 13-12, at 21). Three days later, on July 24, 2017, Mr. Wilder called Carol, and she told him that he had to pay in full or "we're done here." (*Id*., at 24). This was Mr. Wilder's final contact with Credit Control (Dkt. No. 15, at 6).

Based upon the context surrounding Carol's alleged statement, the Court concludes that this statement does not violate §§ 1692e, 1692e(5), or 1692e(10). First, even if Credit Control was not authorized to sue Mr. Wilder, the statement by Carol does not rise to the level of an explicit threat to begin litigation against Mr. Wilder, and an unsophisticated consumer would not interpret Carol's statement to be an explicit or implicit threat of immediate or ongoing litigation. Furthermore, even if Mr. Wilder thought that Carol's alleged statement was a threat to pursue litigation, he immediately called her back and spoke with her. In that conversation, Carol told him to call her back once he had calmed down and was willing to pay. Even to an unsophisticated consumer, this follow-up statement by Carol would have been understood as a willingness to continue discussing payment options.

Mr. Wilder then immediately called Credit Control back and was directed to Mr. Hanson, who offered to place Mr. Wilder in "do not contact" status and told him that the matter would be reviewed "for possible legal action." (Dkt. No. 13-12, at 21). Mr. Wilder then called Credit Control

back three days later, on July 24, 2017, casting doubt on any argument that he believed that his negotiations with Credit Control had ended and that Credit Control intended to pursue immediately litigation against him. Given this context, even an unsophisticated consumer would have understood that, at the time Carol made the alleged statement to Mr. Wilder, Credit Control had not yet decided to pursue litigation and was not threatening to commence immediately litigation.

Furthermore, to the extent Mr. Wilder asserts that Credit Control made a false, deceptive, or misleading threat to pursue litigation as a result of Mr. Hanson's statement that Mr. Wilder's matter would be reviewed "for possible legal action," the Court disagrees. The undisputed record evidence before the Court is that, after Mr. Wilder asked to be placed on "do not contact" status, Mr. Hanson warned him that his matter would be reviewed for "possible legal action." (Dkt. No. 13-12, at 21). Even construing this statement in the light most favorable to Mr. Wilder, this statement is not "literally false" nor was it a threat to take action "that cannot be legally taken." *See Wilhelm v. Credico, Inc.*, 519 F.3d 416, 419 (8th Cir. 2008) (reversing summary judgment in favor of creditor where the creditor made a threat to instigate litigation without informing the debtor that the debtor could dispute the debt and avoid litigation); *Peters*, 277 F.3d at 1056 (finding that a communication to a debtor that was not "literally false" did not violate § 1692e). Even an unsophisticated consumer would have understood Mr. Hanson's statement to mean that Credit Control had not yet decided to recommend or to pursue litigation.

Based upon this undisputed record evidence, the Court concludes that no reasonable juror could conclude that Credit Control, *via* Carol's alleged statement to Mr. Wilder or Mr. Hanson's statement to Mr. Wilder, made a false, deceptive, or misleading threat to pursue litigation against Mr. Wilder. The Court therefore grants summary judgment on Mr. Wilder's claims under 15 U.S.C. §§ 1692e, 1692e(5), and 1692e(10). The Court also grants summary judgment on Mr.

Wilder's claims under Arkansas Code Annotated §§ 17-24-506(a), 17-24-506(b)(5), and 17-24-506(b)(1), which are nearly identical to 15 U.S.C. §§ 1692e, 1692e(5), and 1692e(10).

### C. Claims Under 15 U.S.C. § 1692g and Arkansas Code Annotated § 17-24-508(a)

Credit Control moves for summary judgment on Mr. Wilder's claims under 15 U.S.C. § 1692g and Arkansas Code Annotated § 17-24-508(a). For the reasons discussed below, the Court grants Credit Control summary judgment on these claims.

Mr. Wilder contends Credit Control's May 25, 2017, letter, which contains a demand for payment and a verification rights notice, violates § 1692g and Arkansas Code Annotated § 17-24-508(a). Specifically, Mr. Wilder points out that, during the May 24, 2017, call between Carol and Mr. Wilder, Mr. Wilder informed her that his insurance would pay his debt and that Mr. Wilder later provided his insurance information to Carol. Mr. Wilder argues that Credit Control was therefore aware that MEMS would place a 45-day hold on Mr. Wilder's account, but Credit Control proceeded to send Mr. Wilder a letter on May 25, 2017, that included the notice required under § 1692g and a demand for payment. Mr. Wilder argues that Credit Control's demand for payment in full "was misleading and overshadowed Mr. Wilder's rights" under § 1692g and Arkansas Code Annotated § 17-24-508(a) (Dkt. No. 16, at 12).

Credit Control responds that its May 25, 2017, letter was fully compliant with § 1692g and that it was "absolutely accurate" to include a demand for payment in full in the same letter (Dkt. No. 18, at 11). Credit Control also argues that a "possible payment from an insurer does not mean that the plaintiff was excused from paying any part of the $888.75 he owed." (*Id*.). Credit Control asserts that, even though Mr. Wilder was insured, his insurance policy was only "a possible source of payment" but that it did "not guarantee any payment, much less payment in full." (*Id*. (emphasis omitted)).

Section 1692g states that:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collection shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
>
> > (1) the amount of the debt;
> >
> > (2) the name of the creditor to whom the debt is owed;
> >
> > (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
> >
> > (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
> >
> > (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a). Furthermore, the statute provides that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." *Id*. § 1692g(b). "Overshadowing or inconsistency occurs when a debt-collection letter conveys information in a confusing or contradictory fashion so as to cloud the required message with uncertainty." *Perry v. Trident Asset Mgmt., L.L.C.*, Case No. 4:14-cv-1004-SPM, 2015 WL 417588, at *5 (E.D. Mo. Feb. 2, 2015) (quoting *Founie v. Midland Credit Mgmt., Inc.*, Case No. 4:14-cv-816 RWS, 2014 WL 6607197, at *3 (E.D. Mo. Nov. 19, 2014) (internal quotation omitted)). Whether collection activities or communications within the 30-day validation period overshadow or are inconsistent with a validation notice is determined by applying the

"unsophisticated consumer" standard. *Glackin v. LTD Fin. Servs., L.P.*, Case No. 4:13-cv-00717 CEJ, 2013 WL 3984520, at *3 (E.D. Mo. Aug. 1, 2013). While the Eighth Circuit has not decided the issue, district courts in this circuit have "generally held that the issue of overshadowing can be determined as a matter of law where the facts are undisputed." *Perry*, 2015 WL 417588, at *6 (compiling cases). The Court will follow the same approach in this matter.

Mr. Wilder contends that Credit Control's May 25, 2017, letter, which contained a demand for payment and a § 1692g validation notice, overshadowed the § 1692g notice. Generally, district courts in this circuit have declined to find that a demand for payment overshadows a § 1692g validation notice where the deadline for the demanded payment falls outside of the 30-day dispute period set forth in the validation notice. *See Perry*, 2015 WL 417588, at *6 (holding that defendant's demand for payment did not overshadow the validation notice because there was no demand for immediate payment, no deadline for payment within the 30-day dispute period, and no threat of negative consequences if payment occurred outside of the 30-day period); *Founie*, 2014 WL 6607197, at *2-4 (holding that defendant's letter stating that it would be "very easy" to be "free of this debt" did not overshadow the validation notice in the same letter because there was no action demanded in the 30-day dispute period, nor were there threats of negative consequences if the debtor failed to pay within the 30-day dispute period); *see also Riess v. Messerli & Kramer, P.A.*, Case. No. 11–2307 (RHK/JJK), 2011 WL 5506290, at *4 (D. Minn. Nov.10, 2011) (holding that a letter sent during the 30-day dispute window that stated that it was important that the plaintiff contact defendant to arrange payment, but contained no demand for immediate payment or deadline for responding, did not overshadow or contradict the validation notice; emphasizing that "[n]othing in the . . . letter suggested that [the plaintiff] had to take action before the close of the 30-day window in order to avoid negative consequences"). Courts have held, however, that

overshadowing occurs where an unsophisticated consumer would believe that action was required in the 30-day dispute period. *See Schuller v. AllianceOnce Receivables, Mgmt., Inc.*, Case No. 4:15-cv-298 CDP, 2016 WL 427961, at *5-6 (E.D. Mo. Feb. 4, 2016) (finding that implying that a payment should be made within the 30-day period and that failure to do so would risk an unspecified negative consequence overshadowed the validation notice).

The May 25, 2017, letter from Credit Control to Mr. Wilder included the following language:

> We have been authorized by our client to demand payment in full.
>
> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you the name and address of the original creditor, if different from the current creditor.

(Dkt. No. 13-8). The letter also stated that the "Balance Due" was $888.75 (*Id.*). There is uncontroverted record evidence that Mr. Wilder incurred the $888.75 debt because of medical services he received on December 19, 2016, and that he signed an authorization to incur those charges. The fact that Mr. Wilder had insurance does not mean that he did not owe the $888.75 debt; the Court rejects Mr. Wilder's argument on this point. Further, there is no language in the May 25, 2017, letter that demands *immediate* payment or any payment within the 30-day dispute period. The letter contains no threat of adverse consequences to Mr. Wilder if he does not pay the debt within the 30-day period. There is nothing confusing or inconsistent about informing a consumer that he owes a debt and informing that consumer that he has 30 days to dispute the debt.

Since the May 25, 2017, letter would not have confused or mislead even an unsophisticated consumer about the rights outlined in the validation notice, the demand for payment in full did not overshadow the disclosures of Mr. Wilder's rights in the validation notice. Thus, no reasonable

juror could find that Credit Control violated § 1692g and Arkansas Code Annotated § 17-24-508(a) as alleged by Mr. Wilder, and therefore the Court grants Credit Control summary judgment on Mr. Wilder's claims pursuant to 15 U.S.C. § 1692g and Arkansas Code Annotated § 17-24-508(a).

## IV.     Conclusion

The Court grants Credit Control's motion for summary judgment (Dkt. No. 11).  The requested relief is denied.  The Court denies Mr. Wilder's motion *in limine* as moot (Dkt. No. 23).

It is so ordered this the 5th day of June 2019.

KRISTINE G. BAKER
UNITED STATES DISTRICT COURT JUDGE